Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| EL PUEBLO DE PUERTO RICO  Recurrido  Vs.  EDUARDO CORREA LÓPEZ  Peticionario | KLCE202100891 | *Certiorari* procedente del Tribunal de Primera Instancia, Sala Superior de Arecibo  Caso Núm.: CVI2007G0011 y otros  Sobre: Art. 106 (Asesinato en 1er grado) y otros |

Panel integrado por su presidente, el Juez Rodríguez Casillas, el Juez Rivera Colón y la Jueza Romero García.[1]

Rodríguez Casillas, juez ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 31 de marzo de 2023.

El señor Eduardo Correa López (señor Correa López o peticionario) nos solicita que revoquemos la *Resolución* emitida el 21 de mayo de 2021 por el Tribunal de Primera Instancia, Sala Superior de Arecibo (TPI),[2] que declaró no ha lugar una *Moción en Solicitud de Nuevo Juicio,* bajo la Regla 192 de Procedimiento Criminal.[3]

Examinada la petición, procedemos a expedir el auto de *certiorari* y confirmar la Resolución recurrida.

**-I-**

El **26 de febrero de 2008**, un jurado rindió un veredicto de culpabilidad (por mayoría de diez a dos) contra cada uno de los coacusados, el señor Correa López y el señor Tomás Delgado Nieves (señor Delgado Nieves o coacusado) por asesinato en primer grado y

---

[1] El 4 de febrero de 2022, la Ex Jueza Irene Soroeta Kodesh emitió una *Resolución de Inhibición.* Ello provocó que, en virtud de la Orden Administrativa OATA-2022-022, se asignó al Juez Rivera Colón para sustituirla. De otra parte, el 1 de marzo de 2023, la Hon. Giselle Romero García, mediante Orden Administrativa OATA-2023-040, sustituyó a la Hon. Gina Méndez Miró al dejar de ejercer funciones en este Tribunal de Apelaciones.
[2] Notificada el 25 de mayo de 2021.
[3] 34 L.P.R.A. Ap. II, R. 192.

uso ilegal de dos armas blancas —cuchillos— en la muerte de la señora Yadira Delgado Candelaria tras infligirle 108 heridas.

Así, el **6 de mayo de 2008** el TPI dictó la *Sentencia* contra cada uno de los coacusados, condenándolos a cumplir una pena de cárcel de 99 años por el delito de asesinato en primer grado del artículo 106 del Código Penal de 2004,[4] y 12 años por la violación al artículo 5.05 de la Ley de Armas de 2000,[5] para un total de 111 años en prisión.

Inconformes, el **4 de junio de 2008** el señor Correa López y el coacusado Delgado Nieves presentaron sendas apelaciones ante el Tribunal de Apelaciones que fueron consolidades con los números de casos: KLAN200800865 y KLAN200800866.[6] En lo que respecta al peticionario se le asignó el número de caso KLAN200800866.

Ante este Foro Apelativo, se le imputó al TPI la comisión de los siguientes seis (6) errores:

> Erró el Honorable Tribunal de Primera Instancia al declarar No Ha Lugar a las solicitudes de descubrimiento de prueba hechas por la defensa, colocando al acusado en un estado de indefensión y violentándosele su derecho a adecuada representación legal y a un juicio justo e imparcial.

> Incurrió el Ministerio Público en conducta impropia (*prosecutorial misconduct*) y en una flagrante violación al derecho constitucional del apelante a un debido proceso de ley al no proveer el descubrimiento de prueba que le fuera oportuna y reiteradamente solicitado y aún más, al ocultarle a la defensa la existencia de varias muestras de cabello recuperadas en el cuerpo de la víctima, a las cuales se le negó además el estado a realizarle pruebas de ADN.

> Erró el Honorable Tribunal al permitir la seria violación del derecho del apelante a un debido proceso de ley, al negarse a decretar la disolución del jurado (*mistrial*) y al negarse además a proveer un remedio adecuado al apelante para subsanar la violación perpetrada por el Estado contra el derecho constitucional del acusado y al no permitir que se realizaran las pruebas de ADN a los cabellos encontrados en el cuerpo de la víctima, aun cuando ello era responsabilidad del Ministerio Público, la defensa ofreció sufragar el gasto de

---

[4] Para la fecha de los hechos, el Código Penal vigente era el *Código Penal de 2004* aprobado mediante la Ley Núm. 149 de 18 de junio de 2004. Véase el derogado *Código Penal de 2004*, 33 L.P.R.A. sec. 4734.

[5] De igual modo, para la fecha de los hechos, estaba vigente la derogada Ley 404 de Armas de Puerto Rico. 25 LPRA sec. 460b. La pena de armas fue duplicada, conforme al artículo 7.03 de la misma ley.

[6] Mediante Resolución de 1 de julio de 2008, el caso KLAN2008-0866 fue consolidado con el caso presentado por el coacusado Delgado Nieves, correspondiente al número KLAN2008-0865.

las mismas. Erró además el Honorable Tribunal al permitir el testimonio pericial de un testigo no cualificado como tal y con cuyo testimonio pretendió el Estado sustituir el análisis y resultado de una prueba científica.

Erró el Honorable Tribunal al actuar con pasión, prejuicio y parcialidad en contra del apelante: interferir indebidamente durante los testimonios de los principales testigos de cargo, mediatizando y dirigiendo las respuestas, sustituyendo su apreciación de la prueba por la que venía obligado a realizar el jurado e influenciando indebidamente al jurado con una actitud parcializada.

Erró el Honorable jurado al no conceder al apelante el beneficio de la duda razonable, ante la totalidad de la prueba desfilada por el Ministerio Público: al dar crédito a los testimonios inverosímiles, acomodaticios y contradictorios entre sí de los principales testigos de cargo; al no darle credibilidad a los testigos de defensa, cuando ésta no fue impugnada ni refutada por el Ministerio Público.

Erró el Honorable Jurado al encontrar culpable al apelante de los cargos instruidos por haber habido total insuficiencia de prueba para sostener las mismas acusaciones presentadas y erró el Tribunal al denegar la moción de absolución perentoria presentada por la defensa cuando existía insuficiencia de prueba y más aun no habiéndose identificado el cadáver conforme a derecho.[7]

El **13 de mayo de 2010**, el Tribunal de Apelaciones emitió una Sentencia en los casos KLAN200800865 y KLAN200800866 confirmando las convicciones antes mencionadas. En cuanto a los señalamientos de error relativos a la suficiencia de la prueba y la apreciación de los hechos que hizo el jurado para encontrar a los coacusados culpables más allá de duda razonable,[8] este Foro Intermedio, resolvió que:

Aplicada la doctrina expuesta al caso de marras, debemos concluir que la prueba presentada por el Ministerio Público y admitida en evidencia en el juicio fue suficiente para encontrar culpable más allá de duda razonable a ambos acusados. **El testimonio irrefutado de la niña Shakira – hija de la víctima y del acusado--, ofreció prueba demostrativa de que quienes estaban en el lugar de los hechos el día y hora del cruel asesinato de Yadira fueron los apelantes Tomás y Eduardo**. Si bien su testimonio no aportó prueba directa de la comisión del delito, **su naturaleza circunstancial, debidamente corroborada con extensa prueba adicional, no dejó dudas en el Jurado de que Tomás y Eduardo fueron los que ultimaron de 118 puñaladas a Yadira.[9]** A ese dictamen, libre de pasión,

---

[7] Véase, la *Sentencia* de 13 de mayo de 2010 en los casos KLAN200800865, *El Pueblo de Puerto Rico v. Tomás Delgado Nieves*, y, KLAN200800866, *El Pueblo de Puerto Rico v. Eduardo Correa López*, a la pág. 2.

[8] Véase, la Sentencia de 13 de mayo de 2010 en los casos KLAN200800865, *El Pueblo de Puerto Rico v. Tomás Delgado Nieves*, y, KLAN200800866, *El Pueblo de Puerto Rico v. Eduardo Correa López*, a la pág. 3.

[9] Cabe aclarar que del expediente se desprende que fueron 108 puñaladas y no 118. Énfasis nuestro.

prejuicio o error manifiesto, ofrecemos nuestra mayor deferencia y no habremos de variar su resultado.[10]

En cuanto al señalamiento de error relacionados a la ausencia de análisis tricológico y ADN de los pelos recuperados en la occisa dentro de la escena del crimen, el Tribunal Apelativo resolvió:

> En el caso ante nos, el I.C.F. no hizo análisis tricológicos ni de A.D.N. a los cabellos levantados en la occisa. Ahora bien, los documentos relacionados al análisis realizado por el señor Fernando Mercedes en cuanto a los referidos cabellos, fueron puestos a disposición de la Defensa a la luz del deber continuo del Ministerio Público de descubrir prueba. **A base de ello, la Defensa pudo contrainterrogar extensamente a dicho testigo y el Jurado estuvo en posición de determinar el valor probatorio que habría de darle al análisis microscópico[11] realizado**. Conoció además, que toda la prueba científica del Ministerio Público --incluyendo los cabellos--, pertenecían a la occisa y no a los acusados. La Defensa no exigía se descubriera prueba que el Ministerio Público tuviera disponible, sino que se hicieran, por primera vez, unas pruebas de análisis tricológico o de A.D.N., que ni el Ministerio Público, ni los investigadores ni el I.C.F. mandaron a realizar. **Ello así, nunca estuvo en estado de indefensión pues la prueba de los cabellos pasó al Jurado, así como el hecho de que no se hicieron pruebas tricológicas o de A.D.N. que conectaran a los acusados con los referidos cabellos**.[12]

En lo concerniente al señalamiento de error de que el TPI interfirió indebidamente durante los testimonios de los principales testigos de cargo dirigiendo las respuestas e influenciando indebidamente al jurado con una actitud parcializada. Este Foro Intermedio resolvió:

> En el caso de marras, Tomás y Eduardo señalan que la Juez intervino "continuamente" durante el juicio y dirigió los interrogatorios directos del fiscal y las contestaciones de los testigos para luego resolver controversias evidenciarias. **No aluden en su discusión, a instancias específicas en las cuales la Juez actuó de forma impropia. Tampoco exponen en qué forma específica dichas intervenciones le lesionaron algún derecho.** Ciertamente, con meras vaguedades y generalidades los apelantes no nos colocan en posición de determinar si dichas intervenciones constituyeron un menoscabo a su derecho a un juicio justo e imparcial. El mero hecho de la participación activa de la jueza no es sinónimo de que estuviera parcializada en contra de los apelantes. Tampoco procede, en esta etapa apelativa, plantear por primera vez la supuesta parcialidad de la jueza,

---

[10] Véase, la Sentencia de 13 de mayo de 2012, de los casos consolidados KLAN200800865, *El Pueblo de Puerto Rico v. Tomás Delgado Nieves*, y, KLAN200800866, *El Pueblo de Puerto Rico v. Eduardo Correa López,* a la pág. 25.
[11] Lo correcto debe ser análisis **macroscópico** y no microscópico.
[12] Véase, KLAN200800865, *El Pueblo de Puerto Rico v. Tomás Delgado Nieves*, y, KLAN200800866, *El Pueblo de Puerto Rico v. Eduardo Correa López,* a las págs. 38 y 39. Énfasis nuestro.

si no lo plantearon directamente al Tribunal de Instancia o sin solicitar su inhibición.[13]

El **21 de enero de 2011** el Tribunal Supremo de Puerto Rico denegó el auto de *certiorari* para revisar la Sentencia de este Tribunal confirmando la sentencia condenatoria dictada en este caso.[14]

El **29 de octubre de 2012**, el señor Correa López y el coacusado Delgado Nieves presentaron una *Moción Sobre Representación Legal Adicional; Solicitando se Ordene la Celebración de un Nuevo Juicio y en Solicitud de Remedios Urgentes*. En resumen, adujeron el descubrimiento de nueva prueba, consistente en que la testigo menor de edad, Shakira Delgado Delgado prestó una declaración jurada ante el Notario Rafael Cardona Campos, retractándose del testimonio original que brindó en el juicio. El **26 de noviembre de 2012**, el Ministerio Público se opuso a lo solicitado.

El **24 de octubre de 2013** TPI denegó la solicitud de nuevo juicio, luego de celebrar varias vistas, por lo que razonó de la siguiente forma:

> "A la luz de las circunstancias propias del caso, el nuevo testimonio de Shakira Delgado Delgado mediante declaración jurada, ello no provoca en este juez **graves dudas** en cuanto a la veracidad o certeza de las declaraciones vertidas por el testigo en el juicio anterior puesto que esta se rectifica en el contenido de su declaración original del juicio. La alegada retractación no ha ocurrido en circunstancias tales que me ofrezcan cierta garantía de confiabilidad. **Más bien es una retractación genérica, inducida.**
> Con el conocimiento de la prueba del juicio original y la traída a nuestra atención durante ese nuevo proceso, sostenemos un fallo de culpabilidad contra ambos convictos. La defensa no cumplió con los criterios para la concesión de un nuevo juicio establecidos por el Tribunal Supremo. El testimonio de la testigo retractada fue uno de reafirmación de su testimonio en el juicio original que un juzgador aquilató y encontró culpable a ambos convictos por el delito de Asesinato en 1er grado y Ley de Armas." Resolución de 24 de octubre de 2013, a las págs. 14 a 15. (Énfasis en el original).[15]

---

[13] Véase, KLAN200800865, supra, a la pág. 41. Énfasis nuestro.

[14] Véase, Tribunal Supremo de Puerto Rico, CC-2010-0603, KLAN200800865.

[15] Véase, Resolución recurrida, a la pág. 7 del Apéndice del recurso. Cabe mencionar que esta Resolución fue suscrita por la Hon. Mabel Ruiz Soto, QEPD, quien sustituyó al Hon. Juan Reyes Caraballo a principio del juicio por jurado, ya que este se acogió al retiro.

El **28 de octubre de 2014**, el Tribunal de Apelaciones confirmó la denegatoria a la moción de nuevo, en el caso núm. *KLCE201301427, El Pueblo de Puerto Rico v. Tomás Delgado Nieves y Eduardo Correa López*. Atendió los errores señalados por los coacusados, relativo a las múltiples versiones que la menor Shakira Delgado Delgado había dado en el caso original, y que alegaban, hacía que su testimonio en la vista evidenciaria no goza de credibilidad alguna, pues era una testigo mendaz, que cambia sus versiones según las circunstancias. Al respecto, el Tribunal de Apelaciones resolvió:

> SDD testificó que su padre la llamó desde la cárcel **insistentemente** por un periodo de tiempo con el propósito de que redactara una carta retractándose de su testimonio original. La menor detalló dichas llamadas y precisó como su tío y su hermano colaboraron para prestar una declaración jurada ante el notario Cardona Campos. Quedó demostrado que la retractación ocurrió extrajudicialmente, al margen del ambiente solemne de un tribunal y a instancias de partes interesadas. Además, la declaración jurada se prestó **sin la presencia de su tutora legal, el Ministerio Público, ni nadie que le supliera la capacidad jurídica para declarar o simplemente que la protegiera**. A eso se añade que durante la vista para considerar la moción de nuevo juicio SDD, quien contaba con poco más de quince (15) años, declaró que **se retractó por voluntad de su padre**. Del mismo modo, sostuvo que la verdad de lo sucedido fue lo que declaró en el juicio que culminó con la convicción de su padre y Eduardo Correa López, así como lo declarado ante el fiscal Edwin López Pérez en noviembre de 2012. Del anterior análisis entendemos que **la menor SDD fue presionada por su padre a través de sinnúmero de llamadas a su teléfono celular. Asimismo, ostentaba una orden de protección contra su hermano Tomás Jr., por lo que podemos colegir que fue vulnerable y posiblemente se sintió intimidada por sus propios familiares paternos**. Son precisamente estas posibles circunstancias, junto a la ausencia de su tutora legal, las que le restan confiabilidad a la declaración jurada de SDD vertida ante el notario Cardona Campos.[16]

En esa misma línea, tanto el TPI como este Foro Intermedio le dieron gran peso a la carta redactada a puño y letra por la testigo Shakira Delgado Delgado a la edad de diez (10) años y que estaba dirigida a su padre, el coacusado Tomás Delgado Nieves.

Así se expresó este Foro Apelativo:

---

[16] *KLCE201301427, El Pueblo de Puerto Rico v. Tomás Delgado Nieves y Eduardo Correa López*, a las págs. 18-19. Énfasis nuestro.

Cónsono con lo anterior, el TPI le dio gran peso a una primera carta redactada por SDD en puño y letra. La misma leía de la siguiente manera:

PAPI TE QUIERO MUCHO Y YO ESTOY MUY BIEN POR ESO NO TE PREOCUPES YO ESTOY BIEN Y YO TE SIGO QUERIENDO MUCHO Y PORQUE TU MATASTES [sic] A MI MADRE LA UNICA QUE TENIA AHORA YO TENGO 10 AÑOS I [sic] ME SIENTO ORGULLOSA DE LO QUE YO A EC [sic] HOY ME GUSTARIA SABER SI ESTAYS [sic] BIEN Y CUANTOS AÑOS TIENES YAINOMEMIENTAS [sic] POR FABORY [sic] GRACIAS TE QUIERO SHAKIRA DELGADO DELGADO FIRMA SHAKIRA DELGADO.[17]

Esta carta la redactó SDD un año más tarde de haber testificado en el juicio contra los peticionarios. Al tribunal de primera instancia le dio confiabilidad el hecho de que **la carta se hizo del recuerdo contemporáneo de SDD y sin ninguna intervención o propósito que no fuera el de hacerle una postal a su padre**. No se presentó prueba de que la menor hubiera sido influenciada por terceras personas. **Concurrimos con el análisis del TPI. Vale la pena recordar que mediante la carta SDD confirma su testimonio original vertido en el juicio**.[18]

En cuanto a la declaración jurada tomada a la menor Shakira Delgado por el notario Rafael Cardona Campos, el Tribunal Apelativo lo refirió al Tribunal Supremo de Puerto Rico y a la Oficina de Inspección de Notarías (ODIN), y concluyó que, dicha declaración jurada no gozó de confiabilidad ni credibilidad alguna:

Con relación a la declaración jurada suscrita ante el notario Cardona Campos, éste declaró que se reunió a solas con SDD para cerciorarse de la voluntariedad de su testimonio. **No obstante, notamos que el TPI miró con recelo y sospecha la forma en que se le tomó la declaración jurada de retractación. Ante estas expresiones dirigidas específicamente al rol de notario de Cardona Campos, referimos dicho asunto al Tribunal Supremo de Puerto Rico y a la Oficina de Inspección de Notarías (ODIN) para que de ser necesario, lo evalúe**.
Para concluir, entendemos que la *Resolución* impugnada es correcta en derecho. Si bien la retractación de SDD denotó cierta inconsistencia provocada por partes interesadas, ello no fue base suficiente para ordenar la celebración de un nuevo juicio. **La juez de instancia dilucidó la moción y tras la celebración de la vista entendió que la declaración jurada no gozó de confiabilidad ni credibilidad alguna.**[19]

---

[17] Apéndice del recurso, a la pág. 13.
[18] Véase, *KLCE201301427, El Pueblo de Puerto Rico v. Tomás Delgado Nieves y Eduardo Correa López*, a las págs. 19-20. Énfasis nuestro.
[19] Cabe indicar que el Tribunal Apelativo hace suyo unas expresiones del TPI vertidas en la *Resolución* del 24 de octubre de 2013, a la pág. 16. Las cuales cita en la nota al calce núm. 31 de su Resolución *KLCE201301427*, a la pág. 21, y leen de la siguiente manera:

A nuestro juicio, la actuación notarial del Lcdo. Cardona Campos arroja serias dudas sobre si se actuó dentro del marco de la Ley Notarial y Ética. La Transparencia del proceso notarial a nuestro modo de ver debe caracterizarse de forma tal que no arroje dudas sobre nuestras actuaciones profesionales, máxime cuando en la actuación notarial representamos a nuestro Tribunal Supremo. La

Transcurrido casi dos años desde que el Tribunal de Apelaciones confirmó la denegatoria de nuevo juicio,[20] el **26 de octubre de 2016**, el señor Correa López presentó ante el TPI una *Petición Urgente Solicitando Análisis de ADN al Amparo de la Ley Núm. 246 de 29 de diciembre de 2015*.[21] En virtud de la *Ley de Análisis de ADN Post Sentencia* (Ley 246-2015),[22] el peticionario solicitó que se realizaran exámenes de ADN a una evidencia ocupada en la escena del crimen. En específico, el *Exhibit S* del Ministerio Público admitido en el juicio consistente en un sobre que contenía un pelo recuperado en la pared saliendo del baño de la residencia donde ocurrió el asesinato; y, el *Exhibit V* del Ministerio Público, también admitido en el juicio, y que correspondía a siete sobres conteniendo pelos recuperados en el cuerpo de la occisa.[23]

Luego de varios trámites,[24] mediante Resolución emitida el **16 de octubre de 2017**,[25] el TPI ordenó al Instituto de Ciencias Forenses (ICF) a realizar los exámenes de ADN correspondientes y notificar a las partes y al foro *a quo* los resultados de estos. Específicamente, dispuso como sigue:

> A partir del momento en que el Instituto de Ciencias Forenses tenga la evidencia identificada como Exhibit "S" y "V" del Ministerio Público, *se ordena realice análisis tricológicos de la evidencia descrita*, para determinar si estos tienen folículos para la realización de un análisis de ADN nuclear, En la alternativa, de que se determine que los pelos no tienen folículos, deberán realizarse los análisis de tipo mitocondrial. Una vez obtenidos los resultados de estos análisis, se ordena los mismos sean comparados con el perfil genético de Yadira Delgado Candelaria; Tomás Delgado Nieves y Eduardo Correa López.[26]

---

forma y la manera de cómo se tomó la declaración jurada del 13 de septiembre de 2012 atenta contra los principios más básicos de la prudencia, la lógica y la Ley Notarial.

[20] Los coacusados no recurrieron al Tribunal Supremo en el caso *KLCE201301427, El Pueblo de Puerto Rico v. Tomás Delgado Nieves y Eduardo Correa López.*

[21] El coacusado, *Tomás Delgado Nieves* no se unió a la solicitud.

[22] Ley Núm. 246 de 29 de diciembre de 2015, según enmendada. 34 L.P.R.A. Sec. 4021 *et als.*

[23] Véase, a las págs. 120-121 del Apéndice del recurso.

[24] En la que se llevó a cabo una vista el 28 de febrero de 2017.

[25] Véase, la Resolución de 16 de octubre de 2017, a las págs. 117-145 del Apéndice del recurso. Dicha resolución fue suscrita por la Hon. Heidi Kiess Rivera, quien atendió la petición, así como los incidentes posteriores relacionados.

[26] Véase, a la pág. 145 del Apéndice del recurso. Énfasis en el original.

El **19 de diciembre de 2017** el TPI celebró una vista para entregar en corte abierta a funcionarios del ICF de los Exhibit S y V.[27] Además, las partes acordaron entregar para su examen el *Exhibit U* del Ministerio Público, correspondiente a cabellos que fueron removidos de la cabeza de la occisa, y el *Exhibit Ñ* por estipulación, correspondiente al colector bucal del coacusado Tomás Delgado Nieves.[28]

Así, el **9 de marzo de 2018**, se celebró un vista de seguimiento en la que, luego de escuchar el testimonio del serólogo del ICF, Roberto López Arroyo, el TPI ordenó que los cabellos fueran analizados bajo la prueba de ADN Mitocondrial en el laboratorio escogido por las partes.[29]

El **4 de abril de 2018** el TPI celebró una vista en la que se entregó el Informe del ICF, titulado: *Certificado de Análisis Forense de ADN*, preparado el 3 de abril de 2018 por Roberto López Arroyo —serólogo del ICF—. Allí, se expresó que 16 cabellos de evidencia y 3 muestras de referencias, para un total de 19 muestras, se enviarían a un laboratorio para la realización de un análisis mitocondrial. En consecuencia, en la vista del **11 de mayo de 2018** se notificó que esa evidencia fue enviada al Laboratorio "Serological Research Institute" (SERI), donde el serólogo forense, Phillip Hopper confirmó su recibo. Finalmente, en la vista del **5 de octubre de 2018** se informó que el 3 de octubre de 2018 el SERI emitió el

---

[27] El Tribunal se cercioró de preservar la cadena de custodia de la evidencia entregada. Según se desprende de la Minuta de esta vista, comparecieron por parte del ICF los funcionarios Carmen Tirado, directora del Laboratorio del Área Criminalística, Mireya Hernández y Pedro J. Castro Morales, Investigador Forense. Este último fue el encargado de recibir las piezas evidenciarias.

[28] Sobre esta prueba se informó por el ICF sobre la deseabilidad de volver a tomar una prueba adicional al coacusado convicto, Delgado Nieves. No obstante, en vista de la ausencia de este y su representante legal en el proceso, el TPI dispuso que se realizara la comparación ordenada con la muestra ya obtenida y analizada. Por lo que, del Estado entender que era imperativo tomar una muestra bucal adicional, tenía que notificar a todas las partes para el TPI disponer. Igualmente, el TPI expresó que, de requerirse cualquier otra muestra, debían solicitarlo por escrito, notificarlo a todas las partes y el tribunal resolvería oportunamente. Véase, Minuta de 19 de diciembre de 2017.

[29] El serólogo Roberto López Arroyo testificó que en algunos de los sobres correspondientes al Exhibit V había más de un solo cabello, así como que del Exhibit "S" surgían dos cabellos.

reporte de los resultados de las pruebas de ADN Mitocondrial y de la entrega a las partes de los referidos resultados.

El **2 de noviembre de 2018**, señor Correa López presentó una segunda *Moción en Solicitud de Nuevo Juicio*,[30] al amparo de la Regla 192 de Procedimiento Criminal.[31] Conforme a los resultados de los análisis de ADN antes informados, solicitó la celebración de un nuevo juicio debido al descubrimiento de nueva prueba "exculpatoria" que contravenía el veredicto dictado el 6 de mayo de 2008.[32] En lo pertinente, hizo una reseña de resultados de los análisis de ADN que a continuación plasmamos:

> 26. Así las cosas, los **dieciséis (16) pelos** enumerados en el párrafo anterior fueron sometidos a análisis de ADN mitocondrial en Serological Research Institute ("SERI"). El 5 de octubre de 2018, el NCF, quien contrató y pagó la realización de análisis de ADN mitocondrial con SERI, notificó en corte abierta el *Analytical Report* fechado el 3 de octubre de 2018 por el serólogo forense III Philip Hopper, de SERI.
>
> 27. Las conclusiones del referido *Analytical Report* son las siguientes:
>
>> a. No se obtuvo resultados para los siguientes 7 pelos de dieciséis (16) enviados a SERI para análisis de ADN mitocondrial: **1 pelo** de dos (2) recuperados del muslo izquierdo de la víctima, **1 pelo** recuperado del tórax de la víctima y **3 pelos** seis (6) analizados de la mano izquierda de la víctima.
>> b. **1 pelo** de los dos (2) recuperados del muslo izquierdo de la víctima, **3 pelos** de los seis (6) analizados de la mano izquierda de la víctima y un pelo de los tres (3) recuperados del brazo izquierdo de la víctima presentan a misma secuencia de ADN mitocondrial. Con

---

[30] Con la Moción en Solicitud de Nuevo Juicio se acompañaron los siguientes documentos:
- Anejo A- Certificado de Análisis Forense de ADN de 3 de abril de 2018 realizado por Roberto López Arroyo, serólogo Forense del ICF.
- Anejo B- "Analytical Report" de 3 de octubre de 2018 realizado por Phillip Hopper del SERI.
- Anejo C- Declaración Jurada de Shakira Delgado Delgado de 13 de septiembre de 2012. **[Retracción del testimonio en el juico].**
- Anejo D- Declaración Jurada Entrevista Juramentada de Shakira Delgado de 15 de noviembre de 2012. **[Retracción de la declaración jurada del 13 de septiembre de 2012].**
- Anejo E- Correos electrónicos entre Mireya Hernández Arroyo, del ICF y Phillip Hopper del SERI.

[31] 34 LPRA Ap. II, R. 192.

[32] Véase, Moción en Solicitud de Nuevo Juicio y sus anejos, a las págs. 146-217 del Apéndice del recurso.

excepción de heteroplasmia,[33] la secuencia de ADN presente en dichos pelos es la misma secuencia establecida para la dama víctima. Por lo tanto, Yadira Delgado Candelaria (o algún pariente dentro de su línea materna) podría ser la donante de los referidos pelos. La secuencia de ADN mitocondrial obtenida de estos cinco (5) pelos difiere de la secuencia de ADN mitocondrial establecida para el Peticionario en una sola posición. Por lo tanto, el resultado es inconcluso en cuanto a si el Peticionario (o algún pariente dentro de su línea materna) pudiera ser el donante de dichos pelos.

c. **1 pelo** recuperado del muslo derecho de la víctima presenta una secuencia de ADN mitocondrial parcial. Con excepción de heteroplasmia, la secuencia de ADN presente en dicho pelo es la misma secuencia establecida para Yadira Delgado Candelaria. Por lo tanto, Yadira Delgado Candelaria (o algún pariente dentro de su línea materna) podría ser la donante de los referidos pelos. La secuencia de ADN mitocondrial parcial obtenida de este pelo difiere de la secuencia de ADN mitocondrial establecida por el Peticionario en una sola posición. Por lo tanto, el resultado es inconcluso en cuanto a si el Peticionario (o algún pariente dentro de su línea materna) pudiera ser el donante de dichos pelos.

d. **1 pelo** recuperado en el antebrazo derecho de la víctima presenta una secuencia de ADN mitocondrial parcial. Con excepción de heteroplasmia, la secuencia de ADN presente en dicho pelo es la misma secuencia establecida para Yadira Delgado Candelaria. Por lo tanto, Yadira Delgado Candelaria (o algún pariente dentro de su línea materna) podría ser la donante de los referidos pelos. La secuencia de ADN mitocondrial parcial obtenida de este pelo difiere de la secuencia de ADN mitocondrial establecida para el Peticionario en una sola posición. Por lo tanto, el resultado es inconcluso en cuanto a si el Peticionario (o algún pariente dentro de su línea materna) pudiera ser el donante de dichos pelos.

---

[33] Heteroplasmia es la presencia de más de un tipo de genoma dentro de una célula o un individuo.

e. **2 pelos** levantados en la pared que se encuentra saliendo del baño, a mano izquierda, presentan la misma secuencia de ADN mitocondrial; la cual difiere, en varias posiciones, de la secuencia de ADN mitocondrial del Peticionario y de la víctima, Yadira Delgado Candelaria. **Por lo tanto, tanto el Peticionario como la dama víctima, Yadira Delgado Candelaria, están excluidos de ser los donantes de dichos pelos.** Resulta importante subrayar y recordar que, además de que dichos 2 pelos provienen de una persona desconocida distinta de la víctima y del Peticionario, <u>los mismos fueron levantados de la pared que se encuentra saliendo del baño, lugar desde donde, según el testimonio de la menor Shakira, provenían los gritos de su madre durante la madrugada del 29 de noviembre de 2006.</u> Asimismo, en múltiples ocasiones durante el juicio, tanto los fiscales como los testigos hicieron referencia a dichos pelos, convirtiéndose estos en parte integral del caso del Ministerio Público.[34] Énfasis original.

Conforme a los resultados antes reseñados, señor Correa López hizo un análisis de cómo esa nueva prueba "exculpatoria" debía interpretarse para concederle un nuevo juicio:

28. Huelga explicar, además, que las secuencias de ADN mitocondrial de los pelos descritos en el párrafo 26 anterior, incisos b, c y d, son iguales a y compatibles únicamente con la secuencia de ADN mitocondrial de la dama víctima, Yadira Delgado Candelaria; no con el perfil genético o secuencia de ADN mitocondrial establecida para el Peticionario. En el *Analytical Report*, el serólogo forense Philip Hopper indica que la secuencia de ADN mitocondrial, completa o parcial, obtenida para dichos pelos difiere de la secuencia de ADN mitocondrial establecida para el Peticionario <u>en una sola posición</u> y que, por consiguiente, es inconcluso si el Peticionario (o algún pariente dentro de su línea materna) pudiera ser la fuente de dichos pelos. No obstante lo anterior, ello no significa que dichos pelos pudieran pertenecer a Eduardo. La conclusión de los análisis de dichos pelos es que su secuencia de ADN mitocondrial y aquélla establecida para la víctima (o algún pariente dentro de su línea materna) son la misma; y que, en el caso del Peticionario, hay una sola diferencia entre su secuencia de ADN mitocondrial y aquella extraída a los pelos analizados

29. Por lo tanto, si los pelos tienen la misma secuencia de ADN de la víctima y, en su consecuencia, revelan que Yadira (o algún pariente dentro de su línea materna) podría ser la

---

[34] Véase, *Moción en Solicitud de Nuevo Juicio*, a las págs. 156-157 del Apéndice del recurso.

donante de los pelos; mientras entre la secuencia de ADN mitocondrial de los pelos y aquella establecida para el Peticionario existe, sin lugar a dudas, por lo menos una diferencia, ¿por qué son inconclusos los resultados de dichos pelos en cuanto al Peticionario (o algún pariente dentro de su línea materna)? Mediante correo electrónico de 24 de julio de 2018, enviado por el señor Philip Hopper, serólogo forense de SERI responsable de realizar los análisis de ADN mitocondrial en el caso de epígrafe, a la señora Mireya Hernández, directora del Laboratorio de ADN del NCF, ello se debe a lo siguiente:

> The SWGDAM guidelines (and our guidelines too) say that in order for an exclusion to be Reported there must be more than one difference in the mito sequence. If one of the Evidence hairs matches Yadira, I will say it matches her, but the result for Eduardo would be inconclusive. I would not be able to say that he is excluded as the source of the hair. In a similar way if a hair matches Eduardo I will say it matches him, but for Yadira it will be inconclusive and not an exclusion. However if one of the hairs from Yadira has a 237G mutation (and not the heteroplasmy) then it would have two differences from Eduardo and would be an exclusion for him. Of course if there are hairs that have more than two differences from Yadira and Eduardo, they will both be excluded which is probably still important to know.

Véase Anejo E de la presente Moción. Así pues, los protocolos y guías que rigen los análisis de ADN mitocondrial identifican aquellos resultados que arrojan menos de 2 diferencias en la secuencia de ADN como inconclusos. Pero, para todos los efectos prácticos, aquellos pelos cuya secuencia de ADN mitocondrial es la misma secuencia de la víctima, aunque para efectos de protocolos científicos el resultado en cuanto al Peticionario se identifique como inconcluso, lo cierto es que los pelos son compatibles única y exclusivamente con la víctima. Ello resulta muy relevante en Puerto Rico, donde resulta muy alta la posibilidad de que los antepasados de muchos ciudadanos, que quizás ni siquiera se conocen, pertenezcan a una misma línea materna.

30. Así las cosas, al igual que los resultados de análisis de ADN nuclear divulgados en el Certificado de Análisis Forense del NCF, según se desprende incontrovertiblemente del *Analytical Report* preparado por SERI y fechado el 3 de octubre de 2018, en las piezas de evidencia sometidas a análisis de ADN mitocondrial que arrojaron resultados concluyentes no sólo <u>hay ausencia de material genético (ADN) del Peticionario</u>, sino que en dos de dichas piezas de evidencia, los **2 pelos** levantados de la pared que encuentra saliendo del baño, <u>hay material genético perteneciente a una persona que no es la víctima ni el Peticionario</u>, probablemente el verdadero asesino.

31.      De otra parte, el hecho de que en la escena del crimen, específicamente en la pared que se encuentra saliendo del baño, a la izquierda, se haya levantado **2 pelos** que contienen material genético perteneciente a una persona que no es la víctima ni el Peticionario cobra mayor relevancia y

particular importancia, primeramente, por el área en dónde se encontró los mismos: cerca del marco de la puerta del cuarto de la víctima, dónde su cuerpo sin vida fue hallado. En segundo lugar porque, según transcendió de la investigación, del expediente y de los testimonios vertidos en el juicio en su fondo, luego de que el Peticionario dejara a Tomás en la casa de sus abuelos, Tomás alegó haber escuchado ruidos y que, al asomarse por la ventana de su cuarto, desde donde se veía la casa de la víctima, Tomás vio un hombre salir de la casa y retirarse en el carro color vino que tanto él como el Peticionario habían visto previamente. Según Tomás, unos quince (15) minutos más tarde, vio llegar otro vehículo, el cual se estacionó cerca de la casa de su primo, que quedaba cerca de la casa de la Sra. Delgado, y del cual se bajaron tres personas; una mujer de pelo largo y dos hombres.[35]

En conclusión, el señor Correa López aduce que, de haberse presentado esa nueva prueba en el juicio original, muy probablemente el resultado hubiese sido diferente, ya que la misma contradecía irrefutablemente el testimonio de la testigo principal del caso, la menor Shakira Delgado Delgado, y de quien, nuevamente, señaló había brindado varias versiones de los hechos.

En cumplimiento de orden, el **12 de diciembre de 2018**, el Ministerio Público presentó una *Oposición a Moción en Solicitud de Nuevo Juicio*.[36] Adujo que los resultados de ADN Mitocondrial no hacían que fuese más probable que el convicto hubiera sido inocente que culpable en el juicio original. Además, arguyó que, contrario a lo alegado por el convicto, los resultados de los análisis de ADN no lo excluían científicamente como donante de los cabellos ocupados en el cuerpo de la víctima. En específico, el Pueblo destacó la diferencia entre una muestra de ADN mitocondrial con un resultado de exclusión *versus* uno inconcluso:

> Así, una persona puede ser excluida de manera definitiva como donante de un pelo solamente cuando las muestras de ADN examinadas difieren en dos (2) o más posiciones en la secuencia de ADN mitocondrial. Ello, puesto la diferencia es una sola secuencia puede ser consecuencia de la heteroplasmia. *Scientific Working Group on DNA Analisys Methods Interpretation Guidelines for Mitochondrial DNA Analysis by Forensic DNA Testing Laboratories*. Si la secuencia de las muestras de ADN mitocondrial se diferencia en una sola posición, el resultado se entiende inconcluso y

---

[35] Véase, Moción en Solicitud de Nuevo Juicio, a las págs. 157-158 del Apéndice del recurso.

[36] Véase, Oposición a Moción en Solicitud de Nuevo Juicio, a las págs. 217-243 del Apéndice del recurso.

la persona no puede ser descartada como donante del material genético. Por ende, si no hay diferencias en las secuencias de ADN mitocondrial examinadas, o si solamente hay diferencia en una secuencia, la persona no puede ser excluida como donante del pelo examinado.

Con esa información, el Ministerio Público procede aplicarla a las pruebas efectuadas en este caso:

En el presente caso, los resultados de las pruebas efectuadas por SERI el 3 de octubre de 2018 reflejaron que en cinco (5) pelos levantados del cuerpo de la víctima, la secuencia de ADN mitocondrial difirió de la secuencia de ADN mitocondrial del señor Correa López en una sola posición, por lo que este no puede ser excluido como donante de los mismos. A su vez, otros dos (2) pelos recuperados del cuerpo de la víctima reflejaron una secuencia de ADN mitocondrial parcial y con excepción de heteroplasmia, la secuencia de ADN mitocondrial de dichos pelos difirió de la secuencia de ADN mitocondrial del señor Correa López en una sola posición, por lo que este, o algún pariente dentro de su línea materna, también podría ser donante de los mismos. Nótese, pues, que **conforme a los resultados del análisis de ADN mitocondrial efectuado por SERI, el señor Correa López no puede ser descartado como donante de siete (7) pelos levantados en el cuerpo de la víctima**. Sin embargo, la defensa, alejándose de la normativa científica, afirma que como en los pelos en que se encontró ADN mitocondrial la secuencia fue la misma para el ADN mitocondrial de la víctima, pero difirió en una secuencia del ADN del señor Correa López para efectos prácticos, *"los pelos son compatibles única y exclusivamente con la víctima"*. Claramente dicha aseveración es incorrecta, pues como hemos expuesto, la única forma de poder excluir a una persona como donante de los pelos, es si la secuencia de ADN mitocondrial difiere en dos (2) o más secuencias. Para efectos científicos, resulta inmaterial si no difiere en ninguna secuencia o si difiere solo en una, pues en ambos casos la conclusión es la misma, la persona, o su linaje por la línea materna, no puede ser excluida como donante de los pelos. Ello así, puesto que existe un alto nivel de mutación en el ADN mitocondrial y las secuencias del mismo puede variar incluso en la misma célula.

De otra parte, en cuanto a los dos (2) pelos levantados en la pared de la casa de la víctima, la defensa sostiene que como los resultados de los análisis de ADN mitocondrial reflejaron que las secuencias de ADN difirieron en varias posiciones tanto de la secuencia de ADN mitocondrial de la víctima como del señor Correa López, ambos estaban excluidos de ser los donantes de los mismos, por lo que los mismos debían pertenecer al verdadero asesino. **Ahora bien, si los mencionados dos (2) pelos no pertenecían al señor Correa López, ello en forma alguna necesariamente implica que este no estuvo en la escena y no participó en el asesinato de Yadira**. Recordemos que para que proceda la celebración de un nuevo juicio, la nueva evidencia tiene que ser analizada junto a la evidencia presentada en el juicio original, y de la forma más favorable al fallo o veredicto de culpabilidad que se impugna. A su vez, la defensa tiene que demostrar que la nueva prueba: (1) no se pudo descubrir con razonable diligencia antes del juicio; (2) no es meramente acumulativa; (3) no impugna la prueba aducida

durante el juicio; (4) es creíble, y (5) probablemente produciría un resultado diferente. Énfasis original.[37]

El Ministerio Público concluyó que el análisis de la nueva prueba, en conjunto con la prueba presentada en el juicio, no hacía más probable que el veredicto contra el convicto hubiese sido distinto. Por lo que el testimonio de la testigo fue aquilatado y creído por el jurado.

El **5 de febrero de 2019**, el señor Correa López presentó una *Réplica a Oposición a Moción en Solicitud de Nuevo Juicio*.[38] En síntesis, se reafirmó en su solicitud de nuevo juicio; además, adujo que el Ministerio Público interpretaba de forma errónea las conclusiones de las pruebas de ADN realizadas a los cabellos examinados.

El **28 de marzo de 2019**, el Ministerio Público presentó una *Dúplica a Réplica a Oposición a Moción en Solicitud de Nuevo Juicio*, en la cual reiteró en su posición.[39]

Luego de varios incidentes, las partes estipularon la presentación de la Transcripción de la Prueba Oral del juicio, por lo que el **13 de octubre de 2020**, el señor Correa López presentó una *Moción Urgente Reiterando Solicitud de Concesión de Nuevo Juicio*.[40] De umbral, reconoció los retos que el TPI había enfrentado debido a la pandemia del Coronavirus (COVID-19), no obstante, sostuvo que el caso se encontraba maduro para su resolución, por lo que solicitó se le concediera un nuevo juicio, conforme a las mociones antes presentadas. Asimismo, el **4 de febrero de 2021**, el peticionario presentó una *Segunda Moción Urgente Reiterando Solicitud de Concesión de Nuevo Juicio*.[41] Urgió al TPI a resolver la moción de

---

[37] *Id.*, págs. 237-238 del Apéndice del recurso.
[38] Véase, Réplica a Oposición a Moción en Solicitud de Nuevo Juicio, a las págs. 244-254 del Apéndice del recurso.
[39] Véase, Dúplica a Réplica a Oposición a Moción en Solicitud de Nuevo Juicio, a las págs. 255- 263 del Apéndice del recurso.
[40] Véase, Moción en Solicitud de Nuevo Juicio, a las págs. 264-266 del Apéndice del recurso.
[41] Véase Segunda Moción en Solicitud de Nuevo Juicio, a las págs. 267-270 del Apéndice del recurso.

nuevo juicio a su favor reiterando los argumentos de los resultados de la prueba de ADN mitocondrial.

El **8 de febrero de 2021**, el Ministerio Público presentó una *Contestación a Moción Urgente Reiterando Solicitud de Nuevo Juicio*,[42] en la que sostuvo su oposición a la moción de nuevo juicio.

El **17 de febrero de 2021**, el señor Correa López presentó una *Réplica a Contestación a Segunda Moción Urgente Reiterando Solicitud de Concesión de Nuevo Juicio*,[43] en la cual reprodujo sus planteamientos conforme antes esbozados.

El **24 de mayo de 2021**, el TPI emitió la Resolución recurrida en la declara No Ha Lugar la solicitud de nuevo juicio. Allí, hizo un minucioso examen de toda la prueba (testimonial, documental y pericial) que el Ministerio Publico y la Defensa presentaron en el juicio por jurado.[44]

---

[42] Véase, Contestación a Segunda Moción en Solicitud de Nuevo Juicio, a las págs. 271-273 del Apéndice del recurso.

[43] Véase, Réplica a Contestación a Segunda Moción en Solicitud de Nuevo Juicio, a las págs. 274-277 del Apéndice del recurso.

[44] **Para hacer las determinaciones de hechos el TPI utilizó:**

**(A) La grabación del proceso:** a través del sistema "*For The Record*", el expediente judicial, la prueba física admitida durante el juicio y las voluminosas transcripciones del juicio para las fechas de 10, 11, 15, y 22 de enero de 2008, y 4, 5, 6, 7, 11, 12, 19, 20, 21, 22, 25 y 26 de febrero de 2008, la cuales fueron estipuladas por las partes.

**(B) Reseñó los siguientes testimonios de la prueba presentada por el Ministerio Público en el juicio:** (1) la menor Shakira M. Delgado Delgado, (2) el agente Frank Morales Cruz, (3) el agente Alejandro Montalvo Arguelles, (4) el Sr. Jeffrey A. Martínez Jiménez, (5) el Sr. Sigfredo Delgado Martínez, (6) la Sra. Mayra Santiago Medina, (7) el Sr. Martín Delgado De León, (8) la Sra. Ana Otero García, (9) el agente Heriberto Torres Berrocal, (10) el agente Axel Zoisa Rivera, (11) el Sr. Alex Cintrón Castellanos, (12) el Dr. Francisco Cortés Rodríguez, (13) el Sr. Fernando Mercedes Fernández, y (14) la Sra. María M. Candelaria Andújar.

**(C) De igual modo, reseñó los testimonios que la Defensa presentó:** (1) el Sr. Jeffrey A. Martínez Jiménez, (2) el Sr. Francisco Delgado Delgado, (3) la Sra. Ana Rosa Delgado Delgado, (4) la Sra. Rosa De Laust Ganges, (5) el Sr. Carlos R. Rodríguez Borrás, (6) el Sr. Rodolfo R. Rojas Dávila y (7) el Sr. Luis A. Avilés Valentín.

**(D) Hizo un recuento de toda la prueba física del Ministerio Público sometida y admitida en evidencia, la misma consistió en:**

| | |
|---|---|
| Exhibit A | *Carta redactada por la menor Shakira M. Delgado. |
| Exhibits B-1 al B-15 | *Quince (15) fotos. |
| Exhibits C-1 al C-4 | *Cuatro (4) fotos. |
| Exhibits D-1 y D-2 | *Dos (2) fotos. |
| Exhibit E | *Solicitud de Análisis de las pertenencias de la occisa. |
| Exhibit F | *Solicitud de Análisis (búsqueda de sangre). |
| Exhibit G | *Solicitud de Análisis (comparación de DNA). |
| Exhibit H | *Sobre que contiene pedazo de tela con el que se levantó mancha del piso de la bañera (evidencia núm. ICF 2006-020466-005). |

| | |
|---|---|
| Exhibit I | *Sobre que contiene pedazo de tela con el que se levantó mancha del lavamanos del baño (DNA-06-1296, evidencia núm. ICF 2006-020466-003). |
| Exhibit J | *Sobre que contiene pedazo de tela con el que se levantó mancha del área del piso del baño área del lavamanos (evidencia núm. ICF 2006-020466-022). |
| Exhibit K | *Sobre que contiene pedazo de tela con el que se levantó mancha de las paredes de la bañera (evidencia núm. ICF 2006-020166-004). |
| Exhibit L | *Sobre que contiene pedazo de tela con el que se levantó mancha de la pared donde ubica el receptáculo de encender la luz del baño. (evidencia núm. ICF 2006-020466-006). |
| Exhibit M | *Toalla (evidencia núm. ICF 2006-020466-010). |
| Exhibit N | *Sobre que contiene pedazo de tela cortado del forro de la cama, blanco con diseños de sol amarillos (evidencia núm. ICF 2006-020466-011). |
| Exhibit Ñ | *Sobre que contiene pedazo de tela con el que se levantó mancha de la pared que se encuentra de frente al salir del baño área inferior (evidencia núm. ICF 2006-020466-008). |
| Exhibit O | *Sobre que contiene pedazo de tela con el que se levantó mancha del piso de área del pasillo saliendo del baño (evidencia núm. ICF 2006-020466-007). |
| Exhibits P-1 al P-24 | *Veinticuatro (24) fotos. |
| Exhibit Q | *Certificado de Análisis realizado por el serólogo Fernando Mercedes Fernández. |
| Exhibit R | *Documento de inspección y descripción de las piezas de evidencia. |
| Exhibit S | *Sobre que contiene pelo recuperado en pared saliendo del baño (DNAS-06-1296, evidencia ICF 2006-020466-009). |
| Exhibit T | *Sobre que contiene pelo recuperado levantado del área de la bañera, área del drenaje (DNAS-06-1296, evidencia ICF 2006-020466-001). |
| Exhibit U | *Cinco (5) sobres que contienen cabellos halados de la cabeza de la occisa. (DNAS-06-1300-16.1 al 16.5, 5149-06, 00177801 al 00177805). |
| Exhibit V | *Siete (7) sobres que contienen cabello de la occisa (DNAS-06-1300 16.6 al 16.12, #5149-006-00177806C/U.) |

**(E) La prueba física por estipulación de partes sometida y admitida en evidencia fue la siguiente:**

| | |
|---|---|
| Exhibit A | *Funda de almohada, verde con manchas de sangre (caso núm. DNAS06-1291007). |
| Exhibit B | *Cubre cama de bebé con diseños verdes y amarillos con manchas de sangre (caso núm. DNAS06-1291008). |
| Exhibit C | *"Comforter" azul con diseños de lunas y soles amarillos con manchas de sangre (caso núm. DNAS06-1291009). |
| Exhibit D | *Ropa de cama negra y crema con diseños de varios colores con manchas de sangre (caso núm. DNAS06-1291010). |
| Exhibit E | *Toalla crema con manchas negras (caso núm. DNAS06-1291011). |
| Exhibit F | *Panty bikini rosa con mancha de sangre (caso núm. DNAS06-1291012). |

Por lo que —**en primer orden**— procedemos a transcribir *in extenso* los catorce (14) testimonios de la prueba de cargo.[45]

Comenzamos con la primer testigo presentada por el Ministerio en el juicio por jurado:

### 1. Shakira M. Delgado Delgado

La primera testigo del Ministerio Público fue la menor, quien a la fecha del juicio tenía 10 años y era hija de la víctima y del convicto Tomás Delgado Nieves. Ésta prestó un extenso y detallado testimonio que comenzó el 10 de enero de 2008, continuando el 11, 15 y 22 de enero de 2008, a través del sistema de circuito cerrado. La niña fue la principal testigo del caso.

La menor relató al jurado que para el 28 de noviembre de 2006 tenía 8 años y vivía con su mamá, Yadira Delgado Candelaria, su papá Tomás Delgado y su hermana, Ninoshka Marie Delgado Delgado. El 28 de noviembre de 2006 fue a la casa de su abuela, como a las 9:00 p.m., junto a su mamá y su hermana menor, a buscar un "chupón" para destapar el baño de su casa. Al regresar, destaparon el baño, ella se fue a bañar, comió algo y vio televisión junto a su mamá y su hermana Ninoshka. Luego se acostó como a las 10:00 p.m., en su cuarto. Testificó que en este había una cama litera, un gavetero de su hermana y otro de ella, encima del cual

| | |
|---|---|
| Exhibit G | *Aplicador con aparente mancha levantado del piso frente a los pies de la perjudicada (ICF2006-020102-0013). |
| Exhibit H | *Aplicador con mancha de sangre levantado del lavamanos del cuarto de baño (ICF2006-020102-0014). |
| Exhibit I | *Aplicador con mancha de sangre levantado del piso del cuarto de la perjudicada (ICF2006-020102-0015). |
| Exhibit J | *Fragmentos de uñas de la mano derecha de la occisa (caso núm. DNAS06-1300016.13). |
| Exhibit K | *Fragmentos de uñas de la mano izquierda de la occisa (caso núm. DNAS06-1300016.14). |
| Exhibit L | *Aplicador bucal proveniente de la autopsia núm. A-514906. |
| Exhibit M | *Aplicador vaginal proveniente de la autopsia núm. A-514906. |
| Exhibit N | *Aplicador rectal proveniente de la autopsia núm. A-514906. |
| Exhibit Ñ | *Colector bucal tomado a Tomás Delgado Nieves en el Cuartel de la Policía de Vega Baja. |
| Exhibits O-1 al 0-43 | *Cuarenta y tres (43) fotos. |
| Exhibit P | *Croquis de la casa de la occisa. |
| Exhibit Q | *Documento sobre admisibilidad limitada sobre prueba de polígrafo efectuada a Jeffrey Martínez Jiménez. |
| Exhibit R | *Protocolo de autopsia. |

**(F) La prueba física de Defensa sometida y admitida en evidencia fue la siguiente:**

| | |
|---|---|
| Exhibit A | *Documento de entrevista realizada por el agente Alejandro Montalvo a Kendra Álvarez González. |
| Exhibit B | *Notas tomadas por Ana Otero (testigo del caso). |
| Exhibit C | *Grabación de llamada realizada al sistema 9-1-1. |
| Exhibit D | *Certificación de duplicado de grabación de llamada 9-1-1. |

[45] Véase, los testimonios de la prueba del Ministerio Público en la Resolución recurrida a las págs. 32-86 del Apéndice del recurso.

había un "DVD" y un "Play Station". Señaló que este gavetero se encontraba cerca de la cama litera. El cuarto tenía dos ventanas y la puerta era normal, pero más pequeña que el marco de esta, creando en la parte de arriba un espacio de entre 6 a 7 pulgadas, según describió.[46]

La niña declaró que esa noche, durmió, en primer lugar, en la cama de abajo junto a su hermana de tres años, hasta que ésta se durmiera, ya que le tenía miedo a la oscuridad, y luego se movió a la cama de arriba. Durmió hasta las 3:00 a.m., cuando se despertó debido a que escuchó unos gritos de su mamá provenientes del baño y se asustó. Expresó que ésta gritó "no quiero" en tres ocasiones. La testigo narró que miró por el boquete de la puerta hacia el pasillo, usando sus espejuelos. Estos estaban colocados encima del "Play Station". Para obtenerlos, bajó por las escaleras de la cama litera y volvió a subir. Al mirar hacia el pasillo, observó a su papá (el coacusado) y a Correa López, mientras el primero le hablaba al oído del segundo. Narró que su papá vestía una camisa de manga larga, un mahón largo y unas botas. Sobre Correa López declaró que vestía una camisa blanca, un mahón y unos tenis. Expresó que ambos tenían guantes azules con bolitas y portaban unos cuchillos en las manos. El cuchillo que tenía su papá era de alrededor de 18 pulgadas, con un mango azul, el cual señaló que era de la cocina de su casa, mientras que el de Correa López lo describió como de color negro, mediano y también de la cocina de la casa. Testificó que ellos se movían entre el baño y el cuarto de su mamá, en alrededor de tres o cuatro veces, que esto tardó mucho, como hasta las 5:00 a.m., y que luego se quedó dormida. Sostuvo que la ropa de su papá tenía mucha sangre y la de Correa López, regular. Señaló que su hermana dormía en la cama de abajo.

La testigo describió su casa.[47] Señaló que supo la hora ya que tenía un reloj rojo de "strawberry shortcake," y luego de ponerse los espejuelos observó la hora. Declaró que no estaba oscuro, puesto que su mamá había dejado la luz del pasillo encendida, porque a su hermana le daba miedo.

Luego de relatar lo anterior sobre la noche de los hechos, la menor testificó que se quedó dormida hasta las 7:00 a.m., cuando escuchó el teléfono de su mamá, que estaba debajo del árbol de Navidad, en el paño donde se colocaban los regalos. Explicó que contestó la llamada, y nadie le respondió. Entonces se dirigió con el teléfono hasta el cuarto de su mamá, donde la encontró tirada en su cama, boca arriba, sin ropa, con sangre y lo que creía que eran hojas, encima de ésta.[48] Declaró que las piernas estaban envueltas en una toalla. Testificó que salió corriendo hacia la casa de los abuelos de su papá,[49] al cruzar la calle. Su hermana la acompañó. Al llegar allí, le dijo a la abuela, ("Mother") lo que había visto, quien se lo dijo al abuelo, y éste a su papá. La menor vio a su papá cuando éste salió corriendo para la casa de la occisa. Declaró que don Pachín también fue a la casa. La testigo se quedó en la casa de la abuela con Ninoshka, hasta que llegara su abuela Annie, quien era la mamá de su abuelo Sigfredo, padre de su mamá y su tía Jessica.

A la primera persona que la testigo le contó lo relatado fue al agente Montalvo, porque éste le pidió que se lo dijera para él saberlo. Habló con él en la casa de su abuela Mary, madre de su mamá y de su tía. Declaró que allí se encontraba su abuela Mary, quien se fue para el cuarto porque la testigo no quería que estuviera presente. Shakira se quedó con su tía Jessica y el agente Montalvo, a quien le relató lo antes dicho. Testificó que

---

[46] La descripción dada por Shakira de su cuarto y lo que había en este es cónsona con lo observado en las fotos admitidas en evidencia, incluyendo que había una cama litera con la escalera puesta, cerca de la puerta del cuarto de ella. También se aprecia en las fotos el hueco sobre el marco de la puerta del cuarto de Shakira, que, aunque no se ve tan grande como ella lo describió, sí existía. Según vimos, dicha puerta no llegaba hasta el techo de la casa. Entre dicho hueco y el techo se ve un área que parece en cemento, que estimamos de entre 12 a 18 pulgadas, aproximadamente.

[47] Se admitieron en evidencia varias fotos marcadas como los Exhibits B-1 a B-15 sobre la casa donde ocurrieron los hechos, así como de la residencia de los bisabuelos de la menor. También se admitió el Exhibit A, que correspondía al manuscrito (carta) de 5 páginas escrito por la testigo.

[48] Al observar las fotografías de la occisa, muchas de las heridas que ésta presentaba parecían hojas.

[49] Frente a su casa vivían los abuelos de su papá, a los cuales ella llamaba "Mother" y Pachín.

éste le dio una asignación consistente en que hiciera una carta con todo lo que vio. Al otro día, en el cuarto de su abuela, sola, escribió en una libreta un montón de cosas. Al concluir le entregó la carta a su abuela en un sobre blanco y pequeño para que se lo entregara al agente Montalvo, porque la testigo se iba para la escuela. La carta tenía aproximadamente 4 o 5 páginas. Sostuvo no recordar si habló con el agente Montalvo el día de los hechos. Asimismo, señaló que escribió lo que vio, y que nadie le dijo que escribir. La referida carta fue admitida en evidencia y marcada como Exhibit A del Ministerio Público.[50]

La testigo declaró que conocía desde hacía tiempo a Correa López, ya que era amigo de su papá. Señaló que lo veía casi todos los días, porque él llevaba a su papá al trabajo y lo regresaba. Testificó que luego de verlo en la casa el día de los hechos, se lo encontró posteriormente en el restaurante El Buen Mofongo de Doña Rosa. Ese evento sucedió luego del Día de Reyes, cuando ésta regresó de Washington, de un viaje con su abuela y su hermana, pasando la Navidad. Sostuvo que en el restaurante estaban junto a ella su hermana, su abuela Mary, su bisabuela Annie, su tío Alexis, su tía Anita y don David. Eduardo estaba con la esposa y el nene de él. Al verlo, la testigo se lo dijo a su abuela.

Shakira también declaró haber ido como seis (6) veces al psicólogo y que el 29 de noviembre de 2006, en la mañana cuando vio a su papá, éste tenía una camisa azul y mahón largo.

Durante el contrainterrogatorio de la Defensa, la testigo manifestó que cuando ocurrieron los hechos, ella no vio la puerta del cuarto de su mamá abierta y que ella no vio a su papá entrar al cuarto de su mamá. El día de los hechos, la niña primero vio a su papá con una camisa blanca de manga larga y después él se la cambió a una de manga corta. Ella vio a su papá en el pasillo de la casa con una camisa de manga corta. En ese momento él tenía guantes, pero no el cuchillo y que los guantes no tenían sangre.

La testigo aclaró que a las 7:00 a.m. ella se despertó y fue al baño con su hermana. En eso sonó el celular y ella no esperó a que su hermana saliera del baño y fue a cogerlo. Cuando ella fue a entrar al cuarto de su mamá la puerta estaba cerrada. También declaró que vio una sombra en

---

[50] La carta se transcribe íntegramente a continuación:

"30 de enero de 2007
Para: montalvo-policia.
1- Mami esta en el Cielo
2- yo vi a mi papa en la casa y a Eduardo el amigo de papi Los vi en el pasillo a los 3 de la madrugada.
3- Eduardo tenia una camisa de manga corta de color azul marina pantalón largo y tenis
4- papi tenia una camisa de manga larga luego Se cambio la camisa por una corta.
5- tenia guantes azules y con bolita comó puntitos.
6- El cuchillo era grande mi papá lo tenia en sus mano bocabajo.
7- Mi papá tenia sangre sobre la camisa mucha.
8- Eduardo tenia Sangre Sobre la camisa poquita.
9- Eduardo tenia un cuchillo mediano en sus manos.
10- todo esto yo lo vi cuando me-trepe en la cama litera de ariba.
11- mi cuarto tiene la parte de ariba abierta. Y por ay yo vi todo lo que digo.
12- yo estaba asustada.
13- Esa noche es chuche 3 gritos de mami en el baño que decia no quiero no quiero no quiero.
14- es toy bien nerviosa y asustada
15- Eduardo tenia unos guantes de color azul con bolita pequeñas.
16- Se Sentía ruidos es tranño.
17- por la mañana oi el celular de mi mamá sohar lo cogi y nadie me hablo.
18- Fui al cuarto de mi mamá y tenia mucha sangre y Fria tenia hojas en su cuerpo estaba desnuda.
19- Estaba nerviosa y fui a casa de Mother a buscar ayuda.
20- Se lo dige a mi papa y lo note normal como siempre asido.
21- Luego llego la policia.
Shakira Delgado
Delgado Mari.
                                        Gracias"

su cuarto cuando se despertó a las 3:00 a.m. La noche de los hechos la puerta del cuarto de la testigo estaba cerrada y la luz de éste estaba apagada. La habitación de ella estaba iluminada por la luz del pasillo, ya que su mamá la dejó prendida. El baño de la casa quedaba al lado del cuarto de la testigo. Cuando escuchó los gritos de su mamá, cogió los espejuelos, puso la escalera y se subió arriba. Su papá y Eduardo abrieron la puerta del cuarto de su mamá solo un poco, para poder entrar.

Para la fecha de los hechos la testigo declaró que sus papás no vivían juntos porque estaban peleados. La niña tenía buena relación tanto con su papá, como con su mamá.

Shakira declaró que el 29 de noviembre de 2006 habló con el Agte. Montalvo en la casa de abuela Mary y estaba su tía Jessica. Que recuerde, esa fue la primera entrevista en Vistas del Atlántico, y la primera vez que habló de este caso con el agente Montalvo Arguelles. Ese día en casa de la abuela Mary ella le dijo de la sombra al Agte. Montalvo. La abuela Mary no se encontraba con la testigo, porque ésta le había pedido que se fuera para el cuarto ya que no quería que estuviera presente. La tía se quedó con ella y con el agente Montalvo, pero se mantuvo callada. Ese día que habló con Montalvo, la menor estaba asustada y nerviosa. Cree que esa primera entrevista duró como 1 hora y media. Ella le mencionó a Eduardo al Agte. Montalvo en esa primera entrevista en casa de abuela Mary, pero no se lo describió porque no se lo preguntaron. Durante el contra interrogatorio se le pidió a la testigo que describiera a Eduardo y ésta expresó que no lo podía describir porque no se acordaba. La menor también testificó no acordarse de que le hubiera dicho a su tía Ana sobre un tal "Chino" y las descripciones de éste.

Después de la entrevista con el agente Montalvo el 29 de noviembre, la testigo declaró que se había reunido con éste en el cuartel, una sola vez. Ella habló con el Agente Montalvo antes del día de Reyes. Luego testificó no recordar si había hablado con éste en el cuartel antes o después de ese día de Reyes.

Concluido el testimonio de la menor, y toda vez que testificó mediante el sistema de circuito cerrado, ésta se personó a la sala e identificó a los entonces acusados.

## 2. Agente Frank Morales Cruz

El segundo testigo presentado por el Ministerio Público fue el **agente Frank Morales Cruz**, adscrito al Precinto 107, en Arecibo. Este narró que el 29 de noviembre de 2006, se encontraba laborando en unión a su supervisor, el sargento Roberto Figueroa. A las 8:52 a.m. les fue cursada una querella a través del radio operador del Precinto, en la que se les informó que había una persona muerta en el sector Barrancas y se dirigieron al lugar. A las 9:05 a.m. llegaron a una residencia en la que había tres (3) paramédicos y una ambulancia. Luego que dialogaron, entraron a la casa y se encontró con Tomás Delgado Nieves, quien estaba hablando por teléfono frente al cuarto de la occisa. Este se identificó como el esposo de la víctima.

El Agte. Morales Cruz señaló que junto con un paramédico que había en el lugar, verificó el cuarto donde se hallaba la víctima, sin vida. Al salir del cuarto, le indicó a la persona que enganchara el teléfono y abandonara la residencia, puesto que por lo que observó, la víctima no tenía signos vitales, se podían notar las heridas y había manchas de sangre. Era una escena donde podía haber signos de violencia y al ser el primer agente en esta, le indicó a Tomás Delgado que saliera para preservar y custodiar la misma, en lo que llegaba el personal de Homicidios y Servicios Técnicos para continuar con la investigación.

El testigo describió el interior de la casa, la escena, la posición en que estaba el cuerpo y las heridas de la víctima. A esos fines, se le mostraron las fotos admitidas como los Exhibits C-1 a C-4 sobre la víctima y como se encontraba el día de los hechos. Asimismo, declaró tomarle una información a Tomás Delgado Nieves como su nombre, edad, oficio y donde trabajaba, siendo este el único contacto verbal que tuvo con él. Al coacusado Eduardo Correa, no lo vio en el lugar. Luego de observar la escena, se quedó custodiando la misma hasta que llegaron los agentes de Homicidios. Durante ese período de tiempo nadie entró a la casa.

### 3. Agente Alejandro Montalvo Arguelles

El tercer testigo del Ministerio Público fue el **agente Alejandro Montalvo Arguelles.** Éste declaró que para el 29 de noviembre de 2006 trabajaba en la División de Homicidios del Cuerpo de Investigaciones Criminales de Arecibo (CIC), en el turno de 8:00 a.m. a 5:00 p.m. Testificó que ese día, entre las 9:00 a.m. y 9:05 a.m., se le notificó, a través del radio de la patrulla, que habían encontrado una mujer apuñalada en el sector Los Mora de Barranca, en Arecibo.

Montalvo Arguelles se personó al lugar a las 10:00 a.m. junto a su supervisor, el sargento Félix Pagán y los agentes Rufino Dávila y Leonel Romero. Al llegar, se entrevistó con el agente Frank Morales, quien tomó la investigación inicial. Luego pasó a la escena del crimen, la cual describió como una residencia con un balcón pequeño de cemento, cuya puerta de entrada era blanca con un "screen" del mismo color, que estaban abiertas. Expresó que, al entrar, a la derecha se encontraba la cocina, donde había tres sillas de las que se usaban en los "counters". En la primera silla, observó un martillo y sobre el "counter" una cartera con una "wallet" afuera y un teléfono celular. A su izquierda, se encontraba la sala, en la que había un árbol de Navidad. Hacia el frente se encontraba un pasillo y a la izquierda estaba el cuarto de la víctima. Declaró que la puerta se notaba forzada, ya que estaba rota y abierta. Al entrar, vio a la víctima sobre la cama. Las piernas y los pies le colgaban sobre la cama, se encontraba descalza, tenía el busto expuesto con una "t shirt" roja levantada hacia arriba, y una toalla color blanca y crema sobre sus genitales. Describió que la víctima tenía múltiples heridas limpias, que no sangraban.

El testigo narró que en el cuarto todo estaba en orden. Las gavetas se encontraban cerradas y el aire acondicionado apagado. La luz estaba encendida y en el espaldar de la cama había un uniforme escolar de niña, color azul, a cuadros. Asimismo, esbozó que al lado de los pies de la víctima había unas chanclas bien puestas y que, en el "closet", que no tenía puertas, la ropa estaba en ganchos, de forma ordenada. Frente al cuarto de la occisa se encontraba el cuarto de sus hijas, Shakira y Ninoshka. Describió que en este había una cama litera cuya escalera estaba puesta, un gavetero y ropa de niñas. A la derecha rápido, al entrar, se encontraba la cama, casi paralela a la puerta del cuarto. Sobre la puerta explicó que, en la parte de arriba, tenía una abertura aproximada de 2 pulgadas.

Montalvo Arguelles declaró que, luego de los dos cuartos, a la derecha se encontraba el baño. Narró que estaba limpio, con excepción de unas manchas de sangre en el lavamanos y en el piso, la cortina estaba puesta y todo organizado en el "hamper".

El Agte. Montalvo explicó que también había manchas de sangre en el área de la cama de la víctima, entre los pies y la pared del fondo. Específicamente, señaló que había gotas de sangre en la pared, así como frente al gavetero.

Al momento de arribar a la escena, el agente observó que la puerta del frente de la residencia no estaba forzada, ni tenía ningún tipo de evidencia de que se hubiera forzado. Asimismo, sostuvo que se podían apreciar manchas de aparente sangre. La residencia medía 25 pies de ancho por 30 de largo.

En cuanto a los alrededores de la casa manifestó que, mirando de frente a la residencia de la escena del crimen, a la derecha, había una casa en construcción, mientras que a la izquierda había otra residencia habitada. Al cruzar la calle, como a 100 pies de distancia, se encontraba la residencia de los abuelos de Tomás Delgado Nieves. Era una calle sin salida.

El testigo declaró que en el baño de la residencia y en el cuarto de la víctima, área donde estaba la coqueta, se levantaron del piso unos aplicadores con manchas de sangre. Frente a la víctima, en el área de sus pies se levantó una sustancia transparente con un aplicador. También se levantó un "comforter" de la cama, de color verde con soles amarillos, la toalla que tenía sobre los genitales, la funda de una almohada, un panty bikini que estaba al lado de la víctima y una ropa de cama como de color

negra. En el patio, al lado de los zafacones de basura, se levantó un paño con aparentes manchas de sangre. Según le indicó Tomás y el padre de la víctima, Freddy Candelaria, ese paño era utilizado por la occisa para taparse la cara al dormir. Este último, fue entrevistado el 30 de noviembre de 2006, frente a un Banco, donde estaba retirando un dinero para el sepelio. El señor Candelaria le indicó al testigo, que llegó a la escena donde ya estaban Martín Delgado, Tomás, y otro pariente de ellos, y que vio el paño afuera. Sobre este, Tomás le dijo que había limpiado la puerta y lo había tirado allí. Entonces discutieron, teniendo que ser separados. El testigo expresó que toda esa evidencia se sometió al Instituto de Ciencias Forenses (ICF) para análisis.

El Agte. Montalvo Arguelles declaró, además, que para la fecha de los hechos Shakira tenía 9 años, mientras que su hermana Ninoshka tenía 3 años. De su investigación se desprendía que Shakira fue quien encontró a la víctima, en la mañana. Sostuvo que, según el abuelo de Tomás Delgado Nieves, fue éste quien le colocó la toalla a la víctima sobre los genitales para taparla, a petición suya.

Por su parte, la menor Shakira, le dijo al testigo que sonó el celular de su mamá y salió del cuarto. El celular estaba debajo del "cover" del árbol de navidad. La niña encontró a su mamá sobre la cama con muchos tajitos como hojitas. Entonces fue junto a su hermana a donde "Mother", abuela de Tomás Delgado Nieves, ya que ésta vivía al frente, cruzando la calle, para decirle que había encontrado a su mamá.

El agente continúo testificando que el mismo día 29 de noviembre de 2006, luego de terminar de trabajar la escena, entre las 12:20 p.m. y las 12:30p.m., entrevistó a Tomás Delgado Nieves, a eso de las 2:30 p.m. en las Oficinas del Cuerpo de Investigaciones Criminales (CIC), en la Comandancia de Arecibo. Señaló que éste fue el esposo de la víctima por diez años, y era el padre de Shakira y Ninoshka. De su investigación surgió que el 29 de noviembre de 2006 Delgado Nieves se encontraba viviendo con sus abuelos Martín y Ana en la residencia arriba señalada. Testificó que Tomás se había ido a residir allí desde el día antes del día de Acción de Gracias ("Thanksgiving"), de ese mismo mes. Manifestó que fue Tomás quien llamó al 9-1-1, y dio conocimiento a la Policía sobre la escena.

El testigo declaró que Tomás trabajaba en la fábrica Eaton, en el barrio Santana de Arecibo. El 28 de noviembre de 2006, trabajó en el turno de 3:00 p.m. a 11:30 p.m. y un primo lo llevó. Para regresar, lo hizo con Eduardo Correa, quien era su compañero de trabajo. Con éste, viajaba todas las noches, durante casi un año y medio. Testificó que Tomás le dijo que llegó a su residencia entre las 11:50 y las 12:00 p.m. Éste le manifestó que, a esa hora, frente a la casa de la occisa, se encontraba estacionado el carro de ella y un carro color vino, parecido a la marca Toyota, adelantado, con focos alteza. Explicó que luego que se bajó del carro de Eduardo, se fue hasta su residencia, es decir, la de sus abuelos. Posterior a eso, el agente investigador declaró que Tomás le indicó que, alrededor de 20 minutos después, al sentir un ruido, miró por la ventana hacia la residencia de la víctima, de donde vio salir a un individuo que describió como alto, medio grueso, vestido con una "t shirt" clara, y quien quitó la alarma a un carro y se marchó. Señaló que, aproximadamente 15 minutos después, llegó por la misma calle un vehículo que describió como pequeño, compacto, del que no supo el color, ni tomó el número de tablilla, se estacionó en la casa siguiente y del cual se bajaron tres personas: dos hombres y una mujer de pelo largo, delgados. De estos, señaló que un hombre caminó por detrás de la casa de la occisa y que los otros entraron por el frente. El testigo declaró que Tomás le manifestó que dicho vehículo se retiró cerca de la 1:00 a.m. Montalvo pudo corroborar la existencia del carro color vino, como perteneciente a Jeffrey Martínez, mientras que lo del carro compacto, jamás se supo.[51]

El Agte. Montalvo Arguelles testificó que Tomás le expresó que cerca de las 8:30 a.m., Shakira le dijo que había encontrado muerta a su mamá. Según su investigación, cuando Shakira vio muerta a su madre, fue junto a su hermana Ninoshka a casa de su bisabuela, Doña Ana Delgado, ("Mother"), con quien habló y ésta le notificó a Martín Delgado ("Pachín"), bisabuelo de las menores. Don Martín fue hasta la residencia de la víctima

---

[51] Subrayado nuestro.

y corroboró que ésta se encontraba sin vida, salió, y luego regresó con Tomás, a quien le dijo que cubriera el cuerpo, ya que la occisa estaba desnuda. Sobre las características físicas de Tomás ese día, declaró que se encontraba normal, con excepción de una herida en un dedo, la cual le explicó que fue a las 6:00 de la mañana encrestando un gallo junto a don Martín.

El testigo testificó que entrevistó a don Martín Delgado, abuelo de Tomás Delgado Nieves, el 1 de diciembre de 2006, en la Fiscalía de Arecibo. Éste le señaló que el 29 de noviembre de 2006, él y Tomás no se encontraban encrestando gallos.

El agente Montalvo también declaró que, como parte de su investigación, entrevistó a Jeffrey Martínez, quien tenía una relación de amantes con la occisa, al haber compartido íntimamente con ésta en dos ocasiones. Señaló que él fue entrevistado el 8 de diciembre de 2006, aunque anteriormente, el día siguiente al crimen, el testigo había ido a su área de trabajo, en la tienda "Taco Maker", de los cines de Arecibo. Declaró que como había muchos clientes solo pudo hablar con él y no entrevistarlo. Asimismo, testificó que en el lugar también trabajaba la víctima. Ese día, Jeffrey Martínez le indicó que no conocía que ésta tuviera enemigos o problemas relacionados a alguien que quisiera hacerle daño.

El 8 de diciembre de 2006 Jeffrey Martínez fue entrevistado en las oficinas del CIC de Arecibo. El testigo declaró que esta entrevista giró en torno a que había obtenido una información de que él compartía íntimamente con la víctima. Martínez le expresó que fue a la casa de la occisa el 28 de noviembre de 2006 en un vehículo de su papá, marca Toyota, color vino, que tenía focos "clear". Le señaló que llegó pasadas las 10:30 p.m. y que estuvo con ella hasta las 12:20 a.m. del 29 de noviembre de 2006. Sostuvo que durante ese tiempo habló con la occisa en la sala y luego pasaron a la habitación, donde se dieron unos besos. No tuvieron intimidad porque la puerta estaba abierta, y las niñas estaban en su cuarto durmiendo. La puerta del cuarto de las niñas estaba cerrada. Señaló que estaba vestido con una "t shirt" roja. Martínez le indicó al agente que llegó allí a insistencias de la occisa y que se estacionó paralelo al carro de ésta. El testigo manifestó que Jeffrey Martínez era flaco, y que posteriormente lo descartó como sospechoso.[52]

El Agte. Montalvo Arguelles continuó declarando que entrevistó a Correa López el 30 de noviembre de 2006, a la 1:30 p.m. en la acera, frente a la residencia de éste. Para el 28 de noviembre de 2006 el convicto trabajaba en la fábrica Eaton, al igual que Tomás. Éstos tenían el mismo turno y llevaban viajando juntos un año y medio. Ese día habían salido a las 11:30 del trabajo. Tomás Delgado habló con Correa López y se fue con él, y un individuo que se llamaba Luis Torres. Tomaron la carretera número 2 de Arecibo, hasta el garaje Shell, que estaba en la entrada de Islote, donde se quedó Luis Torres. Correa López y Tomás Delgado siguieron para el "CMN *Car Wash"* que ubicaba en el centro del Pueblo de Arecibo. Allí echó gasolina y continuó a llevar a Tomás a la casa. Al llegar, a la izquierda, en el estacionamiento de la casa de Tomás, al lado del carro de la esposa, había un carro raro. El Agte. Montalvo Arguelles le preguntó a Correa López por el modelo, marca y color. Correa López le contestó que "era un carro raro", "allí había un carro raro". El testigo le preguntó de nuevo por el color, o marca y le respondió que porque… "No, un carro raro". El agente Montalvo le preguntó si no le había tomado la tablilla y Correa López le dijo que no, que Tomás se había bajado y él viró y se fue.[53]

Así las cosas, el Agte. Montalvo testificó que preparó un croquis de la escena y que el 4 de diciembre de 2006, a la 10:00 a.m., a petición del Fiscal de Distrito, fue nuevamente a la residencia con técnicos del Instituto de Ciencias Forenses (ICF). Estos realizaron pruebas de Luminol, con el fin de detectar sangre que no estaba visible al ojo humano. En este extremo, declaró que la escena fue custodiada desde el 1 de diciembre de 2006, cuando se colocó una vigilancia fija a partir de las 3:30 p.m., hasta ese día 4 de diciembre de 2006, que llegó forense. En este punto del testimonio, la jueza que presidió el caso le advirtió al testigo, en ausencia del jurado, que no podía hablar de la evidencia de los cabellos.[54]

---

[52] Subrayado nuestro.
[53] *Id.*
[54] Transcripción del Juicio por Jurado, 5 de febrero de 2008, pág. 152.

Montalvo Arguelles testificó que le entregó la residencia al ICF hasta la 1:00 p.m. que estos se la devolvieron, y que se siguieron los estándares del ICF, para lo cual firmó un recibo. Declaró que la prueba que él ocupó la llevó al ICF, donde solicitó que le hicieran pruebas periciales. Específicamente, solicitó someter la evidencia a análisis serológicos para búsqueda de sangre y ADN que no fuera de la víctima.[55] La evidencia que el testigo llevó para la realización de dicho examen constó de una funda de almohada, un cubrecama de bebé de color crema con diseños verdes y amarillos, un "comforter" con diseños de lunas y soles de color amarillo, ropa de cama color negro y crema con diseños de varios colores, una toalla de color crema sin manchas, un panty tipo bikini marca "Hanes" con manchas de aparente sangre, un aplicador levantado en el piso frente a los pies de la occisa, otro aplicador con manchas levantado del lavamanos del cuarto de baño y un aplicador con manchas levantado en el piso del cuarto de la víctima.

Finalmente, el Agte. Montalvo Arguelles declaró que entrevistó a la menor Shakira Delgado en dos ocasiones. La primera entrevista fue el 29 de noviembre de 2006, en la oficina de Homicidios en Arecibo, a las 5:30 p.m. La menor estuvo acompañada de su bisabuela Ana Martínez (abuela de la víctima). Durante la entrevista, la niña estaba bien ansiosa, nerviosa, haciendo gestos de todo tipo, al punto de que era terrible poder bregar con ella. Testificó que nunca había tenido esa experiencia con un niño.

El Agte. Montalvo narró que le preguntó a Shakira si había visto algo. Ésta le respondió que ella se encontraba en la cama litera de arriba y que escuchó un ruido que decía: "No, no, no," en el baño, que vio una sombra por la parte de arriba de la puerta y que esa sombra era de su papá. Toda vez que la menor continuaba demasiado ansiosa, el testigo le indicó a la bisabuela de Shakira que la tenía que llevar a un psicólogo porque no podían comunicarse en ese estado. Éste declaró que esa primera entrevista duró alrededor de una hora, y concluyó aproximadamente de 6:30 p.m. a 6:35 p.m. Testificó que después del día de los hechos, la menor quedó bajo la custodia de María Candelaria, su abuela (madre de la víctima).

La segunda entrevista ocurrió el 30 de enero de 2007, a petición de María Candelaria, quien le indicó que Shakira quería hablar con él. El agente Montalvo declaró que se trasladó a la casa de ellas, en la urbanización Vistas del Atlántico. Estando allí, la menor pidió que su abuela se fuera al cuarto, quedándose sólo con Ana Otero, esposa del hermano de la víctima. Indicó que ésta permaneció sentada al lado de la menor, sin hacer nada más.

Durante la entrevista, Shakira le narró al testigo que el día de los hechos ella estaba con su hermana en la cama de abajo de la litera. Señaló que escuchó ruidos extraños y que en el baño decían: "No quiero, no quiero, no quiero". Entonces subió por la escalerita a la cama de arriba, y que, por la abertura de la puerta, arriba, ella observó hacía el pasillo donde vio a su papá Tomás y a Correa López, en este. Le indicó que su papá tenía una camisa larga, mientras que Correa López una camisa corta. Su papá tenía mucha sangre encima, y que estos se hablaban al oído. Tomás pasó para la cocina en una ocasión y vino con otra camisa, no con la que tenía, la que tenía un carrito en la espalda dibujado. Continúo narrándole que ella se puso nerviosa, que eran las 3:00 a.m., y que sabía la hora porque tenía un reloj. Explicó que permaneció en la cama, temerosa, y que se quedó dormida, hasta que sonó el teléfono por la mañana, y se encontró con el cadáver de su madre.

El testigo explicó que Shakira le dijo que Tomás tenía un cuchillo grande con la punta hacia bajo y que Correa López tenía uno más pequeño. Le señaló que ambos tenían en sus manos guantes azules con bolitas como puntitos. Sobre las camisas, expresó que Tomás tenía mucha sangre en la camisa, mientras que Eduardo tenía poquita.

El agente declaró que le indicó a la menor que lo que ella narró, lo hiciera en una cartita, que sellara el sobre y se la entregara. Ésta le dijo que lo haría y que fuera al otro día para recogerla, lo que sucedió alrededor

---

[55] Exhibit E del Ministerio Público.

el mediodía cuando María Candelaria lo llamó.[56] Según el agente, esta carta contenía más o menos, lo que la menor le narró.[57]

Montalvo Arguelles continúo declarando que a Tomás se le tomó una muestra bucal para prueba de ADN, mientras que a Correa López se le tomaron huellas dactilares para compararlas con una que fue levantada en la puerta de la residencia. Este análisis arrojó un resultado negativo. Luego de los procesos investigativos, la custodia de la residencia le fue entregada a Tomás.

En el contrainterrogatorio, el Agte. Montalvo Arguelles, explicó que, ese día, como a las 12 y pico, entrevistó a la Sra. Ana Rosa Delgado ("Mother") en el comedor de la residencia de ella. En el lugar estaban otros agentes, don Martín Delgado ("Pachín") y el Fiscal Miranda. Luego de entrevistarla, ella le mostró el cuarto de Tomás Delgado Nieves. La cama estaba arreglada, observó el closet, unas cajas de herramientas, y había una ventana desde donde se podía ver la residencia de la occisa. El agente Montalvo no revisó el closet de ese cuarto, ni las cajas de herramientas, ni el "laundry" de la residencia. Tampoco pasó al cuarto donde dormían doña Ana y don Pachín, ni al interior de una covacha que había en la casa. Sí fue al área de la covacha en la que había una llave de agua, donde Tomás se estaba lavando las botas cuando le notificaron.

La señora Delgado le expresó al testigo que las niñas llegaron, le dijeron lo que pasaba y que ella se lo dijo a Pachín (Martín). Don Pachín fue a la residencia de Yadira solo. Tomás estaba en el gallerín. Don Martín revisó e informó a Tomás. Fue en ese momento cuando Tomás se estaba lavando las botas.

El Agte. Montalvo Arguelles también vio a Sigfredo Delgado, padre de la occisa, el 30 de noviembre de 2006, en la residencia de éste en Jardines de Arecibo y le entregó algunas de las pertenencias de ella. Ese día 30, el testigo, se encontró con él, más temprano, en un banco y éste le manifestó que el paño lo usó Tomás para limpiar a la occisa. Sin embargo, posteriormente, Sigfredo dijo en Fiscalía que Tomás había limpiado la puerta con el paño que estaba frente a los zafacones, y que fue Tomás quien lo tiró allí.

El Agte. Montalvo entrevistó a Tomás Delgado Nieves en el CIC, el 29 de noviembre de 2006, después de la 2:30 p.m. Éste le habló de un carro color vino, adelantado, con focos transparentes, parecido a un Toyota. También le mencionó un segundo carro. Posteriormente, el agente Montalvo fue a la fábrica Eaton y corroboró que Eduardo y Tomás trabajaron el 28 de noviembre de 2006, hasta las 11:30 p.m.[58]

Como parte de la investigación el Agte. Montalvo Arguelles también entrevistó el 29 de noviembre de 2006 a Kendra Álvarez, a quien conocía previamente. Ésta era amiga de Yadira y madrina de Ninoshka. Kendra le dijo que llamó a Yadira ese 28 de noviembre de 2006, entre 8:00 a 9:00 p.m. y después de eso no la llamó más. El Agente solicitó el registro de llamadas del teléfono residencial y del teléfono celular de la occisa. El número de teléfono celular de Kendra no apareció registrado la noche del 28 o madrugada de 29 de noviembre, ni en el teléfono residencial, ni en el celular de Yadira. Sin embargo, Kendra llamó del teléfono de su casa al de Yadira. En el registro telefónico de Yadira había una llamada de 18 minutos de duración del (787) 878-1607, a las 20:02. (8:02 p.m.).

Durante la investigación el agente solicitó el registro de llamadas del celular de Tomás Delgado Nieves y de la casa donde estaba viviendo éste (Casa de doña Ana "Mother"). Desde el teléfono residencial de "Mother" no se realizaron llamadas al teléfono residencial, ni celular de Correa López. El agente le pidió a Delgado Nieves muestras de fluido corporal y éste voluntariamente las suministró. Con relación al resultado de las huellas obtenidas, no eran compatibles ni con las de Correa López, ni con las de Delgado Nieves.

Según el testigo, la casa de la occisa estuvo sin custodiar la tarde del 29 de noviembre, todo el día 30 de noviembre, y parte del 1 de diciembre, porque ya ese día se custodió desde las 3:30 p.m., hasta el 4 de diciembre de 2006. El 30 de noviembre de 2006 la familia de la occisa entró a buscar ropa.

---

[56] Exhibit A del Ministerio Público.
[57] Subrayado nuestro.
[58] *Id.*

Con relación a Eduardo Correa López, se ocupó su vehículo para búsqueda de sangre, con resultados negativos. Éste vivía en la Barriada San José, calle General Patton 703, en Arecibo. Ese lugar quedaba como a 5 millas de donde ocurrieron los hechos en Barrancas de Arecibo.

El 29 de noviembre de 2006 el agente Montalvo entrevistó al Agte. Frank Morales, a Ana Rosa Delgado ("Mother"), a Tomás Delgado, y a Shakira Delgado. En la primera entrevista de Shakira en comandancia el 29 de noviembre de 2006, ella no mencionó a Correa López. Solo habló de una sombra, no de dos. Shakira mencionó a Correa López luego de un encuentro con éste en el Restaurante Doña Rosa, posterior a que ella llegara de Washington. Hasta ese momento Shakira no lo había mencionado. En dicho restaurante, ella estaba acompañada de varios adultos, familiares de Yadira. Shakira había estado bajo la tutela de los familiares de Yadira desde el 29 de noviembre de 2006.

Por otro lado, el Agte. Montalvo Arguelles testificó que no midió el hueco de la puerta del cuarto de Shakira, ni la puerta del mismo, ni la distancia entre la litera y el hueco. De la menor Ninoshka expresó que está tenía 3 años y hablaba poquito.

Con relación a Correa López el testigo narró que lo entrevistó dos veces. La primera fue el 30 de noviembre de 2006, 12:10 p.m. La segunda entrevista fue el 16 de enero de 2007 a las 5:10 p.m., y ya para ese momento figuraba como sospechoso. Ninguna de las pruebas científicas realizadas, fueron compatibles con Correa López.

El 4 de diciembre de 2006 Montalvo Arguelles entrevistó a Juan Álvarez, novio de Kendra y padrino de Ninoshka. También entrevistó a Sharon Álvarez. A don Pachín no lo entrevistó en la escena porque éste tenía sordera aguda. En cuanto a la carta que escribió Shakira, tenía fecha del 30 de enero de 2007.

El testigo narró que Correa López comenzó a ser sospechoso luego del incidente en el Restaurante el Mofongo de Doña Rosa en enero, antes que lo llamaran con relación a la carta. Fue antes de la entrevista a Shakira. Sobre esto, le informaron que ellas estaban cenando en el restaurante y se encontraban en una mesa. Estaba María, la yerna, la hija, había un grupo, todos familiares de Shakira. Cuando llegó Eduardo a comprar, tenía una gorra puesta. Tan pronto la nena lo vio empezó a tener una reacción y se puso bien nerviosa, temblorosa, y le señaló a la abuela a Eduardo, o sea y que le hizo un comentario de Eduardo. Le dijo mira mami, ese es Eduardo, pero bien nerviosa y consecuente a esto, en las noches ella se levantaba llorando en la cama. La señora le dijo que no sabía lo que pasó, pero ella se pasaba gritando y llorando, que estaban escondidos en la casa Tomás y Eduardo.

### 4. Jeffrey Alberto Martínez Jiménez[59]

El cuarto testigo del Ministerio Público fue el Sr. **Jeffrey Alberto Martínez Jiménez**. Para el 28 de noviembre de 2006 éste tenía 18 años, era soltero, vivía con sus padres y trabajaba en "Taco Maker" de Hatillo. Martínez Jiménez conocía a Yadira Delgado Candelaria hacía 3 o 4 meses a la fecha de los hechos, porque ella trabajaba con él, lo ayudaba y le daba consejos. Ésta era su amiga de privilegio. Es decir, eran amantes.

El 28 de noviembre de 2006, aproximadamente a las 10:00 p.m. el testigo se encontraba en su trabajo. Salió a las 10:30 p.m., y fue a la casa de la occisa, en Barranca. El testigo tardó de 6 a 7 minutos en llegar al lugar. Éste se personó en un Toyota Corolla, del año 2000, color vino con focos alteza "clear", que era de su padre, ya que su guagua, una Hyundai Excel roja, estaba dañada hacía meses. Se estacionó al lado izquierdo de la guagua de Yadira, específicamente entre la casa y la guagua. Éste tenía puesto su uniforme que era una camisa roja y un pantalón negro.

En la casa estaba Yadira, quien le dijo que las nenas se encontraban durmiendo en el cuarto. Ésta tenía puesta una camisa blanca, corta, de manguillo, y un pantalón corto, (pijama) rosa. Yadira tenía dos nenas. La grande se llamaba Shakira. Él las vio de lejos una vez, en el trabajo. Continuó declarando que había visitado esa casa en dos ocasiones, incluyendo esa noche. La primera vez fue en ese mismo año, para llevarle un árbol de navidad.

---

[59] También, fue presentado como testigo de la Defensa.

El testigo expresó que fue esa noche a la casa de Yadira para hablar de su relación, ya que él tenía cierto temor porque ella le había dicho que estaba casada, pero separada hacía 3 o 4 meses, y los padres de él no sabían nada de la misma. Al llegar hablaron de eso y él le dijo que le diera un tiempo a ver si ésta conseguía el divorcio. Ella le contestó que era verdad, que necesitaban tiempo. Esa conversación se llevó a cabo en la sala.

Según el testigo, luego, ella lo cogió de la mano, lo llevó al cuarto y se empezaron a besar en la cama. Él la tocaba, pero no hubo partes bajas, ni penetración, por respeto, porque ella le había dicho que las nenas estaban en el cuarto y él no iba a tener sexo así. Como a las 12:20 a 12:30 a.m. decidió irse a su casa porque estaba cansado. Tardó 20 minutos en llegar.

La última vez que el testigo vio a Yadira fue en la casa de ella, cuando él salió y ella cerró la puerta. Éste se enteró de la muerte al otro día, por una compañera de trabajo de nombre Sharon. Ella llegó frente a la casa del abuelo de él y le dijo llorando que habían matado a Yadira. Él se puso triste. Al rato prendió el televisor y lo estaban dando en las noticias.

Posteriormente el Agte. Montalvo fue a "Taco Maker". El testigo conversó con Montalvo en dos ocasiones. Una en "Taco Maker" y la otra en el cuartel. En "Taco Maker" hablaron de cosas sencillas. Le dijo al Agte. Montalvo que conocía a Yadira, del trabajo. El agente le preguntó que, si era amigo de ella y le expresó que sí, que del trabajo, pero no le dijo de la relación que tenían. El testigo relató que estaba nervioso porque nunca había hablado con un agente. Luego volvieron a hablar en el cuartel y ahí el testigo le dijo al Agte. Montalvo que él y Yadira eran amantes. Explicó que dijo dos cosas distintas porque estaba bien nervioso. Manifestó que el carro Toyota color vino tenía una alarma que cuando activaba y desactivaba sonaba un "beep", "beep".

Durante el contrainterrogatorio, entre otras cosas, el testigo narró que nunca había recibido llamadas amenazantes relacionadas a su relación con Yadira y que fue al velatorio de ésta.

### 5. Sigfredo Delgado Martínez

El quinto testigo presentado por el Ministerio Público fue el Sr. **Sigfredo Delgado Martínez.** Este trabajaba para el Departamento de la Familia y era el padre de la occisa Yadira Delgado.

Para el 29 de noviembre de 2006, el Sr. Delgado Martínez residía en Jardines de Arecibo, calle JJ, #15. Ese día, a eso de las 8:10 a.m., Delgado Nieves lo llamó para que subiera al cerro porque había un problema, pero no le dijo cual. Él salió para allá y al llegar vio a Tomás hablando por teléfono. También habían dos tíos de él. Estaban todos fuera de la casa. Trató de entrar a la misma y Tomás no lo dejó. Éste le dijo "No entres, que no te va a gustar". Le explicó que Yadira estaba acostada en la cama, que la tocó y estaba dura. Le dijo, además, que le había tapado la parte de arriba y la parte de abajo del cuerpo. Que allí había un paño, limpió y lo tiró debajo de un palito que estaba en el área. Le expresó que había limpiado con ese paño, un "screen" que estaba en el piso de la cama de Yadira y que tiró el paño en el jardín, afuera. Ese paño lo usaba Yadira para taparse la cara cuando estaba durmiendo. Ante lo manifestado por Delgado Nieves, el testigo se quedó en "shock".

El Sr. Delgado Martínez continuó declarando que la policía llegó a la escena como 20 minutos de después de él. Expresó que le había preguntado a Tomás en varias ocasiones si él lo había hecho, y le respondió que no. El testigo manifestó que estuvo bastantes horas en la escena y se fue después que sacaron el cuerpo de su hija. El martillo que estaba en la residencia de Yadira era de él, y ella se lo había pedido prestado. Ese martillo le fue devuelto por el agente Montalvo.

### 6. Mayra Santiago Medina

La sexta testigo del Ministerio Público fue la Sra. **Mayra Santiago Medina.** Ésta tenía 27 años de edad y era prima de Yadira. Se veían semanalmente, una vez a la semana, usualmente los fines de semana y casi todos los días hablaban por teléfono.

La testigo expresó que Yadira estaba separada de su esposo Tomás Delgado. Ellos tenían dos niñas de nombre Shakira y Ninoshka. Para el 28 de noviembre de 2006, Yadira trabajaba en "Taco Maker". La última vez que ésta habló con Yadira fue la noche antes de que muriera, como a las 8:15 p.m. Yadira fue quien la llamó por teléfono y hablaron como media hora. Ésta le dijo, entre otras cosas, que se encontraba terminando de arreglar el árbol de navidad y esperando que llegara a su casa una persona de nombre Jeffrey para hablar y definir algo. También le dijo que ella y Tomás habían discutido por unos muñecos inflables que ésta tenía en la casa y que él se los había llevado. La testigo le preguntó por Tommy y Yadira le respondió que estaba trabajando y salía como a las 11:20. Ella le dijo a Yadira que cuando el muchacho llegara, hablaran rápido y se fuera antes que Tomás llegará.

La testigo se enteró de la muerte de Yadira al otro día como a las 10:30 a.m., porque su mamá la llamó por teléfono y se lo dijo. Al recibir la noticia, empezó a llorar y llamó a su esposo.

### 7. Martín Delgado De León

El séptimo testigo del Ministerio Público fue el Sr. **Martín Delgado De León (don Pachín),** quien para el 29 de noviembre de 2006 vivía en el Bo. Hato Viejo de Arecibo con su esposa y su nieto Tomás Delgado. Ese día, como a las 8:00 a.m., Shakira llegó a su casa llorando, diciendo que su mamá estaba en la cama con sangre en el pecho. Él le dijo, "vente, vamos a la casa" y la nena se echó los brazos a la cabeza y desesperada dijo "no, no, yo no voy, yo no voy". Entonces él fue a la casa y vio a Yadira desnuda acostada en la cama. La movió, le movió la pierna izquierda un poco y nada.

El testigo regresó a su casa. Su esposa estaba en la cocina, le dijo que la muchacha había muerto y salieron. En eso, Tomás acababa de entrar de lavarse los zapatos porque venía de los gallos y le dijeron que su esposa estaba muerta. Él se echó los brazos a la cabeza y salió corriendo para la casa. Éste la vio allí y lloraba. Había una toalla en la misma cama y el testigo le dijo a Tomás que la cubriera. Tomás la cubrió y salieron de la casa.

La noche antes, el testigo se acostó a dormir a las 8:00 p.m. y se despertó de 2 a 3 veces para ir al baño. Cuando se levantó esa noche, la puerta del cuarto de Tomás estaba cerrada.

Delgado De León declaró que el 29 de noviembre de 2006, él no encrestó o recortó gallos con Tomás. Solo les dieron comida. Ese día cree que no habló con el Agte. Montalvo. Sin embargo, después de eso, habló con él en el cuartel y le dijo lo mismo que testificó.

En el contra interrogatorio el testigo aclaró que él le dijo a Tomás lo que la niña le dijo, después que Tomás se lavó las botas. El testigo todavía no había ido a la casa de Yadira. Fueron los dos juntos. Tomás fue quien llamó a la policía y al padre de ella. Expresó que Tomás no tocó a Yadira, ni la limpió y que solo le puso la toalla encima. Ese día, o al otro día, el Agte. Montalvo estuvo en su casa y entrevistó a su esposa Ana Rosa. También testificó que los gallos se encrestaban por la tarde.

### 8. Ana Otero García

La octava testigo del Ministerio Público fue la Sra. **Ana Otero García**, quien tenía 26 años, trabajaba en SAM'S, estaba casada con Héctor Delgado Candelaria y vivía con él y sus dos hijos en Vistas del Atlántico.

La testigo conocía a Yadira Delgado Candelaria hacía 6 años, porque era la hermana de su esposo. Ella se comunicaba con Yadira casi todos los días. Yadira estaba casada con Tomás Delgado y tenían dos niñas, Shakira de 10 años y Ninoshka de 4 años.

El día de la muerte de Yadira ella había dejado a su suegra Mary, quien era la mamá de Yadira, como a las 8:30 en una cita médica. La testigo se enteró de la muerte porque el papá de Yadira la llamó llorando a su celular de 9:00 a 9:30 a.m., y le dijo que la habían matado. En ese momento, estaba en la tienda Pitusa, con su hija y fue a decírselo a su esposo, que estaba durmiendo en la casa. Su esposo y ella fueron a la casa de Yadira a verificar lo que había pasado. La casa y el patio estaba

encintados. No los dejaron pasar y se quedaron de media a una hora mirando desde el carro. Allí vieron a Freddy (Sigfredo Delgado), a la bisabuela de Shakira (Annie Martínez) y a Tomás Delgado, quien estaba frente a la casa de él y de Yadira. Él se veía normal. Después de eso, fueron a buscar a Mary. En el momento que estaban llegando, Mary gritó, tiró el teléfono y se desmayó. Alguien le dijo por el teléfono lo que había sucedido. La recogieron, la llevaron a su casa y se quedaron con ella.

Desde el 29 de noviembre de 2006 Shakira se fue a vivir a Vistas del Atlántico con su abuela María Candelaria. Luego de los hechos, la testigo veía a la nena ocasionalmente los fines de semana o una vez en la semana.

Posteriormente, luego que Shakira regresó de un viaje, (cree que esto pasó en enero 2007), la testigo estuvo presente en casa de María Candelaria cuando el agente Montalvo entrevistó a la niña. Era después de las 3:00 p.m. y en la residencia estaban ella, María, su esposo y su hija.

Ese día, al principio Shakira no quería empezar a hablar y se puso bien intranquila y a moverse mucho en el mueble. La testigo le agarró la mano y le dijo que se tranquilizara que ella había mandado a llamar al agente Montalvo para hablar, y que le dijera lo que iba a decirle. El agente Montalvo empezó a buscarle la vuelta y ella empezó a expresar lo que había pasado. Esa conversación duró como 45 minutos.

La testigo escuchó que Shakira le dijo al Agte. Montalvo que había visto a su papá y al amigo en la casa, que estaba lleno de sangre, y que tenían un cuchillo cada uno. Que el papá tenía unos guantes en las manos color azul de unas bolitas. El amigo de papá tenía un cuchillo en la mano y los guantes también. Shakira le dijo al Agte. Montalvo que la mamá decía No, No.  Eran como las 3:00 a.m., y ella tenía un reloj de "Kitty" o de "Strawberry Shortcake". La niña despertó porque el celular había sonado y fue a avisarle a la mamá y ahí se encontró con la escena. La nena salió corriendo de la casa y fue a avisarle al papá, que estaba bregando con los gallos.

Cuando el agente Montalvo se fue, le dijo a Shakira que le iba a dar de asignación que le escribiera una carta donde le dijera lo mismo que le había dicho, y si se acordaba de algo más que también lo escribiera, lo pusiera en un sobre y se lo entregara a él. Cuando el agente Montalvo y la niña hablaron, Mary estaba en un cuarto, con el esposo de la testigo y su hija porque Shakira no quería que estuviera la abuela, solamente la testigo.

Una vez el Agte. Montalvo se fue, Otero García le dijo a Shakira que entrara al cuarto, que hiciera la asignación que le dio el agente Montalvo y escribiera la verdad. Que no escribiera lo que ella creía que había pasado, que escribiera lo que había visto. Shakira entró al cuarto y ella se fue porque empezaba a trabajar a las 6:00 p.m. La testigo no habló con Mary sobre lo que Shakira había dicho porque como ésta no quería que la abuela estuviera, ella no se lo dijo.

En el contrainterrogatorio, la testigo explicó que, desde el 29 de noviembre de 2006, hasta el día de la vista (11 de febrero de 2008), Shakira estuvo con Mary y los familiares de Yadira. Shakira expresó que había visto al amigo de papá, Eduardo, con él. La testigo le dijo a su esposo que la niña habló de lo que había pasado en la casa. Después de eso ella no dialogó más del tema con ésta.

La testigo manifestó que Shakira habló con el Agte. Montalvo después que llegó del viaje. Otero García no fue a ese viaje. Shakira viajó con su abuela y su hermana Ninoshka. Sin embargo, la testigo no recordó si la hermana gemela de la occisa fue con ellas, o era que iban para la casa de ella. Según Otero García, Shakira regresó el 7 de enero. Dos o tres semanas después de eso fue que Shakira habló con el Agte. Montalvo.

La testigo hizo una carta de su puño y letra,[60] después de la muerte de Yadira. Ella escribió ese documento porque había escuchado que

---

[60] Exhibit B de la Defensa- La carta de Ana Otero se transcribe íntegramente a continuación:

> "Dice que un primo visitaba la casa, que se parqueaba lejos para que nadie lo viera. Dice que un tal chino que es verdaderamente su primo no es porque el no va ya a la casa. El tipo es trigueño no tan alto, flaco como *eñemao*, no es narizón, pelo negro pegao (dice que se parece a ese primo, que nadie conoce ni su tio ni su papa)

tomara nota cuando la niña hablara cualquier cosa que se oyera importante para la investigación. Esas notas las tomó antes que la niña se fuera de viaje, en la casa de Annie, la bisabuela de la nena. Shakira salió hablando espontáneamente y la testigo lo escribió. Ella mencionó que un primo visitaba la casa y se estacionaba lejos para que nadie lo viera. La testigo le preguntó que cual primo y Shakira no supo decirle porque no sabía quién era, pero que no era Chino, el cual sí era primo. Chino era primo de Mayra. La niña dijo que Chino ya no iba a la casa de Yadira. La menor describió al primo que visitaba la casa como trigueño, no tan alto, flaco, como "eñemao", que no era narizón y tenía pelo negro, "pegao".

Otero García también mencionó en el escrito que la menor le dijo que si su papá se enteraba de que ese primo que nadie conocía llegaba a la casa, pasaría algo con la mamá. Eso lo dijo la menor. Lo que la testigo escribió entre paréntesis ella lo interpretó, porque la niña hizo un gesto que se pasó la mano por el cuello. La niña hizo el gesto en ese momento, pero no verbalizó. Del documento también surgía que Shakira le expresó que la mamá le decía a ella que no salieran de su cuarto cuando estaba esa persona en la casa. La niña le manifestó a la testigo que esa persona y su mamá fumaban tabaco en la casa. La testigo escribió todo eso y cree que le entregó la carta al Agte. Montalvo.

### 9. Agente Heriberto Torres Berrocal

El noveno testigo presentado por la Fiscalía fue el **agente Heriberto Torres Berrocal**, adscrito a la División de Servicios Técnicos. Éste testificó que el día 29 de noviembre de 2006 se encontraba laborando en el turno de 8:00 a.m. a 5:00 p.m. cuando, a través de la radio de la Policía, le indicaron que pasara a la carretera 653, camino Los Delgado, sector Los Mora de Arecibo, con relación a una persona muerta. Declaró que arribó a las 9:16 a.m. junto a su compañero José Maysonet, con quien trabajaba en pareja.

En el lugar, se entrevistó con el agente Frank Morales, quien estaba a cargo. El agente Torres Berrocal declaró que fue él quien acordonó la escena. Luego de esto, esperó por el agente de Homicidios y el Fiscal, fotografió la escena y tomó las fotos que le requirió el agente investigador. Además, trató por huellas[61] la puerta de entrada de la residencia de la occisa, tanto por delante como por detrás, la puerta de "screen", un celular, unas tarjetas, el espaldar de la cama y un cristal, del cual se levantaron varios fragmentos de huella. Declaró que se levantaron seis parchos con fragmentos de huella.[62] Estos fueron enviados al Laboratorio de la Policía, Sección Monodactilar.

Durante el contrainterrogatorio, el agente Torres Berrocal testificó que, en la puerta de entrada, los fragmentos de huella estaban marcados en áreas donde había manchas de aparente sangre. La puerta de "screen" fue trabajada para huellas, pero no se desarrollaron. En el celular se levantó un parche de huellas. Asimismo, declaró haber tomado 84 fotografías en el lugar de los hechos, la cuales posteriormente fueron reveladas. Además, informó que las puertas y ventanas de la residencia, así como el hueco del aire acondicionado, no se encontraban forzados.

### 10. Agente Axel Joel Zoisa Rivera

El décimo testigo del Ministerio Público fue el **agente Axel Joel Zoisa Rivera**, quien trabajaba para el Instituto de Ciencias Forenses, en la División de Investigadores Forenses, Sección de Análisis e

---

que si su papa se entera.. ella la nena se puso las manos en la cabeza y luego se las paso por el cuello como para cortárselo. (eso es lo que hubiera echo su papa)
la mama decia que no saliera de hay o sea del cuarto porque ella fumaba tabaco con esa persona."

[61] El agente Torres Berrocal testificó que tratar una huella se refería a aplicar el polvo de grafito con una brocha a la superficie que se quería trabajar, se desarrollaba la huella y se fotografiaba. Luego se utilizaba un parche plástico, se levantaba, se adhería a esta tarjeta y se enviaba al laboratorio.

[62] Según el agente Torres Berrocal, los fragmentos de huella eran partes de la huella dactilar de los dedos de alguna persona. No era la huella completa.

Investigaciones Especiales. Éste declaró que el 12 de diciembre de 2006 el agente Montalvo se comunicó con su oficina para solicitar una toma de muestra bucal al señor Tomás Delgado[63]. Esta muestra fue obtenida en la Oficina de Inteligencia Criminal del cuartel de Vega Baja, estando presente el agente Montalvo, el testigo y el donante.

Zoisa Rivera, testificó que el agente tenía que llenar una solicitud de análisis y se completaba otro documento para este ser entregado al laboratorio. Explicó que el colector bucal era como una paleta, venía sellado, y se abría frente al donante, previo a colocarse guantes para no contaminar. El colector se introducía en el interior de la mejilla, tanto del lado derecho como del izquierdo, pasándolo siete veces por cada lado para extraer saliva. Una vez la muestra era tomada, al haberse sometido a la muestra libre y voluntariamente, el donante firmaba dos documentos. Tanto él, como el agente, iniciaban ese colector bucal. Luego se procedía a embalar y enviar al laboratorio[64] para un análisis de ADN.

### 11.  Alex Cintrón Castellanos

El undécimo testigo de la Fiscalía fue el Sr. **Alex Cintrón Castellanos**, quien previo a prestar su testimonio frente al jurado, testificó, en ausencia de este, en una Regla 9 de Evidencia.[65] En la misma, declaró que trabajaba para el Instituto de Ciencias Forenses como investigador forense, desde junio de 2004. El 4 de diciembre de 2006 éste se presentó a la Comandancia de Arecibo, a solicitud del agente Alejandro Montalvo, para hacer una búsqueda de sangre en una residencia en el sector Barranca. Para ello, además de la inspección visual, utilizó el sistema *Crimescope*, también conocido como *ALIS* y el químico *Luminol*. Sostuvo que ambos sistemas se utilizaban en la oscuridad para reflejar machas de sangres, fluidos y saliva.

El testigo explicó que, en el baño de la residencia, específicamente en el drenaje de la ducha, levantó varios pelos, los cuales embaló en un sobre manila pequeño, al que le colocó sus iniciales. Asimismo, declaró que en el área del lavamanos y en el piso frente a este, levantó unas manchas de aparente sangre.[66] Cintrón Castellanos no midió las manchas, ni se pudieron fotografiar. Se ocuparon y se embalaron. Además, en el baño, área del "hamper", ocupó una toalla que reflejaba manchas de aparente sangre o fluido y fue embalada.

En el pasillo saliendo del baño, es decir, el pasillo central de la casa, Cintrón Castellanos levantó manchas de aparente sangre en el piso. Testificó que, en el pasillo, en la pared frontal, al salir del baño, en la parte inferior, ocupó una mancha de aparente sangre, la cual embaló. Más arriba en dicha pared, hacia la izquierda, cerca del marco de la puerta del cuarto donde se encontró a la víctima, ocupó un pelo incrustado. Este indicó que el mismo estaba junto con una fibra y lo embaló.

Finalmente, el testigo testificó que el cuarto de la víctima se fotografió y utilizando el sistema ALIS, ocupó y embaló una mancha en el forro de la cama. Declaró que no era él, sino que era en el laboratorio donde se determinaba qué eran los fluidos ocupados. El testigo también realizó un croquis.

Luego de escuchado el testimonio del Sr. Cintrón Castellanos en la Regla 9, el Tribunal determinó que el testigo **no podría declarar ante el jurado sobre los cabellos y la fibra levantadas por él. Específicamente de los dos (2) pelos que el testigo levantó en la escena**.[67]

Ante el Jurado, Cintrón Castellanos testificó que trabajaba para el Instituto de Ciencias Forenses desde junio de 2004, como investigador

---

[63] Zoisa Rivera testificó que en una muestra bucal se introducía un colector bucal en el interior de la mejilla, de donde se extraía saliva para hacer análisis de ADN.

[64] Testificó que embalar se refería a embalar el colector, colocarlo en un sobre de papel, el cual se sellaba y se identificaba.

[65] 32 LPRA Ap. IV, R.9 (derogada). Esta Regla corresponde a la vigente Regla 109 de Evidencia. 32 LPRA Ap. VI. R. 109. Subrayado nuestro.

[66] El testigo declaró que levantó dichas manchas con una bayeta blanca y agua destilada. Se embalaron en sobres distintos, con sus iniciales. Todas las piezas ocupadas tenían su número, iniciales, fecha en que levantó, qué levantó y qué usó.

[67] Énfasis nuestro.

forense. A la fecha del juicio se desempeñaba como investigador forense en la Sección de Análisis de Vehículos. Declaró sobre sus credenciales académicas, adiestramientos profesionales tomados, así como los relativos al manejo de escenas criminales y levantamiento de evidencia. Específicamente habló sobre los sistemas de recopilación de manchas de fluidos corporales, ALIS (Crimescope) y Luminol. Explicó que el ALIS era una máquina que se utilizaba con corriente de 110 voltios, que tenía una manga que, al encenderla, producía una luz. La luz se utilizaba en la oscuridad y esa luz iba a resaltar si había una mancha. Con relación al Luminol, testificó que este se utilizaba en la oscuridad. Era un líquido que venía ya en un envase con su gatillo y un sobre aparte. Ese sobre contenía un polvo que se le echaba dentro del químico y se agitaba. Esa mezcla era lo que hacía que se reflejara la mancha.

El 4 de diciembre de 2006, el testigo se presentó a la Comandancia de Arecibo, a solicitud del agente Alejandro Montalvo Arguelles, para hacer una búsqueda de sangre en una residencia en el sector Barranca. Lo acompañaba su auxiliar David Betancourt. Tan pronto llegó al lugar, observó que la residencia que iba a trabajar estaba acordonada con cinta amarilla y custodiada por un agente. Señaló que David Betancourt era el encargado de tomar fotografías del exterior e interior de la residencia y de la evidencia, por instrucciones suyas. Le mostraron los Exhibits B-1 al B-5 del Ministerio Público sobre el interior de la residencia.[68]

El testigo declaró que antes de comenzar el trabajo, el agente Montalvo Arguelles completó una Solicitud de Análisis que incluía lo relacionado al caso y la solicitud de búsqueda de sangre. Completada la misma, David Betancourt procedió a tomar fotografías para documentar como estaba todo antes de comenzar, mientras que él realizaba un croquis de la residencia. Señaló, además, que se colocó el equipo de seguridad (guantes y mameluco). De esta forma, declaró sobre los procesos que realizó con "Crimescope" y Luminol y lo que hizo una vez recolectó la evidencia. En el re directo declaró que el agente Montalvo se mantuvo fuera de la residencia, y que él se movía allá para informarle de sus hallazgos.

El testigo narró que levantó del área del lavamanos unas manchas de aparente sangre, las cuales estaban visibles. Frente al lavamanos, en el área del piso, levantó otra mancha visible. En el área de la bañera, en el piso frente a la regadera, se levantó otra mancha. Frente a la regadera, en la pared a la derecha, también se levantó otra mancha. En el "hamper" del baño se levantó una toalla que presentaba varias manchas. Todo lo recolectado en el baño fue embalado, dándole número, iniciándolo, y escribiendo fecha y descripción.

Cintrón Castellanos declaró que, al salir del baño, en la pared del frente, en el área inferior, se levantó una mancha visible de aparente sangre, la cual embaló igual que las del baño.

En cuanto al área del cuarto donde se encontró a la occisa, el testigo expresó que presentaba mucha sangre en el área del forro de la cama. En el forro se encontraron, además, manchas no visibles y se procedió a levantar dicha evidencia.

Durante el contrainterrogatorio, el testigo declaró no haber medido las manchas levantadas. Sí tomó medidas de la casa como, por ejemplo, el pasillo que medía 3' 2" ancho. Asimismo, declaró no haber revisado la sala y el pasillo con los equipos, debido a que había mucha claridad como para utilizar los sistemas en dichas áreas, ya que fue a la residencia de día y no de noche. Sin embargo, sí hizo una inspección visual en toda la casa. Una vez concluyó dicha tarea, Cintrón Castellanos relató que realizó el cierre de la solicitud con el agente Montalvo Arguelles, y procedió a embalar la evidencia ocupada en sobres manilas. En total recolectó once (11) piezas de evidencia. Procedió a identificar las mismas en corte.[69] Declaró que esa evidencia la entregó en el Laboratorio de Criminalística del ICF, a la receptora Bárbara Carmona Guadalupe.

---

[68] El testigo describió el Exhibit B-1 como una foto del interior de la residencia que reflejaba parte de la sala y el pasillo que cruzaba hasta la parte posterior, hacia los cuartos y el baño. Describió los Exhibits B-2, B-3 y B-4 como la primera habitación a la parte derecha en el pasillo, donde se mostraban unas camas literas. Describió el Exhibit B-5 como una foto del área del closet del cuarto donde se encontró a la occisa.

[69] Exhibits, G, H, I, J, K, L, M, N, Ñ del Ministerio Público.

### 12.    Patólogo Francisco Cortés Rodríguez

El duodécimo testigo de la Fiscalía fue el **patólogo Francisco Cortés Rodríguez**. Éste declaró que trabajaba para el Instituto de Ciencias Forenses. Luego de ser estipulada su capacidad, sostuvo que él hizo la autopsia de la occisa el 1 de diciembre de 2006, conforme al Manual de Procedimientos y realizó el informe de autopsia el 13 de diciembre de 2006.[70]

Declaró que su informe describía el cuerpo de una mujer de la raza blanca, que medía 67 pulgadas de estatura, y tenía un peso estimado de 140 libras. Testificó que ésta vestía una blusa amarilla y que presentaba múltiples heridas incisas e inciso-punzantes diseminadas por el cuerpo. Además, declaró que presentaba contusiones.[71] Señaló que fue identificada por su padre.

Cortés Rodríguez explicó que el proceso que se realizaba cuando se hacía una autopsia completa constaba de un examen externo y un examen interno. En el examen externo que realizó de la occisa, pudo notar el cuerpo de una mujer bien desarrollada, bien nutrida, que presentaba **108 heridas** incisas e inciso-punzantes, como hallazgo principal.  Estas heridas se encontraban en la cara, en el tronco, en las caderas y en las extremidades superiores.  Declaró que fue en estas partes donde estaban la mayor parte de las heridas.

Sobre el examen interno, el testigo testificó que muchas de las heridas penetraron a la cavidad torácica y abdominal, interesaron órganos vitales como el corazón, los pulmones y el hígado, así como el estómago, intestinos y mesenterio. Éste narró que hubo 8 heridas al corazón, 12 al hígado, 8 al pulmón derecho y 3 el pulmón izquierdo. Las heridas fueron causadas con un arma blanca tipo cuchillo. **Declaró que fueron utilizados al menos un cuchillo y que <u>pudo haber sido más de uno</u>**. La profundidad de las heridas variaba de acuerdo con la localización del cuerpo. Igualmente, sostuvo que, debido a la configuración nítida y elíptica de las heridas, estas resultaban compatibles con haber sido producidas por arma blanca. **Declaró que la trayectoria de las heridas que penetraron la región torácica hacia la cavidad, iba en una dirección de abajo hacia arriba, mientras que las que penetraron en la cavidad abdominal iban de arriba hacia abajo**.[72] Sobre estas trayectorias, explicó que las mismas no se referían a la posición del cuerpo al momento de recibir el trauma, sino que describía una posición anatómica particular que era el cuerpo puesto de pie, con las palmas de las manos hacia el frente. **Posteriormente declaró que era posible que las heridas hayan sido realizadas por dos personas.**

Cortés Rodríguez testificó que varias heridas pudieron haber causado la muerte de la occisa. Declaró que la causa de muerte fue por heridas de arma blanca y que la manera de la muerte fue homicidio.[73]

El testigo sostuvo que durante la realización de la autopsia se adquirían del cuerpo sangre, humor vítreo[74] y secreciones de las fosas nasales,[75] las cuales se enviaban al Laboratorio de Toxicología para su análisis sobre alcohol y sustancias controladas. Declaró que estos exámenes arrojaron resultados negativos. Igualmente, testificó que se realizó un examen de la genitalia y del ano para detectar la presencia de semen y entendía que los resultados fueron negativos. No obstante, sostuvo que no se podía descartar que hubo violación.

El patólogo continúo declarando sobre los Exhibits (fotografías) que se le presentaron. Sobre estos expresó lo siguiente:

---

[70] Exhibit R por estipulación.

[71] Testificó que una contusión era un golpe, comúnmente conocido como hematoma, como consecuencia de la aplicación de fuerza con un objeto romo a una parte del cuerpo.

[72] Exhibit R por estipulación.

[73] Declaró que según se describiría en la Patología Forense, homicidio sería la muerte a manos de otra persona.

[74] Declaró que esto era un líquido dentro del ojo, el cual se aspiraba con una aguja fina.

[75] Testificó que estas se adquirían mediante el uso de un hisopo (palo con bola de algodón en un extremo) nasal.

- El Exhibit P-1 lo describió como una foto de la mano derecha de la occisa, la cual presentaba heridas de defensa.
- El Exhibit P-2 era una foto del dedo índice y el tercero, donde se observaba una herida entre ellos y en la palma y el dedo pulgar, también heridas de defensa.
- El Exhibit P-3 lo describió como una foto de la parte posterior de la mano derecha, la cual presentaba dos heridas compatibles con heridas de defensa.
- Los Exhibits P-4 y P-5 eran dos fotos del antebrazo, que presentaban una herida incisa en su parte interna, que también resultaba compatible con una herida de defensa.
- El Exhibit P-6 era una foto de la mano izquierda de la occisa la cual reflejaba unas heridas de defensa a nivel del pulgar y la palma de la mano, así como otra herida más amplia en el antebrazo. Testificó que las uñas de la occisa se encontraban azules o moradas, lo cual era compatible a eventos de baja oxigenación, pérdida de sangre o traumas directos a las uñas.
- En el Exhibit P-7 declaró que se podía ver el área de la muñeca y el área de los nudillos donde se observaban heridas de tipo de defensa.
-  El Exhibit P-8 mostraba dos heridas, una en el brazo izquierdo y en el antebrazo una herida más amplia, también de defensa.
- El Exhibit P-9 era una fotografía de una herida incisa al lado del codo, interesando el brazo derecho, así como de dos heridas adicionales en el antebrazo, todas compatibles con heridas de defensa.
- El Exhibit P-10 declaró que era el antebrazo izquierdo, y que presentaba heridas incisas compatibles con ser heridas de defensa.
- El Exhibit P-11 mostraba tres heridas superficiales, que eran abrasiones lineales (arañazos) y una herida grande en el antebrazo, así como una herida en la palma de la mano, base del pulgar, compatibles con ser heridas de defensa.
- El Exhibit P-12 mostraba una foto del brazo derecho con dos heridas en el brazo y una justamente encima de donde se doblaba el codo.
- El Exhibit P-13 eran las heridas del brazo y del ante brazo izquierdo, compatibles con ser heridas de defensa.
- El Exhibit P-14 era una foto del antebrazo derecho donde se podía observar una herida incisa, cerca del codo.
- El Exhibit P-15 era un acercamiento del brazo izquierdo, donde se podía ver una herida incisa grande en su antebrazo, compatible con ser una herida de defensa.
- En el Exhibit P-16 se podía ver la mano izquierda donde las heridas envolvían los nudillos y el pliegue entre el pulgar y el dedo índice, compatibles con heridas de defensa.
- El Exhibit P-17 mostraba heridas incisas en el antebrazo, compatibles con ser de tipo de defensa.
- El Exhibit P-18 era un acercamiento de la herida en el antebrazo, encima de la muñeca compatible con ser una herida de defensa.
- El Exhibit P-19 era una contusión o varias en la cara anterior del muslo derecho, así como heridas en el abdomen. Testificó que estas contusiones (comúnmente conocidos como hematomas) se ocasionaban por un golpe directo al área, que causaba el rompimiento de los vasos sanguíneos finitos debajo de la piel, a nivel del músculo, el cual sangraba, de forma que no rompía hacia afuera. Sostuvo que la contusión era reciente.
- El Exhibit P-20 era la cara externa del muslo, donde se observaban áreas de contusión irregulares y recientes.

- El Exhibit P-21 era una foto de la cara de la occisa, que presentaba una herida cortante en la nariz y múltiples heridas incisas e inciso-punzantes en el pecho.
- El Exhibit P-22 fue descrito como una herida inciso-punzante en el muslo derecho.
- En el Exhibit P-23 declaró que se podía ver una contusión en el muslo derecho, parte de las anteriores contusiones y unas contusiones solitarias.
- El Exhibit P-24 mostraba una contusión por agarre o golpe que no era reciente, de color rosado violáceo.
- En el Exhibit C-1 expuso que debía haber más sangre encima del cuerpo.

El testigo explicó que una mujer normalmente tendría 4 litros de sangre en su cuerpo, y que la occisa debió haber perdido mucha sangre por razón de sus heridas, particularmente, por las heridas del corazón, pulmones e hígado, que eran órganos vasculares. También declaró que, por la cantidad de sangre que había, era una posibilidad que a la occisa no la hubiesen matado en el cuarto. Asimismo, manifestó que se desprendía una mancha de sangre compatible con que se hubiese pasado un paño húmedo.

En el contrainterrogatorio dirigido por la entonces representación legal de Correa López,[76] el testigo declaró que se realizó un raspado de lo que quedaba de las uñas de la occisa, el cual tenía entendido que sólo reflejó sangre de ésta. **También declaró que la muerte de la occisa no fue inmediata, y que ésta luchó por su vida.**

Durante el contrainterrogatorio dirigido por la representación legal de coacusado Delgado Nieves,[77] Cortés Rodríguez fue sometido a un interrogatorio en ausencia el Jurado, conforme a la Regla 9 de Evidencia. En este, el testigo declaró sobre varias evidencias que levantó. Las mismas consistieron en pelos del cabello de la occisa, así como pelos recuperados encima del cuerpo de ésta. Testificó que recuperó seis (6) pelos del cuerpo de la occisa.[78]

Cortés Rodríguez declaró que recuperó un pelo largo en el tórax (pecho), otro corto en la misma área; uno en el muslo izquierdo; uno en el muslo derecho; uno en el brazo izquierdo, entre el codo y el hombro; y uno en el antebrazo derecho, entre el codo y la muñeca. Declaró que estos fueron embalados individualmente y enviados al Laboratorio de Serología para análisis, cuyos resultados desconocía. También narró que se recuperaron pelos del cabello de la occisa. En este extremo, sostuvo que se levantaron cinco (5) pelos de distintas partes de la cabeza. Del área púbica no se recuperaron pelos, puesto que estaba rasurada.

El testigo declaró que se hacía una solicitud para que se analizara con lo que se pudiera analizar, y que no era una solicitud específica. Señaló, además, que ello se realizaba como parte del protocolo estandarizado para muertes donde había cierta cercanía entre la víctima y el victimario.

Luego de escuchar el testimonio, el Tribunal determinó no permitir preguntas ante el jurado, sobre los pelos recuperados, así como esperar al testimonio del siguiente testigo de apellido Mercedes.

### 13.    Fernando Mercedes Fernández (Especialista en ADN)

El decimotercer testigo del Ministerio Público fue el Sr. **Fernando Mercedes Fernández**, quien declaró que trabajaba para el Instituto de Ciencias Forenses por aproximadamente 11 años y medio, como especialista en ADN, en el Laboratorio de ADN-Serología. Testificó sobre su preparación académica, adiestramientos, educación continua, así como sus funciones en el Instituto. Sostuvo que había trabajado en más de 100 casos criminales y había testificado en más de 50 de estos.

Mercedes Fernández explicó que una vez se le asignaba un caso, lo recibía y pasaba por los análisis serológicos. Estos fueron definidos como los exámenes en el cual toda la evidencia que sometía la Policía, agentes

---

[76] Lcda. Mayra López Mulero.
[77] Lcdo. Jorge Gordon Menéndez.
[78] Subrayado nuestro.

de ley y orden, o por solicitud del fiscal o del patólogo, se le realizaban análisis preliminares para determinar y categorizar los biofluidos que se sometieron como aparentes. Señaló que biofluidos se refería a sangre, semen, orina, heces fecales, hueso, tejido, dientes y cabello. Sostuvo que había realizado más de 100 exámenes serológicos y de ADN. Explicó que una vez los exámenes de serología daban positivo a la presencia del biofluido correspondiente, el caso pasaba al área de ADN donde se comparaba, ya sea con la víctima, con el sospechoso, el biofluido con la escena, o la escena contra la víctima o sospechosos. De esta forma, se cualificó como testigo perito.

A Mercedes Fernández se le mostraron varios Exhibits. Sobre estos declaró lo siguiente:

- El Exhibit Q del Ministerio Público era un Certificado de Análisis realizado por él, sobre los análisis que llevó a cabo de las piezas evidenciarias.
- El Exhibit A por estipulación (sobre DNAS06-1291-007), lo describió como funda de almohada color verde con manchas de sangre, que dio positivo a sangre cuyo ADN correspondía a la occisa.
- El Exhibit B (sobre DNAS06-1291-008) era un cubrecama de bebe con diseños verdes y amarillos, que dio positivo a sangre cuyo ADN correspondía a la occisa.
- El Exhibit C (sobre DNAS06-1291-009) lo describió como un "comforter" azul con diseños de lunas y soles amarillos, que dio positivo a sangre cuyo ADN correspondía a la occisa.
- El Exhibit D (sobre DNAS06-1291-010) era una ropa de cama de color negro, crema y con diseños de colores, que dio positivo a sangre cuyo ADN correspondía a la occisa.
- El Exhibit E (sobre DNAS06-1291-011) era el número de pieza 011, descrita como una toalla color crema, que dio positivo a sangre cuyo ADN correspondía a la occisa.
- El Exhibit F (sobre DNAS06-1291-012) respondía a un panty tipo bikini, color rosa, que dio positivo a sangre cuyo ADN correspondía a la occisa. Además, declaró que a esta pieza se le realizó una prueba para detectar semen, la cual arrojó negativo.
- El Exhibit G (sobre DNAS06-1291-013) era un aplicador con aparente mancha, levantada del piso, frente a los pies de la occisa. No se encontró perfil genético de presencia de sangre, ni de semen. Se aclaró en el contrainterrogatorio que no se obtuvo.
- El Exhibit H (sobre DNAS06-1291-014) era un aplicador con manchas de sangre levantado del lavamanos del cuarto de baño. Este dio positivo a sangre cuyo ADN correspondía a la occisa.
- El Exhibit I por estipulación (sobre DNAS06-1291-015) era un aplicador con manchas de sangre, levantado del piso del cuarto de la occisa, que dio positivo a sangre cuyo ADN correspondía a ésta.
- El Exhibit O (DNAS06-1296-007) era un pedazo de tela con aparente mancha, levantado del piso del área del pasillo, saliendo del baño, que dio negativo a la presencia de sangre.
- El Exhibit Ñ (DNAS06-1296-008) era un pedazo de tela con aparente mancha, levantado de la pared que se encontraba de frente al salir del baño, área inferior, que dio negativo a la presencia de sangre.
- El Exhibit M (DNAS06-1296-010) era una toalla de varios colores con aparentes manchas, levantada del baño de la residencia, que dio negativo a la presencia de sangre.
- El Exhibit N (DNAS06-1296-011) era un pedazo de tela blanco con diseños de sol amarillo con manchas de sangre, cortado del forro de la cama, que dio positivo a sangre, cuyo ADN correspondía a la occisa.
- El Exhibit J (DNAS06-1300-16.13), eran como muestras de fragmentos de uña de la mano derecha, que se tomaban en el proceso a todos los cuerpos y que provenían ya de la

autopsia. Declaró que dio positivo a presencia de sangre cuyo ADN correspondía a la occisa.

- El Exhibit K (DNAS06-1300-16.14) lo describió como uña de mano izquierda, que dio positivo a presencia de sangre cuyo ADN correspondía a la occisa.
- El Exhibit L (DNAS06-1300-16.15) era un aplicador bucal proveniente de la autopsia de la occisa, que dio negativo a la presencia de semen.
- El Exhibit M por <u>estipulación</u> (DNAS06-1300-16.16) era un aplicador vaginal proveniente de la autopsia de la occisa, que dio negativo a la presencia de semen.
- El Exhibit N por <u>estipulación</u> (DNAS06-1300-16.17) era un aplicador rectal proveniente de la autopsia de la occisa, que dio negativo a la presencia de semen.
- El Exhibit Ñ por <u>estipulación</u> (DNAS06-1333) era un colector bucal tomado a Tomás Delgado Nieves, como muestra de referencia para obtener un perfil genético de éste.

Sobre la pieza de evidencia identificada como DNAS06-1300-16.18 declaró que era una muestra de referencia consistente de un tubo de sangre proveniente de la misma de la occisa, el cual se usó para el proceso comparativo de las piezas de evidencia mencionadas.

<u>Durante un interrogatorio al amparo de la Regla 9 de Evidencia, Mercedes Fernández declaró sobre las **piezas de evidencia DNAS06-1296-009 que se describió como pelo levantado en la pared que se encuentra saliendo del baño lado izquierdo, con fibra, y la DNAS06-1296-001 que describió como un pelo recuperado en el área de la bañera, área del drenaje**.</u>[79] Sobre estas explicó que no fueron sometidas a análisis de ADN, ya que no pidieron análisis tricológicos para los cabellos, el análisis que se le realizaba a este tipo de evidencia era de comparación de cabellos, y los exámenes que estaban pidiendo cuanto antes eran los análisis de ADN de las manchas de sangre. No pidieron nada más.

A preguntas de la Juez, Mercedes Fernández testificó que los cabellos referentes a la autopsia eran: cabello de la coronilla, cabello del lado anterior, cabello del lado posterior, cabello del lado derecho y cabello del lado izquierdo. Estas eran muestras de referencia que se le tomaron al cuerpo para poderlos evaluar.

No obstante, el testigo narró que la pieza evidenciaria DNAS06-1296-001, que describió como un pelo recuperado en el área de la bañera, área del drenaje lado izquierdo con fibra, fue evaluada macroscópicamente (miradas bajo una lupa) y compartía características con los cabellos de referencia tomados de la occisa, aunque no se le realizaron análisis microscópicos para emitir conclusiones. Explicó que el análisis macroscópico era una cuestión subjetiva y no objetiva. Declaró que el análisis tricológico consistía en la evaluación microscópica y macroscópica de la anatomía del cabello, a través de 25 características y del cual sostuvo que no tenía mucho poder de discriminación en comparación con la prueba de ADN. La prueba de ADN podía realizarse si los cabellos tenían folículo. Si no los tenían, se recomendaba el análisis de ADN mitocondrial que era de bajo poder de discriminación en comparación con la prueba de ADN nucleolar, toda vez que solo se analizaba la información genética materna.

Sobre los otros cabellos recuperados en evidencia: el DNAS0601300-16.6, pelo recuperado del muslo derecho, DNAS0601300-16.7, pelo recuperado del tórax, DNAS0601300-16.8, pelo recuperado del antebrazo derecho, DNAS0601300-16.9, pelo recuperado del muslo izquierdo; DNAS0601300-16.10, pelo recuperado del tórax, DNAS0601300-16.11, pelo recuperado de la mano izquierda, y DNAS0601300-16.12 pelo recuperado del brazo izquierdo, señaló que presentaban características macroscópicas morfológicas similares a la occisa. Estos fueron comparados con los que se le sacaron de la cabeza a la occisa. Declaró que esa información surgía del documento "Comentarios Pertinentes al Caso".

---

[79] Subrayado nuestro.

**Luego de escuchar el testimonio anterior, el Tribunal determinó que el testigo iba a discutir frente al jurado lo mismo que declaró en el interrogatorio bajo la Regla 9. Es decir, sobre los exámenes que realizó, los que no hizo, la razón para eso, y sobre toda la prueba existente, incluidos los cabellos. El Tribunal dispuso que no iba a ordenar la realización de análisis a esa prueba.** A esos, fines indicó que no se iba a discutir ello frente al jurado, para evitar que se confundieran. Asimismo, sostuvo que se realizarían las inferencias en las instrucciones adecuadas, a los efectos de que nada en relación a esos cabellos conectaban o podían ser objeto de que ese Jurado entendiera que pertenecían a ninguno de los dos acusados. [80]

De esta forma, con relación a la pieza de evidencia DNAS06-1296-009 (Identificación Q), que se describió como pelo levantado en la pared que se encontraba saliendo del baño, lado izquierdo, con fibra, declaró que llegó ante sí a través del área de Recibo de Evidencia, una vez el investigador Alex Cintrón lo sometió para análisis. Fue recibido en el Instituto el 6 de diciembre de 2006. Testificó que realizó una evaluación macroscópica. Sostuvo que en una evaluación macroscópica la evidencia se miraba bajo una luz y una lámpara, que era como una lupa, pero de mayor intensidad para poder apreciar mejor las características anatómicas y físicas de la propia evidencia, sin tenerla que ver bajo un microscopio. Asimismo, se observaba la muestra de referencia, la cual era una de la que se conocía el origen, que en este caso era de la cabeza de la occisa. De su evaluación surgió que ambas piezas eran similares en cuanto a características anatómicas macroscópicamente. Manifestó que no realizó otro análisis.

Sobre la pieza de evidencia DNAS06-1296-001 (Identificación R), que describió como un pelo recuperado en el "área de la bañera, área del drenaje", el testigo declaró que fue otra pieza que se evaluó macroscópicamente y no se tomó en consideración para analizarse en ese momento, porque compartía características similares a las muestras de referencia provenientes de la occisa. En este extremo, explicó que, al colocarse bajo la lupa, macroscópicamente eran similares en cuanto a las características de la anatomía del pelo, el grosor, y el color. Dicha evidencia la sometió el agente Alex Cintrón a la División de Recibo de Evidencia.[81]

Sobre la Identificación S del Ministerio Público, el testigo declaró que eran cinco sobres con cabellos de la occisa, levantados durante la autopsia como muestra de referencia.

Sobre la Identificación T del Ministerio Público, declaró que consistía en siete sobres que contenían cabellos recogidos del cuerpo de la víctima. Es decir, muestras de pelos recuperados en diferentes partes del cuerpo. Detalló esta evidencia como: pelo recuperado en el brazo izquierdo, pelo recuperado en la mano izquierda, pelo recuperado en el tórax, pelo recuperado en el muslo izquierdo, pelo recuperado en el antebrazo derecho, pelo recuperado en el tórax, y pelo recuperado en el muslo derecho. Declaró que estos pelos fueron evaluados macroscópicamente (balo una luz y lupa) y concluyó que todos los pelos tenían características similares macroscópicamente con la muestra de referencia de la occisa.[82]

Sobre la Identificación U del Ministerio Público declaró que era un documento preparado por él, el 7 de diciembre de 2006, que se realizó como parte del proceso de foto documentación de las piezas de evidencia y muestras de referencia del caso. En este, se detallaron las piezas de evidencias examinadas en el laboratorio. Testificó que la segunda página de ese documento se titulaba "Hoja de Comentarios Pertinentes al Caso", también preparado por él, y en la cual se documentaron las observaciones que se obtuvieron de su evaluación preliminar del caso. Expresó que surgía del documento, que dicho proceso se inició el 6 de diciembre de 2006 y culminó entre el 3 al 5 de enero de 2007, luego de ser revisado por la supervisora Carmen Tirado Neris. Fue marcado como Exhibit R del Ministerio Público.

Mercedes Fernández continúo declarando que luego del análisis macroscópico, al ver que los pelos compartían características generales

---

[80] No surge de la grabación que la Jueza haya impartido esa instrucción específica, durante las instrucciones al jurado. Subrayado nuestro.
[81] Subrayado nuestro.
[82] *Id.*

con las muestras de referencia de la occisa, no se le realizó un análisis más profundo, que sería un análisis microscópico. Asimismo, testificó que no se le requirió en ese momento la realización de un análisis tricológico a los cabellos. Señaló que no se pidieron análisis tricológicos y que lo que estaban requiriendo lo antes posible, era el análisis de las manchas de sangre que se habían presentado el día antes.

Sobre el contenido del Exhibit R del Ministerio Público, testificó que de la "Hoja de Comentarios Pertinentes al Caso" se desprendía que los cabellos compartían características similares a la muestra de referencia. Igualmente, declaró que dicha evaluación no surgía del informe final, y sí de las "Hojas de Comentarios Pertinentes al Caso", debido a que se requería un análisis tricológico y un análisis microscópico para realizar una comparación más detallada. <u>Los pelos recuperados, al ser similares macroscópicamente con los de la occisa, no tenían características diferentes que llamaran la atención para realizar el análisis tricológico mencionado.</u>[83]

El testigo narró que la muestra bucal tomada al acusado Tomás Delgado Nieves, no compartía características, ni perfil genético con ninguna de las piezas de evidencias antes reseñadas. En otras palabras, él estaba excluido de ser el donante del perfil genético de esas piezas de evidencia.

Sobre el Exhibit Q del Ministerio Público, Certificado de Análisis, el testigo declaró que de allí surgía que, de la pieza de evidencia 1291-07, que era la funda de la almohada verde con manchas de sangre, no se obtuvo perfil genético. Igual sostuvo sobre las piezas DNAS1291-008a y DNAS1291-008b, que eran diferentes muestras, y del mismo cubrecama de bebé y el DNAS1291-013, que eran los fragmentos de uña de la mano derecha. Declaró que no obtener un perfil genético se refería a que no había cantidad suficiente o que había demasiado material genético o demasiada sangre que estuviera hemoconcentrada.

**La conclusión del testigo en cuanto a los pelos fue que estos eran similares a los de Yadira Delgado Candelaria. En cuanto a los análisis de ADN, las muestras que dieron positivo fueron a la sangre de la occisa.**

En el contrainterrogatorio, Mercedes Fernández explicó que a ninguno de los pelos se les hizo análisis tricológico, ya que nunca se solicitó ese tipo de análisis. El testigo no refirió los pelos para el análisis tricológico, por órdenes de su supervisor, porque el análisis solicitado fue de ADN de las piezas de evidencia, no de los pelos. A pesar de eso, él no mandó a hacer un análisis tricológico de los pelos porque no había muestra de referencia del sospechoso en cuanto a cabellos, y porque no se le solicitó ese análisis. Estos llegaron como parte del proceso. Sin embargo, si se lo hubiesen pedido, teniendo la información del colector bucal de Tomás Delgado, pudo haberlo comparado con los pelos, de éstos tener folículos para comparar ADN.

Cónsono con lo anterior, el testigo expresó que a la occisa le arrancaron (5) pelos de la cabeza y durante la autopsia se recolectaron (7) pelos en el cuerpo. Los pelos recuperados eran macroscópicamente similares a los de la occisa. **Los pelos recuperados a través de todo el cuerpo de la occisa eran muestras de evidencia que no se sabía su origen.    <u>Posiblemente pudieran ser de Yadira u otra persona.</u>**

El Sr. Mercedes Fernández declaró que el Sr. Alex Cintrón ocupó dos pelos más en lugares distintos. Sobre el Exhibit S, pelo levantado de la pared saliendo del baño, lado izquierdo con fibra, según el documento de Solicitud de Análisis, se solicitó análisis de ADN, análisis serológico. En ese Exhibit S, tampoco se analizó la fibra. En el Informe no se incluyó el pelo levantado en el área de la bañera, área del drenaje que era el 001, ni el pelo levantado de la pared que se encontraba saliendo del baño, lado izquierdo con fibra, (DNAS06-1296-009).

En el Informe tampoco había nada referente a los pelos recuperados en el cuerpo durante la autopsia a la occisa. Con relación a estos últimos, se incluyeron en los comentarios pertinentes al caso. Los pelos de referencia de la occisa tampoco estaban en el Informe, pero sí en la Hoja

---

[83] Subrayado nuestro.

de Comentarios. No aparecían como evidencia en el Informe, en el Certificado de Análisis.

<u>El testigo manifestó que también analizó la prueba de referencia de Tomás. Esa prueba no lo involucró con ninguna evidencia analizada. Podría decir que lo excluye</u>.[84]

### 14.    María M. Candelaria Andújar

La decimocuarta testigo de la Fiscalía fue la **Sra. María M. Candelaria Andújar**, quien residía en Vistas del Atlántico, en Arecibo hacía (15) años. A la fecha de la vista, vivía allí con su hija, el esposo, el hijo de ella y sus dos nietas Shakira y Ninoshka Delgado. La testigo era la madre de la occisa Yadira Delgado.

Candelaria Andújar tenía otra hija que era hermana gemela de Yadira, y un hijo. El 29 de noviembre de 2006 en la mañana, la testigo estaba en la oficina de un doctor y recibió varias llamadas a su teléfono, incluyendo una de su hija, desde Estados Unidos. Ella tomó la llamada de su hija, quien le preguntó qué había pasado en Puerto Rico. La testigo le contestó que no sabía, porque estaba en una cita médica, llamó a casa de Yadira y le contestó un primo de Tomás Delgado. Ella le preguntó qué pasaba, porque había recibido varias llamadas y éste le dijo que habían matado a Yadira. La testigo estaba sola y se desmayó en ese momento. Despertó a las 5:00 p.m. Para la fecha de los hechos, Yadira vivía en el camino Los Delgado con su esposo Tomás Delgado y sus dos hijas. Sin embargo, Tomás vivía con sus abuelos, frente a la casa de Yadira.

El 28 de noviembre de 2006, la testigo vio a su hija Yadira en dos ocasiones. La primera fue a las 3:00 p.m., cuando recogió a las niñas en su casa y la segunda, a las 9:00 p.m. aproximadamente, porque fue a buscar un destapador para el baño, que estaba tapado. En ese momento, Yadira estaba con las nenas.

Candelaria Andújar expresó que Yadira trabajaba en "Taco Maker", al lado de los cines y tenía horarios rotativos. La testigo describió la casa de Yadira. Especificó que la puerta de entrada al cuarto de Yadira estaba rota. La puerta del cuarto de la niña tenía una abertura de (3) pulgadas arriba del marco de la puerta y la puerta que daba hacia el patio, también tenía esa abertura. Del tema del caso ella nunca había hablado con Shakira porque el psicólogo dijo que no se le debía hablar de este.

Para el 29 de diciembre de 2006 las niñas y ella se fueron para Washington. Era un viaje que tenía planificado desde agosto con Shakira, pero cuando las (2) nenas pasaron a vivir con ella, le sacó pasaje a la otra niña. Estuvieron en Washington hasta el 7 de enero de 2007. Ese mismo día llegaron como a las 3:30 p.m. a 4:00 p.m. a Arecibo y fueron a comer al Mofongo de Doña Rosa. Estando en el lugar, Shakira se puso bien nerviosa, parándose de la silla, moviéndose y metiendo las manos en la comida. Nunca la había visto tan nerviosa. Mientras estuvieron en Nueva York la niña estuvo bien tranquila.

En el lugar, Shakira le dijo a la bisabuela (no a la testigo), que una persona que había en una mesa era el mejor amigo de su papá. Esa noche, cuando iban a dormir, Shakira tenía miedo. La abuela buscó en los "closets" y ella seguía diciendo que tenía miedo. La testigo llamó al psicólogo y llevó a Shakira a una cita. Luego de la visita al psicólogo la niña no dormía bien, seguía bajando las notas e insistiendo que le tenía miedo a una persona, aunque no le dijo a quién.

A finales del mes de enero de 2007, pasadas 2 o 3 semanas de la cita con el psicólogo, Shakira le dijo a Candelaria Andújar que quería hablar con el policía gordito que ella se había entrevistado cuando murió su mamá. Shakira le dijo eso a la testigo al levantarse, ya que dormían juntas. Como a las 9:00 a.m., la testigo llamó al Agente Montalvo. Éste llegó de 3:00 p.m. a 4:00 p.m. y estaba su yerna Ana Otero, la hija de Ana, las dos nenas y ella. Shakira le dijo que quería hablar con Montalvo y con Ana Otero y que la abuela no estuviera. Entonces, ella se fue para el cuarto y la niña se quedó en la sala con el agente Montalvo y con Ana Otero.

Pasada como media hora, Ana fue al cuarto y le notificó que ya habían terminado. Ana le dijo a Shakira que escribiera lo mismo que le había dicho al agente Montalvo. Lo iba a escribir en una carta o papel. La

---

[84] Subrayado nuestro.

niña fue al cuarto de la abuela a escribir la carta. Se tardó como (20) minutos, salió, le entregó un sobre con un sellito y le dijo que esa carta era para Montalvo, que nadie podía verla. La testigo llamó al Agte. Montalvo y le entregó la carta al otro día.

Como parte de su testimonio, Candelaria Andújar narró que, luego que enterraron a su hija, fue con la policía a la casa de Yadira a buscar las pertenencias de Shakira. La testigo expresó que el mejor amigo del papá de Shakira, se llamaba Eduardo Correa López.

En el contrainterrogatorio, la testigo expresó nunca haber visto a Eduardo Correa. Ella sabía que el mejor amigo de Tomás se llamaba Eduardo porque se lo habían dicho. Ante lo expresado por la testigo la Jueza que presidió el caso, impartió la siguiente instrucción al Jurado:

> "La situación es la siguiente: Ustedes oyeron el testimonio que desfiló en esa silla tanto a preguntas de la Defensa como a preguntas del Ministerio Público. En relación específicamente al hecho de si la persona que estaba en el Restaurante el Mofongo de Doña Rosa era Eduardo Correa, nunca la niña dijo que esa persona era Eduardo Correa. Lo único que dijo: "Esa persona es el mejor amigo de mi papá", pero nunca dijo que fuera Eduardo Correa. Por lo tanto, la pregunta que se hace indicando que, si esa persona es Eduardo Correa, ella contesta que sí, pero realmente ella no puede contestar que sí porque ella ni lo oyó de la niña, ni lo sabe personalmente, ni conocía a Eduardo Correa. Por lo tanto, no lo pudo reconocer ella en el negocio de El Mofongo de Doña Rosa. Eso quede así claro, porque esa es la prueba que realmente ustedes tienen que tomar en consideración y no pueden tomar consideración que se diga que ella sabía que la persona que estaba allí era Eduardo... ¿qué?... Correa López, sino que la persona que estaba allí, por dichos de su nieta, era el mejor amigo de su papá. Nada más. ¿Está bien?"

La testigo manifestó, a preguntas de la licenciada López Mulero, que el vehículo de su hija había sido tiroteado (8) años atrás, pero que no era un carro blanco, si no un Mitsubishi color vino.

El día de los hechos, el hijo de la testigo fue a buscar a Shakira a casa de su bisabuela Annie. Antes de la muerte de Yadira, la testigo no sabía quién era Jeffrey Martínez.

Candelaria Andújar llevó a Shakira al psicólogo varias veces, incluyendo 3 veces en enero. En total fue de 6 a 7 veces, porque luego la llevaron también a un psiquiatra. Shakira usaba espejuelos desde los 7 años. Que ella supiera su hija no tenía problemas con nadie. Con este testimonio culminó el desfile de la prueba de cargo del Ministerio Público.

Concluido el desfile de la prueba del Ministerio Público, examinemos a continuación los testimonios de los **testigos presentados por la Defensa**:[85]

### 1. Jeffrey Alberto Martínez Jiménez[86]

El primer testigo de Defensa fue el **Sr. Jeffrey Alberto Martínez Jiménez**, quien para el 28 de noviembre de 2006 vivía en las Parcelas Pérez, calle B 5, en el Barrio Santana, y hacía unos meses, trabajaba en "Taco Maker". Este testificó que conocía a Yadira Delgado porque eran compañeros de trabajo y que fue a la residencia de ella en (2) ocasiones. La primera vez, fue en su vehículo de motor que era un Toyota color vino. La segunda vez, fue en la guagua de ella, para llevar el árbol de navidad. El día que fue en el Toyota color vino, estacionó el mismo a pocos pies de

---

[85] Véase, los testimonios de la prueba de la Defensa en la Resolución recurrida a las págs. 86-93 del Apéndice del recurso.
[86] Este testigo también declaró como prueba del Ministerio Público.

la casa. Nunca fumó tabaco con Yadira porque él no fumaba y nunca vio a Shakira en la casa.

## 2. Francisco Delgado Delgado

El segundo testigo de Defensa fue el **Sr. Francisco Delgado Delgado**, quien vivía en el Barrio Hato Abajo, Sector Los Mora, en Arecibo y conocía a Tomás Delgado porque era el nieto de su hermana Ana Rosa Delgado Delgado.

El 29 de noviembre de 2006, aproximadamente a las 10:00 a.m., el testigo narró que se encontraba con su esposa en la terraza de su hogar, cerca de la casa de su hermana Ana Rosa, y vio varias patrullas que subían y bajaban del lugar donde estaba la casa de ésta. Se montó en su vehículo y fue a la casa de su hermana. La gente comentaba que había muerto una señora. Era la esposa de Tommy. En el lugar había varias personas que conocía, entre estas, Tommy, a Víctor, que era el tío de Tommy, y a un primo de nombre Amado. Estando allí, una persona le dijo a Tomás, que lo acompañara. Tomás tenía un celular o teléfono en la mano y le dijo a Víctor que se lo guardara. Delgado Delgado fue hacia la casa de Ana Rosa y se sentó en la baranda del balcón. En el lugar, estaba Ana Rosa, Freddy Delgado, la bisabuela de la hija de Tommy y el testigo. Éste escuchó que don Freddy Delgado y la bisabuela comentaban los muchos problemas que le había ocasionado la difunta. Escuchó que don Freddy decía que esa dama, la difunta, le había dado muchos problemas desde que tenía catorce (14) años, que no sentaba cabeza, y de las malas amistades que tenía. Esa conversación fue entre la bisabuela, Freddy el papá de él.

La Defensa presentó la grabación de una llamada al 911 que hiciera Tomás Delgado el 29 de noviembre de 2006, relacionado a los hechos. (No se transcribió la grabación).

## 3. Ana Rosa Delgado Delgado

La tercera testigo de Defensa fue la **Sra. Ana Rosa Delgado Delgado** quien vivía en el Bo. Hato Viejo, sector Barrancas en Arecibo, hacía 28 años. Para el 28 de noviembre de 2006 vivían con ella, su esposo y su nieto Tomás Delgado Nieves. Ese día, Tomás llegó del trabajo a eso de las 11:50 p.m. La testigo estaba despierta y lo vio entrar al baño. De 11:50 p.m. a 12 de la medianoche, éste cerró la puerta, se acostó y no lo oyó más. Ella también se acostó a dormir.

El 29 de noviembre de 2006 la testigo se levantó de 3:00 a 3:30 a.m., que era la hora que se levantaba todos los días. Fue a la cocina, tomó café y oró. Como a las 5:30 a.m. llegó a su casa, su hija Aida Iris Delgado. Ella iba todos los días a esa hora a ayudarle en el hogar. Aproximadamente a las 6:00 a.m., su hija se fue porque tenía que hacer una diligencia. A esa hora la testigo levantó a don Martín, quien desayunó y se fue para el gallerín. Tomás también se levantó a las 6:00 a.m. y fue a la cocina a desayunar. Después de eso, éste también se fue para el gallerín.

Como a las 7:00 a 7:30 a.m. llegaron Shakira y Ninoshka gritando a su casa. Para esa fecha, vivían con la mamá, al frente de la casa de la testigo. Las niñas estaban en pijamas y descalzas, gritando "Mother, Mother". Ellas siempre se referían a la testigo como "Mother". Éstas decían que a su mamá le había pasado algo porque estaba acostada en la cama y con mucha sangre. La testigo les preguntó si habían visto algo y le respondieron "no Mother", "Mother" "yo no vi nada", "yo no vi nada", "Mother", "yo no vi nada". La pequeña se acostó en el piso y le decía "Mother", mami está así, mami está así acostada.

Delgado Delgado manifestó que cuando llegaron las nenas, Tomás todavía estaba en el gallerín, pero Pacho (don Martín) ya había regresado de este y se encontraba en la casa. Don Pacho les preguntó a las nenas si vieron algo y ellas le respondieron que no. Él fue a la casa de las niñas, pero éstas no quisieron ir y se quedaron con la testigo en la casa. Don Pacho regresó a avisar lo que había visto y a buscar a Tomás, que estaba en el gallerín. Tomás salió corriendo para allá.

La testigo declaró que las niñas estuvieron con ella dos (2) o tres (3) horas. De 11:00 a 11:30 a.m. llegó la bisabuela de ellas a buscarlas, con el papá de la difunta, y se sentaron los tres a hablar. En eso llegó el hermano de la testigo, Francisco Delgado Delgado.

Con relación al Agte. Montalvo, Delgado Delgado testificó que lo conoció ese día porque fue a hacerle preguntas. Estaban en la mesa del comedor. También se encontraban el licenciado Miranda, otro policía y el hermano de ella. El agente Montalvo le preguntó si podía ir al cuarto de Tomás y ella lo llevó. Según la testigo, en el cuarto de Tomás, Montalvo verificó, y buscó en una caja grande que había allí. Ella le abrió el "closet" para que viera la ropa y lo que había. Éste también verificó el baño y el "hamper". También fue al "laundry" de la casa, que quedaba en los bajos. Allí vio otro "hamper". Luego él se fue para el "gallerín", pero ella se quedó arriba.

En el contrainterrogatorio del Ministerio Público, la testigo declaró que, para el 28 de noviembre de 2006, Tomás llevaba aproximadamente dos (2) o tres (3) semanas viviendo con ésta. Él estaba casado, pero separado de la occisa. Para esa fecha, según la testigo, Tomás tenía una motora y un carro. Sin embargo, cogía pon con un amigo que se llamaba Eduardo.

El 28 de noviembre de 2006, la testigo se acostó a dormir a las 8:00 p.m. A esa hora escuchó a Ninoshka y Shakira jugando en los alrededores de la casa. Ésta no vio con quien llegó Tomás. Sí informó que él llegó del trabajo aproximadamente a las 12 medianoche. La testigo no escuchó, a eso de las 10:30 p.m., una alarma que hacía "beep" "beep", porque estaba dormida. Tampoco escuchó a las 12:45 a.m. a 1:00 a.m. cuando la alarma hizo "beep" "beep" otra vez. De 12:45 a 1:00 a.m. tampoco escuchó otro carro que pasó cerca de su casa.

Delgado Delgado indicó que vio a Tomás desde su cuarto, porque ella estaba acostada. Ésta lo vio entrar en toalla al baño, pero no lo vio al salir. Cuando Tomás se despertó a las 6:00 a.m. y fue a la cocina, no le dijo a la testigo que estaba preocupado porque a la hora que llegó, había un carro color vino, que escuchó "beep" "beep" y eso le extrañó. Tampoco le dijo que estaba preocupado porque a eso de las 3:00 a.m. vio otro carro que llegó con tres (3) personas y se bajaron en su casa.

La testigo narró que Tomás tenía llave de la casa de ella. También declaró que Tomás trabajaba en el turno de 3:00 p.m. a 11:30 p.m. Para ir al trabajo, Eduardo lo buscaba y por las noches regresaba con Eduardo o con otro compañero de nombre Alcides. La testigo nunca le dijo al agente Montalvo que había visto a Tomás esa noche cuando llegó a la casa. Lo dijo por primera vez ese día durante su testimonio.

### 4. Rosa De Laust Ganges

La cuarta testigo de Defensa fue la **Sra. Rosa De Laust Ganges**, quien tenía 79 años y era viuda. Ella era cubana y su esposo puertorriqueño. Desde que llegó de Cuba vivió en Arecibo. A la fecha de la vista ésta vivía en la Urb. Ocean View.

La testigo conoció a Eduardo Correa López porque lo empleó como jardinero en su casa. Él iba una vez al mes y estuvo trabajando con ella por tres años. Testificó que Eduardo era cristiano, católico, una persona con una humildad muy grande, muy responsable y que no fallaba en su trabajo con ella. El acusado hizo muchas cosas que le hicieron pensar que ella debía estar ahí testificando.

En el contrainterrogatorio del Ministerio Público, la testigo declaró que nunca acompañó a Eduardo a la iglesia, a visitar enfermos, velorios, rosarios o círculos de oración. Como parte de los oficios de jardinería, Eduardo era diestro con cuchillo, tijeras y guantes. La testigo dijo conocer a Eduardo, pero no sabía el nombre de la esposa, ni de los hijos. Tampoco conocía las edades de los niños, aunque sabía que eran dos. No conocía los "hobbies" de él, ni quienes eran sus amigos. La testigo no sabía lo que hizo Eduardo el 28 y 29 de noviembre de 2006.

### 5. Carlos R. Rodríguez Borrás

El quinto testigo de Defensa fue el **Sr. Carlos R. Rodríguez Borrás**, quien era oficial de custodia en la cárcel de Sabana Hoyos, tenía 33 años, y era divorciado con dos hijos.

El testigo explicó que conocía a Eduardo Correa López hacía ocho (8) años, del vecindario, en el Cotto en Arecibo, ya que éste vivía con sus

papás al frente de la casa de Rodríguez Borrás. Para la fecha de la vista, entendía que Eduardo debía tener algunos 25 años.

El testigo compartía con Correa López casi todos los días. En los fines de semana, el testigo hacía BBQ en su casa y compartían socialmente. Informó que Eduardo estaba casado, tenía dos (2) hijos pequeños, y era un padre responsable que siempre estaba para arriba y para abajo con su esposa e hijos. Lo describió como trabajador, cristiano, responsable, que lo de él era de quien lo necesitara y que no podía pensar en mal para nadie. Era un muchachito serio que no le brindaba su amistad a todo el mundo. Hacía como un año que había dejado de ser vecino de Correa López, pero siempre habían estado compartiendo y en comunicación. El testigo trabajaba de 6:00 a.m. a 2:00 p.m.

Durante el contrainterrogatorio del Ministerio Público, el testigo manifestó que tenía la custodia de sus dos hijos. Manifestó no conocer a Tomás Delgado, ni el nombre de la fábrica donde trabajaba Eduardo, ni los amigos de éste en la fábrica. El testigo no podía hablar de la reputación de Eduardo en el trabajo, solo de lo que él conocía.

Eduardo vivía hacia un año atrás en San José y el testigo no conocía los vecinos de Eduardo en ese lugar. En ocasiones el testigo salía más tarde de las 2:00 pm de su trabajo. Esa era la norma. Por último, declaró no saber quién mató a Yadira Delgado.

### 6. Rodolfo Ricardo Rojas Dávila

El sexto testigo de Defensa fue el **Sr. Rodolfo Ricardo Rojas Dávila,** quien tenía 42 años y vivía en Arecibo hacía 8 años. Era ingeniero industrial y gerente de manufactura del segundo turno en "Eaton Electrical".

Rojas Dávila testificó que Tomás Delgado Nieves trabajaba en la "Eaton Electrical" hacía más de 5 años. Lo supervisaba Luis Avilés. Eduardo Correa López también trabajaba con él. Éstos estaban asignados al área de moldeo. A ambos los supervisó ocasionalmente cuando el supervisor de ellos se ausentaba. Testificó que Delgado Nieves y Correa López eran unos empleados normales. Hacían su trabajo y cumplían con las normas. No recuerda que hubiesen sido disciplinados. A la fecha de la vista, ambos estaban suspendidos de empleo y sueldo hasta que se aclarara la situación. Expresó no conocer a Delgado Nieves y Correa López fuera del área laboral. Tampoco sabía si viajaban juntos para llegar al trabajo. Manifestó que para hacer el trabajo de moldeo se utilizaban guantes.

### 7. Luis Antonio Avilés Valentín

El séptimo y último testigo de Defensa fue el **Sr. Luis Antonio Avilés Valentín**, quien tenía 53 años, vivía en Camuy, y trabaja en Arecibo en la "Eaton Electrical", hacía 20 años. Era supervisor de producción. El Sr. Rodolfo Rojas era su gerente.

El testigo manifestó que conocía a Tomás Delgado Nieves y a Eduardo Correa López por que los supervisó en la "Eaton Electrical". Ambos llevaban varios años laborando allí. Delgado Nieves y Correa López trabajaban en el área de moldeo, en el turno de 3:00 p.m. a 11:15 u 11:30 p.m. A Tomás Delgado lo describió como responsable, bien cooperador, tímido, bien educado y en ocasiones lo utilizó para dar "training" a otros empleados. Sobre Eduardo Correa explicó que era un poquito más hiperactivo, pero hacía su trabajo y era responsable. Avilés Valentín explicó que los empleados se evaluaban anualmente. Tomás Delgado Nieves era un empleado excelente y Eduardo Correa López era promedio. Nunca tuvo que intervenir con ellos por alguna conducta impropia. De la vida privada de los acusados el testigo no podía decir nada. No sabía si ellos viajaban juntos y desconocía si ambos fueron sometidos a pruebas de dopaje. Por último, no sabía lo que sucedió el 28 y 29 de noviembre de 2006, porque no estaba con ellos.

Finalizado el desfile de prueba del Ministerio Público y la Defensa, dio inicio el Informe Final al Jurado.[87] Citamos *in extenso* de la Resolución recurrida:

### A. Turno inicial de la Fiscalía

Durante el informe inicial provisto por el Ministerio Público, este, al comentar sobre el testimonio ofrecido por el agente Alejandro Montalvo Arguelles sobre el manejo de la escena, sostuvo en lo pertinente, que se ocuparon en evidencia 14 pelos, de los cuales 7 fueron obtenidos en el cuerpo de la occisa, 5 fueron tomados de ésta como muestras de referencias y 2 que fueron levantados por Alex Cintrón el 4 de diciembre de 2006. Sobre estos, el Ministerio Publico expresó que, conforme el testimonio del perito Fernando Mercedes, a estos no se le realizaron exámenes tricológicos, ni de ADN debido a que fueron analizados por él de forma macroscópica mediante observación a través de una lupa. Conforme a lo anterior, concluyó que dichos pelos pertenecían a la occisa.

### B. Informe de la Defensa

Durante el informe de la Defensa de Correa López, al cuestionar la labor del testigo Fernando Mercedes, sostuvo, en lo aquí pertinente, que este podía comparar el perfil genético de los cabellos, particularmente, los recuperados sobre el cuerpo de la víctima, con la muestra de saliva tomada al coacusado, pero determinó que no era necesario, a pesar de que el patólogo Francisco Cortés declaró que era probable que la víctima haya tenido cercanía con su victimario, lo cual resultaba de importancia. Es en este extremo, que cuestionó los contornos de la intervención de este testigo en cuanto a esa y demás evidencia ocupada en el caso y remitida para su análisis.

### C. Informe Refutación de la Fiscalía

En su informe final de refutación, el Ministerio Público nuevamente se reafirmó en lo declarado por el testigo Fernando Mercedes, en cuanto a que los pelos ocupados fueron evaluados macroscópicamente por una lupa y que todos mostraban características similares a las de la occisa. El Fiscal expresó que, si se hubieran realizado los análisis de ADN y estos coincidían con los coacusados, estos aducirían como explicación para ello, el que el coacusado residía allí y Correa López era quien lo transportaba al trabajo. Por otro lado, también manifestó que de la prueba de defensa salía a relucir todas las personas, que estuvieron en la escena del crimen.

Finalmente, el TPI impartió instrucciones al Jurado a los fines de la valoración de la evidencia presentada en términos de la credibilidad de los testigos; inconsistencias en los testimonios, impugnación de testigo por declaraciones anteriores;[88] testimonio pericial; y evidencia demostrativa, entre otras. En específico, se estipuló las inconsistencias en el testimonio de la testigo Shakira

---

[87] Véase, los Informes Finales al Jurado en la Resolución recurrida a las págs. 93-95 del Apéndice del recurso.

[88] El Tribunal hizo mención del testimonio de Shakira Delgado. De ahí que informara y le leyera al Jurado las estipulaciones de las partes en cuanto a las inconsistencias de este testimonio.

Delgado Delgado, y le fueron leídas al Jurado el día 26 de febrero de 2008, en el siguiente orden:

1. Durante la vista preliminar declaró que para la fecha del 28 y 29 de noviembre de 2006 ella vivía con su mamá y con Ninoshka, su hermana.
Durante el juicio declaró que para la fecha del 28 y 29 de noviembre de 2006 ella vivía con su mamá, Ninoshka su hermana, y con su papá.

2. Durante la vista preliminar declaró que ella se acostó a dormir con Ninoshka en la parte de abajo de la cama litera como a las 10:00 p.m.
Durante el juicio declaró que ella se acostó a dormir con Ninoshka en la parte de abajo de la cama litera a las 11:00 p.m.

3. Durante el juicio declaró que se levantó de la cama de abajo de la litera a las 12:00 de la medianoche y se fue a la cama de arriba.
Durante la vista preliminar nunca lo declaró.

4. Durante la vista preliminar declaró que cuando escuchó los gritos de su mamá a las 3:00 a.m., se encontraba en la cama de abajo de la litera.
Durante el juicio declaró que cuando escuchó los gritos de su mamá a las 3:00 a.m. se encontraba en la cama de arriba de la litera.

5. Durante la vista preliminar declaró que cuando escuchó los gritos de su mamá a las 3:00 a.m. se levantó de la cama de abajo de la litera y fue a buscar sus espejuelos que se encontraban sobre el aparato de "DVD".
Durante el juicio declaró que cuando escuchó los gritos de mamá a las 3:00 a.m. se bajó por las escaleras de la litera y se fue a buscar sus espejuelos que se encontraban sobre el aparato de "DVD".

6. Durante la vista preliminar declaró que después de coger los espejuelos subió a la parte de arriba de la litera y comenzó a mirar detrás del hueco.
Durante el juicio declaró lo mismo.

7. Durante la vista preliminar declaró que vio a papá en el pasillo con botas puestas.
Durante el juico declaró que vio a papá en el pasillo con tenis puestos.

8. Durante la vista preliminar declaró que vio a papá y a Eduardo caminar desde el baño hasta el cuarto de su mamá.

9. Durante el juicio declaró que vio a su papá y a Eduardo caminar desde el baño hasta la cocina.

10. Durante la vista preliminar nunca declaró que ella estuvo despierta desde las 3:00 a.m. hasta las 5:00 a.m.

11. Durante el juicio declaró que ella estuvo despierta desde las 3:00 a.m. hasta las 5:00 a.m.

12. Durante la vista preliminar declaró que se despertó a las 8:00 a.m. para ir al baño.

13. Durante el juicio declaró que se despertó a las 7:00 a.m. para ir al baño.

14. Durante la vista preliminar declaró que cuando abrió el celular de su mamá vio las letras "j", "i".

15. Durante el juicio declaró que cuando abrió el celular de su mamá vio las letras "h", "e".

16. En la vista preliminar indicó que el acusado Tomas Delgado vivía con su abuela desde el día del pavo.

17. En el juicio no precisó desde cuando estaba viviendo en esa residencia.

18. En vista preliminar indicó que se acostó aproximadamente a las 10:00 p.m.

19. En el juicio indicó que se acostó aproximadamente a las 11:00 p.m. del 28 de noviembre de 2006.

20. En vista preliminar indicó que cuando escuchó los gritos de su madre estaba en la litera de abajo y subió a la parte de arriba.

21. En juicio indicó que a las 12:00 de la medianoche aproximadamente subió a la parte de arriba de la litera a dormir.

22. Posteriormente en el juicio, a preguntas de la Lcda. López Mulero, indicó que no se acordaba si dormía al lado de su hermana Ninoshka.

23. En vista preliminar indicó que los acusados caminaban del baño a la cocina.

24. En el juicio indicó que los acusados caminaban del baño al cuarto.

25. En vista preliminar indicó que la carta que contiene los hechos que ella observó le pegó mucho "tape". En el juicio indicó que le pegó un sello de mantecado.

26. En vista preliminar no indicó que fue al baño con su hermana antes de encontrar a su mamá asesinada.

27. En el juicio indicó que se levantó por la mañana y que fue al baño.

28. En vista preliminar indicó que su clase favorita es la de matemáticas.

29. En juicio indicó que su clase favorita es la de ciencias.

30. En vista preliminar indicó que cuando escuchó los gritos de su madre diciendo: "no quiero" "no quiero" puso la escalera de la litera.

31. En el juicio indicó que cuando escuchó los gritos la escalera estaba puesta.

32. Luego indicó que no se acordaba.

33. En vista preliminar indicó que se levantó, el 28 de noviembre de 2006, a las 8:00 a.m. aproximadamente.

34. En el juicio indicó que se levantó a las 7:00 a.m. aproximadamente.

35. En la vista preliminar indicó que al momento de los hechos tenía nueve (9) años de edad. En el juicio indicó que al momento de los hechos tenía ocho (8) años de edad.[89]

A tono con la evidencia antes reseñada, el TPI razonó que no procede el nuevo juicio solicitado por el señor Correa López:

En resumen, este Tribunal entiende que no procede el nuevo juicio solicitado por Correa López. Los resultados de los análisis de ADN mitocondrial realizados a los **cabellos ocupados sobre el cuerpo de la víctima** son inconclusos a los fines de excluirlo como posible fuente de estos. Estos no contradicen o son incompatibles con el testimonio de Shakira y el resto de la prueba presentada y creída por el Jurado en el juicio llevado contra éste y el coacusado Tomás Delgado Nieves. Por tanto, esta prueba no tiene, a nuestro entender, el carácter exculpatorio aducido por Correa López. De otra parte, con relación a **los dos cabellos levantados en la pared al salir del baño en la escena del crimen**, los cuales sí excluyeron tanto a la occisa, como a Correa López de ser la fuente de los mismos, lo cierto es que estos tampoco contradicen o son incompatibles con la prueba presentada, especialmente, el testimonio de la testigo Shakira Delgado Delgado creído por el jurado, a los efectos de que el 29 de noviembre de 2006 a las 3:00 a.m. Yadira estaba viva porque

---

[89] Véase, la Resolución recurrida a las págs. 95-97 del Apéndice del recurso.

Shakira escuchó la voz de su mamá. Entre 3:00 a 5:00 a.m. la niña vio a los convictos dentro de su casa con ropa ensangrentada y cuchillos en sus manos y a las 7:00 a.m. la niña encontró a su madre muerta. A tenor con lo anterior, no creemos que los nuevos resultados de ADN, evaluados ante la totalidad de la prueba presentada al Jurado, sean una prueba lo suficientemente sólida como para conceder lo solicitado. Dichos resultados no demuestran que es más probable que Correa López sea inocente que culpable.

Por tanto, este Tribunal entiende que, al evaluar la nueva prueba junto a la presentada en el juicio original, de la forma más favorable al fallo o veredicto de culpabilidad que se impugna, esta no crea duda razonable en nuestro ánimo en cuanto a la culpabilidad del peticionario. *Pueblo v. Marcano Parrilla II, supra*, pág. 738. La nueva prueba tenía que ser de tal magnitud que, de haber sido presentada en el juicio, hubiera demostrado que es más probable que Correa López fuera inocente que culpable. Éste no cumplió con el referido estándar. *Pueblo v. Marcano Parrilla II, supra, pág. 743, 744.* Énfasis original.[90]

Inconforme, el **3 de junio de 2021**, el señor Correa López presentó una *Moción de Reconsideración*.[91] En síntesis, adujo que la nueva prueba presentada era evidencia exculpatoria; además, la misma estuvo bajo el control del Ministerio Público sin ser descubierta ni anunciada, lo que resultaba preocupante. Máxime, cuando en la Resolución del 16 de octubre de 2017 que dio paso a realizar el examen de ADN a la evidencia del Pueblo, constituye ley del caso al expresar que: *"existe una controversia sobre la identidad del o de los autores al amparo de la Ley 246-1015 por lo que Correa López cumple con los criterios relacionados con la identidad del responsable."* Reiteró que los resultados de ADN de los pelos encontrados en la pared al lado del baño constituyen prueba exculpatoria al excluir como donantes al peticionario y la occisa. Así, solicitó que se declarara el nuevo juicio y la excarcelación mediante fianza del peticionario, o en la alternativa, señalase una vista evidenciaria conforme al caso de *Pueblo v. Rivera Montalvo*, 2020 TSPR 116.

---

[90] Véase, Resolución del 24 de mayo del 2021, a las págs. 113-114 del Apéndice del recurso.

[91] Véase, Moción de Reconsideración, a las págs. 278-281.

El **10 de junio de 2021**, el Ministerio Publico presentó una *Oposición a Moción de Reconsideración*.[92] En resumen, adujo que los pelos encontrados en la pared al lado del baño no constituyen prueba exculpatoria que excluya al peticionario como coautor de la muerte ni de que esos pelos les pertenece al verdadero asesino. Arguyó que tampoco procedía una vista evidenciaria en la medida que el peticionario solicitó reiteradamente que se resolviera la moción de nuevo juicio con las mociones sometidos por las partes. Finalizó indicando que la Resolución del 16 de octubre de 2017 trataba de una petición para realizar el examen de ADN lo que resultaba distinguible de la moción de nuevo juicio.

El **30 de junio de 2021**, el TIP emitió una Resolución,[93] declarando no ha lugar la moción de reconsideración. En síntesis, razonó que la controversia sobre la prueba no descubierta ni anunciada hasta que apareció en el juicio, fue resuelta en la Sentencia del **13 de mayo de 2010**, emitida en este Tribunal Intermedio en la apelación de los casos *KLAN200800865, El Pueblo de Puerto Rico v. Tomás Delgado Nieves*, y, *KLAN200800866, El Pueblo de Puerto Rico v. Eduardo Correa López*. En particular, destacó:

> El 22 de enero de 2008, luego de desinsacularse el Jurado y de haber comenzado el desfile de prueba, las partes intentaron estipular cierta prueba que fuera analizada en el I.C.F. Mientras se daba ese proceso, en uno de los paquetes que se abrió, aparecieron unos sobrecitos que contenían doce (12) pelos, siete (7) de ellos levantados por el patólogo forense en diferentes partes del cadáver, así como cinco (5) pelos que éste arrancó de la cabeza del cadáver (muestras de referencia). El hallazgo de tales pelos en uno de los sobres fue sorpresivo para todas las partes, debido a que dichos sobres no habían sido abiertos anteriormente para evitar cualquier planteamiento sobre cadena de custodia. Ello así, no es posible inferir que el Ministerio Público ocultó deliberadamente la existencia de dichos pelos. De hecho, el propio Tribunal consignó para récord que la Fiscalía no tenía conocimiento de esos sobres. Citas omitidas.[94]

---

[92] Véase, Oposición a Moción de Reconsideración, a las págs. 282-285.
[93] Notificada el 1 de julio de 2021. Véase, la Resolución, a las págs. 286-300.
[94] Véase, Resolución, a la pág. 289 del Apéndice del recurso.

También, descartó que la la Resolución del 16 de octubre de 2017 concediendo realizar el examen de ADN a la evidencia del Pueblo bajo la Ley 246-1015, constituyera ley del caso, ya que no se trataba de una solicitud de nuevo juicio. Y finalmente, denegó la celebración de la vista evidenciaria, distinguiendo el caso de *Pueblo v. Rivera Montalvo*, 2020 TSPR 116, pues allí se trataba de una vista de nuevo juicio bajo la Regla 192.1 de Procedimiento Criminal, mientras que en este caso es de aplicación la Regla 192 de Procedimiento Criminal que no requiere una vista antes de resolver la moción. Añadió, que el peticionario solicitó que resolviera su petición sin que se celebrase la referida vista.

El **21 de julio de 2021** el señor Correa López presentó ante nos el presente recurso de *certiorari* y le imputa al TPI la comisión de los siguientes errores:

> Erró el Honorable Tribunal de Primera Instancia al aplicar incorrectamente la doctrina establecida en el caso Pueblo v. Marcano Parrilla II, 168 D.P.R. 721 (2006) a la nueva prueba y en su valoración de los análisis de ADN.

> Erró el Honorable Tribunal de Primera Instancia al no considerar como parte de la evaluación para la concesión de nuevo juicio el efecto del testimonio retractado de la principal testigo de cargo conjuntamente con la nueva prueba.

Luego de varias órdenes dirigidas al perfeccionamiento del recurso,[95] el **4 de octubre de 2021**, compareció el Ministerio Público representado por la Oficina del Procurador General en *Escrito en Cumplimiento de Orden,* para oponerse a la solicitud de *certiorari.*

En **14 de octubre de 2021**, el señor Correa López presentó *Moción Solicitando se Señale Vista Oral al Palio de la Regla 80 del Reglamento del Honorable Tribunal de Apelaciones.*

Conforme al Canon 20 de Ética Judicial,[96] el **4 de febrero de 2022**, la juez de apelaciones, Irene Soroeta Kodesh, se auto inhibió

---

[95] Véase, las Resoluciones emitidas el: 12 de agosto de 2021; 13 de septiembre de 2021; y, 28 de septiembre de 2021.
[96] 4 L.P.R.A. Ap. IV-B R. 20.

de participar en este caso, por lo que fue sustituida por el juez Felipe Rivera Colón.[97]

Luego de varios trámites, el **11 de enero de 2023**, emitimos una Resolución, en la que concedimos la celebración de una vista oral el **24 de enero de 2023**, a las 2:00 p.m., en el Tribunal de Apelaciones. Le indicamos a las partes que debían prepararse para ilustrar al Tribunal, con especificidad, sobre las teorías jurídicas, jurisprudencia y su aplicación específica a este caso, para determinar la procedencia de la moción de nuevo juicio, bajo el inciso (b) de la Regla 192.1. En lo particular, la discusión sobre: **(1)** Si las muestras de pelos sometidas a la prueba de ADN realizada en este caso, constituyen prueba que se catalogue como no concluyente para determinar la procedencia de la moción de nuevo juicio. **(2)** La interacción de la norma sentada en el caso de *Pueblo v. Rivera Montalvo*, 205 DPR 352 (2020), con lo planteado en el caso de autos. **(3)** Si procede una moción de nuevo juicio para que comparezcan peritos y expliquen los resultados obtenidos en las muestras de pelos sometidas a la prueba de ADN realizada en este caso.

Finalmente, la vista oral fue celebrada con la presencia del Ministerio Público representado por la Oficina del Procurador General y los representantes legales del señor Correa López.

El **1 de marzo de 2023**, la Hon. Gina Méndez Miró fue sustituida por la Hon. Giselle Romero García, al dejar de ejercer funciones en este Tribunal de Apelaciones.[98]

Así, el caso quedó perfeccionado para la consideración de este Panel Especial.

**-II-**

Resumidos los hechos que originan la presente controversia, examinemos el derecho aplicable.

---

[97] Véase, Orden Administrativa JP-2018-03.
[98] Véase, Orden Administrativa OATA-2023-040.

**A.**

Conocido es que el auto de *certiorari* es un vehículo procesal de <u>carácter discrecional</u> que permite a un tribunal de mayor jerarquía a revisar las determinaciones de un tribunal inferior.[99] Por lo tanto, resulta importante entender su <u>carácter discrecional</u>, que no es otra cosa que, <u>tener el poder para decidir en una forma u otra, esto es, para escoger entre uno o varios cursos de acción</u>.[100]

Con ese fin, la Regla 40 del Reglamento del Tribunal de Apelaciones,[101] dispone los criterios que debemos tomar en consideración para determinar la procedencia o no de la expedición del auto de *certiorari*; estos son:

(A) *Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.*

(B) *Si la situación de hechos planteada es la más indicada para el análisis del problema.*

(C) *Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.*

(D) *Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.*

(E) *Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.*

(F) *Si la expedición del auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.*

(G) *Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia.*

Siendo la característica distintiva para la expedición de este recurso <u>la discreción conferida al tribunal revisor</u>, el Tribunal Supremo de Puerto Rico ha dispuesto que:

> *de ordinario, no se intervendrá con el ejercicio de discreción de los tribunales de instancia, salvo que se demuestre que hubo un craso abuso de discreción, o que el tribunal actuó con prejuicio o parcialidad, o que se equivocó en la interpretación o aplicación de cualquier norma procesal o de derecho sustantivo, y que nuestra intervención en esa etapa evitará un perjuicio sustancial.[102]*

De manera, que si la actuación del foro recurrido <u>no está</u>

---

[99] *IG Builders et al. v. BBVAPR,* 185 DPR 307, 337-338 (2012); *Pueblo v. Díaz de León,* 176 DPR 913, 917 (2009).

[100] *García v. Asociación,* 165 DPR 311, 321 (2005).

[101] 4 LPRA Ap. XXII-B, R. 40.

[102] *IG Builders et al. v. BBVAPR, supra,* pág. 338; *Zorniak Air Services v. Cessna Aircraft Co.,* 132 DPR 170, 181 (1992); *Lluch v. España Service Sta.,* 117 DPR 729, 745 (1986).

desprovista de base razonable ni perjudica los derechos sustanciales de las partes, deberá prevalecer el criterio del juez de primera instancia a quien le corresponde la dirección del proceso.[103]

**-B-**

De umbral, las Reglas 188(a) y 192 de Procedimiento Criminal,[104] dictan las pautas para la presentación de mociones de nuevo juicio, basadas en el descubrimiento de nueva prueba.

En primer orden, la Regla 188 inciso (a) de Procedimiento Criminal,[105] versa sobre los fundamentos a considerarse para conceder un nuevo juicio, **antes** de dictar sentencia.[106] En lo pertinente, se establece:

> (a) [S]e ha descubierto nueva prueba, la cual, de haber sido presentada en el juicio, **probablemente habría cambiado el veredicto o fallo del tribunal**, y la que no pudo el acusado con razonable diligencia descubrir y presentar en el juicio. Al solicitar nuevo juicio por este fundamento, el acusado deberá acompañar a su moción la nueva prueba en forma de declaraciones juradas de los testigos que la aducirán.
> [...]

En cuanto a la moción de nuevo juicio de la Regla 192 de Procedimiento Criminal,[107] procede cuando el acusado adviene en

---

[103] *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 434-435 (2013); *Sierra v. Tribunal Superior*, 81 DPR 554, 572 (1959).

[104] 34 LPRA Ap. II, Rs. 188(a), 192.

[105] 34 L.P.R.A. Ap. II, R. 188 inciso (a).

[106] Léase en conjunto con la Regla 189 de Procedimiento Criminal. La moción de nuevo juicio deberá presentarse antes de que se dicte la sentencia excepto que cuando se fundare en lo dispuesto en el apartado (e) de la Regla 188 deberá presentarse dentro de los treinta (30) días siguientes a la fecha en que se tuvo conocimiento de la muerte o incapacidad del taquígrafo o de la pérdida o destrucción de sus notas, y cuando se fundare en lo dispuesto en la Regla 192 deberá presentarse dentro de los treinta (30) días siguientes a la fecha en que se tuvo conocimiento de los nuevos hechos o de los nuevos elementos de prueba. 34 L.P.R.A. Ap. II, R. 189.

[107] 34 L.P.R.A. Ap. II, R. 192. Cabe diferencial que la Regla 192.1 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 192.1, establece con relación al procedimiento posterior a la sentencia relativos a cuestiones de derecho, prescitas en los siguientes criterios:
> Cualquier persona que se halle detenida en virtud de una sentencia dictada por cualquier sala del Tribunal de Primera Instancia y que alegue el derecho a ser puesta en libertad porque:
> **(1)** La sentencia fue impuesta en violación de la Constitución o las leyes del Estado Libre Asociado de Puerto Rico o la Constitución y las leyes de Estados Unidos;
> **(2)** el tribunal no tenía jurisdicción para imponer dicha sentencia;
> **(3)** la sentencia impuesta excede de la pena prescrita por la ley;
> **(4)** la sentencia está sujeta a ataque colateral por cualquier motivo, podrá presentar una moción a la sala del tribunal que impuso la sentencia para que anule, deje sin efecto o corrija la sentencia.
> [...]

conocimiento de nueva prueba **<u>después</u>** de que se haya dictado sentencia. En específico, establece:

> También podrá el tribunal, a solicitud del acusado, conceder un nuevo juicio cuando <u>después</u> de dictada la sentencia sobreviniere el conocimiento de nuevos hechos o de nuevos elementos de prueba de tal naturaleza **que evidencien la inocencia del condenado**.

Tomando en lenguaje de las Reglas 188(a) y 192, en *Pueblo v. Marcano Parrilla II*, 168 D.P.R. 721 (2006) se explicó que surgen notables diferencias del texto de ambas reglas, en cuanto a los criterios para que proceda un nuevo juicio. Por ello, la Regla 188 requiere que la nueva prueba sea una que **probablemente** habría cambiado el veredicto o fallo del tribunal; mientras que la Regla 192, "<u>requiere que la nueva prueba sea una tal que evidencie la posible inocencia del convicto</u>".[108]

No obstante, —tanto en nuestro ordenamiento procesal penal (Regla 188(a) o 192), como en el ámbito criminal federal (Regla 33[109])— se ha establecido que una moción de nuevo juicio —fundada en el descubrimiento de nueva prueba— <u>únicamente procede cuando</u>: **(1)** no se pudo descubrir con razonable diligencia antes del juicio; **(2)** no es meramente acumulativa; **(3)** no impugna la prueba aducida durante el juicio; **(4)** es creíble, y **(5)** probablemente produciría un resultado diferente.[110] Estos criterios son conocidos

---

[108] *Pueblo v. Marcano Parrilla II*, 168 D.P.R. 721, 738 (2006).

[109] **Rule 33. New Trial**
   **(a) Defendant's Motion**. Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. If the case was tried without a jury, the court may take additional testimony and enter a new judgment.
   **(b) Time to File**.
   **(1) Newly Discovered Evidence**. Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty. If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case.
   **(2) Other Grounds**. Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty.

[110] Véase: *Pueblo v. Torres Feliciano*, 210 D.P.R. 63, 71 (2018), citando en aprobación a *Pueblo v. Rodríguez*, 193 DPR 987, 998-1000 (2015) *Pueblo v. Marcano Parrilla II*, 168 D.P.R. 721 (2006); *Pueblo v. Chévere Heredia*, 139 D.P.R. 1 (1995). Véase además, *Pueblo v. Martínez Ortiz*, 135 D.P.R. 100 (1994); *Pueblo v. Torres Rivera*, 129 D.P.R. 331 (1991), entre otros.

como los de *Berry Rule,* provenientes del caso *Berry v. State,* 11 Ga. 511, 527 (1851), y que aplica a Puerto Rico.

Ahora bien, estamos conscientes que el estándar reglamentario bajo la Regla 192: *"la nueva prueba sea una tal que evidencie la posible inocencia del convicto"*, no requiere que la misma demuestre: *"de forma exacta y certera la inocencia del acusado".*[111] Eso último fue reconsiderado en *Pueblo v. Marcano Parrilla II, supra,* por ser un estándar muy oneroso para cualquier convicto.[112]

Por lo tanto —y tomando en consideración que el fin último de la Regla 192 es la concesión de un nuevo juicio— el caso de *Pueblo v. Marcano Parrilla II,* resolvió que un nuevo juicio bajo el crisol de la referida Regla 192 resulta procedente si: "analizando la nueva evidencia **junto a la presentada en el juicio original** de la forma **más favorable al fallo o veredicto de culpabilidad** que se impugna, la misma **pudo haber creado duda razonable** en el ánimo del juzgador, en cuanto a la **culpabilidad del peticionario**."[113] Acto seguido, añadió: "Esto es, la nueva prueba debe demostrar que es más probable que el convicto sea inocente a que sea culpable".[114]

Claro está, la presunta nueva prueba no puede ser analizada de forma aislada. Es decir, tiene que ser evaluada a la luz de **toda** la prueba admitida durante el juicio que dio lugar a la convicción y, de la forma más favorable al fallo o veredicto que se impugna.[115]

En ese sentido, cabe reiterar que la solicitud de nuevo juicio bajo la Regla 192 es de naturaleza excepcional, ya que puede afectar la finalidad y firmeza de una sentencia que se presume correcta.[116] Por lo tanto, la concesión de un nuevo juicio descansa en la sana

---

[111] *Pueblo v. Marcano Parrilla II,* 168 D.P.R. 721, 739 (2006).
[112] *Id.*
[113] *Pueblo v. Marcano Parrilla II,* 168 D.P.R. 721, 739-740 (2006), y reiterado en *Pueblo v. Torres Feliciano,* 210 D.P.R. 63, 72 (2018)
[114] *Id.*
[115] *Pueblo v. Torres Feliciano,* 210 D.P.R. 63, 71 (2018).
[116] *Pueblo v. Rodríguez, supra,* a la pág. 999.

discreción del tribunal sentenciador, y dicha determinación merece deferencia, mientras no se demuestre un claro abuso de discreción.

**-III-**

A la luz de los hechos y el derecho antes discutidos debemos determinar si el TPI cometió los siguientes errores:

> *Erró el Honorable Tribunal de Primera Instancia al aplicar incorrectamente la doctrina establecida en el caso Pueblo v. Marcano Parrilla II, 168 D.P.R. 721 (2006) a la nueva prueba y en su valoración de los análisis de ADN.*

> *Erró el Honorable Tribunal de Primera Instancia al no considerar como parte de la evaluación para la concesión de nuevo juicio el efecto del testimonio retractado de la principal testigo de cargo conjuntamente con la nueva prueba.*

**-A-**

**En primer orden**, analicemos la nueva prueba que consiste en los resultados que obran en el *Analytical Report,* fechado el 3 de octubre de 2018 por el serólogo forense III, Philip Hopper del Laboratorio *Serological Research Institute* (SERI).[117] Para este análisis se tomaron muestras bucales a los coacusados Eduardo Correa López y Tomás Delgado Nieves. Además se tomó muestra de pelos extraídas del cuero cabelludo de la occisa, señora Yadira Delgado Candelaria.[118]

A continuación esbozamos la **explicación** que contiene el *Analytical Report* de SERI sobre la prueba realizada.[119] El referido reporte comienza explicando qué es el ADN y cómo se extrae:

> Deoxyribonucleic acid or DNA is found in nucleated cells, e.g., white blood cells, salivary, vaginal and tissue epithelial cells and spermatozoa. The DNA can be extracted and the amount obtained is proportional to the number of cells present. When an organic extraction is performed on a biological sample, all genomic DNA will be extracted, including both nuclear and mitochondrial DNA. Thousands of copies of mitochondrial DNA are present in each cell, making mitochondrial DNA analysis possible from samples which are highly degraded or have very limited quantities of DNA. Samples such as skeletal remains, teeth and hair shafts frequently yield mitochondrial DNA results when nuclear DNA analysis is not possible.

---

[117] Véase, *Analytical Report*, a las págs. 170-178 del Apéndice del recurso.
[118] Véase, *Analytical Report*, a las págs. 172-173 del Apéndice del recurso.
[119] Véase, *Analytical Report,* a las págs. 176-177 del Apéndice del recurso.

Ahora, explica en qué consiste el ADN humano y el método de análisis para entender su origen y función :

Human DNA consists of a number of genetic marker systems. Nuclear DNA is found in the nucleus of the cell, and is inherited from both the mother and father. Analysis methods utilizing nuclear DNA rely on identifying small specific sections or repetitive sections of DNA wherein there are recognizable differences between people. Alternatively, analysis of mitochondrial DNA relies on determining the specific order or sequence of some of the thousands of individual nucleotide bases that serve as the building blocks of a person´s mitochondrial DNA. Unlike nuclear DNA, mitochondrial DNA is located in the mitochondria of the cell, and is inherited maternally. In other words, both males and females have mitochondrial DNA, but only females can pass it on to their offspring. The mitochondrial genome is passed on in its entirety; therefore every individual in the same maternal lineage will (except in rare cases of mutation) have the identical mitochondrial DNA sequence.

Thousands of copies of mitochondrial DNA are present in each cell, making mitochondrial DNA analysis possible from samples which are highly degraded or have very limited quantities of DNA. Samples such as skeletal remains, teeth and hair shafts frequently yield mitochondrial DNA results when nuclear DNA analysis is not possible.

En lo pertinente al análisis forense científico, explica la importancia del *Control Region*:

The part of the mitochondrial genome significant to forensic science is known as the Control Region, and is made up of two hypervariable regions (HV1 and HV2). The forensic community generally recognizes the HV1 and HV2 regions as consisting of base positions 16024-16365 and 73-340, respectively. An adenine (A), cytosine (C), guanine (G) or thymine (T) nucleotide is designated at every position, and base designations are numbered according to the Cambridge Reference Sequence, also referred to as the Anderson Sequence. Although tile entire HV1 and HV2 regions are sequenced, only differences (polymorphisms) from the Anderson Sequence are noted when reporting a sample´s mitochondrial DNA type.

A tono con lo antes indicado, explica qué es una heteroplasmia para el análisis de los resultados de una prueba de ADN:

Heteroplasmy indicates the presence of two variant populations of mitochondrial DNA in the same person. Point heteroplasmy results in the presence of two different nucleotides at the same base position. Normally, it is expected that the occurrence of heteroplasmy would be present at no more than one position within the same sequence. While heteroplasmy can appear to look like a mixture of DNA from two or more people, it actually results from a mutation in the mitochondrial DNA of one person. Hairs from heteroplasmic individuals do not always show evidence of more than one sequence.

Así, pasa a explicar lo que es el método de PCR,[120] y su utilidad en los análisis de ADN:

> Because the PCR method can amplify very small amounts of DNA, contamination of the samples is always an important concern. Consequently, the reagents used in the extinction are themselves subjected to the entire extraction, amplification, and sequencing process without adding any DNA. These blank controls should show no activity at the sequencing stage, thereby strongly indicating that contamination has not occurred. If any typing result is obtained, contamination could have occurred in the evidence samples. Several reagent blanks and amplification controls were generated during the testing performed in this case. Partial mitochondrial DNA sequence results were detected in One of the extraction blanks and one of the negative amplification controls. These results do not affect the conclusions below.

Finalmente, explica la importancia de la base de datos *European DNA Profiling Group:*

> As mitochondrial DNA is only inherited maternally, traditional statistical analysis, as used with nuclear DNA typing, cannot be used. How often a particular mitochondrial DNA sequence (haplotype) occurs in a population is determined by consulting a mitochondrial DNA database maintained by the European DNA Profiling Group (empop.org). While this database is not large, compared to the total population, it can give an estimate about how common or rare the sequence is in a population.

Concluida la explicación, en el *Analytical Report* se plasman cuatro (4) **conclusiones** de los resultados de las pruebas de ADN realizadas para este caso.[121] Veamos la primera conclusión:

1. The same mitochondrial DNA sequence was obtained from the hair from the victim's left thigh (item 4), the hair from the victim's left hand (item 6), the hair from the victim's left hand (item 8), the hair from the victim's left hand (item 11), and the hair from the victim's left arm (item 13). With the exception of point heteroplasmy, this sequence is the same as the sequence determined for Yadira Delgado-Candelaria (item I 8). Consequently, Yadira Delgado-Candelaria (or someone from her maternal lineage) could be the source of these hairs. A search of the EDNAP mtDNA Population Database (EMPOP) of 29,422 samples showed 48 samples with the same mitochondrial sequence as these hairs. The mitochondrial DNA sequence obtained from these five hairs differs at only one position from the sequence determined for Eduardo Correa-Lopez (item 17). Consequently, it is inconclusive if he (or someone from his maternal lineage) could be the source of these hairs.

---

[120] Polymerase Chain Reaction (PCR). Véase, además, The National Center for Biotechnology Information (NCBI). www.ncbi.nlm.nih.gov
[121] Véase, *Analytical Report,* a las págs. 177-178 del Apéndice del recurso.

Noten que, de los pelos recuperados del muslo izquierdo, de la mano izquierda y del brazo izquierdo de la occisa (5 pelos en total), se obtuvo la misma secuencia de ADN mitocondrial. Allí, se indica que la occisa, señora Delgado Candelaria (o alguien de su línea materna) podría ser la fuente de estos pelos. Sin embargo, la secuencia de ADN Mitocondrial obtenida de estos 5 pelos difieren en una sola posición de la secuencia del señor Correa López. Por lo que este resultado es inconcluso para indicar si el señor Correa (o alguien perteneciente a su línea materna) podría ser la fuente de estos pelos.

Veamos la segunda conclusión:

2. A partial mitochondrial DNA sequence was obtained from the hair from the victim's right thigh (item 1). With the exception of point heteroplasmy, the mitochondrial DNA sequence obtained from the hair is the same as the sequence determined for Yadira Delgado-Candelaria. Consequently, Yadira Delgado-Candelaria (or someone from her maternal lineage) could be the source of this hair. A search of the EDNAP mtDNA Population Database (EMPOP) of 29,947 samples showed 62 samples with the same mitochondrial sequence as this hair. The mitochondrial DNA sequence obtained from this hair differs at only one position from the sequence determined for Eduardo Correa-Lopez. Consequently, it is inconclusive if he (or someone from his maternal lineage) could be the source of this hair.

En lo pertinente, notamos que, de la muestra de pelo recuperado en el muslo derecho de la occisa, se obtuvo una secuencia parcial de ADN mitocondrial. Por lo que la occisa, señora Delgado Candelaria (o alguien perteneciente a su línea materna) podría ser la fuente del pelo. Sin embargo, la secuencia de ADN Mitocondrial obtenida de este pelo, difiere en una sola posición de la secuencia del señor Correa López. Por lo que este resultado es inconcluso para indicar si él (o alguien perteneciente a su línea materna) podría ser la fuente del pelo.

Pasemos a la tercera conclusión:

3. A partial mitochondrial DNA sequence was obtained from the hair from the victim's right forearm (item 2). With the exception of point heteroplasmy, the mitochondrial DNA

> sequence obtained from the hair is the same as the sequence determined for Yadira Delgado-Candelaria. Consequently, Yadira Delgado-Candelaria (or someone from her maternal lineage) could be the source of this hair. A search of the EDNAP mtDNA Population Database (EMPOP) of 34,617 samples showed 91 samples with the same mitochondrial sequence as this hair. The mitochondrial DNA sequence obtained from this hair differs at only one position from the sequence determined for Eduardo Correa Lopez. Consequently, it is inconclusive if he (or someone from his maternal lineage) could be the source of this hair.

A igual que en la segunda conclusión, se obtuvo una secuencia parcial de ADN mitocondrial obtenida del pelo recuperado en el ante brazo derecho de la occisa, señora Delgado Candelaria, por lo que ella (o alguien de su línea materna) podría ser la fuente del pelo. Sin embargo, la secuencia de ADN Mitocondrial obtenida de este pelo difiere en una sola posición de la secuencia del señor Correa López. Por lo que este resultado es inconcluso para indicar si el señor Correa (o alguien perteneciente a su línea materna) podría ser la fuente del pelo.

Por último, la cuarta conclusión lee como sigue:

4. The same mitochondrial DNA sequence was obtained from both of the hairs from the left wall (items 15 and 16). This sequence differs at a number of positions from the sequences determined for Eduardo Correa-Lopez and Yadira Delgado-Candelaria. Consequently, Eduardo Correa-Lopez and Yadira Delgado-Candelaria are both excluded as the source of these hairs.

Distinto a las tres conclusiones anteriores, en esta se obtuvo la misma secuencia de ADN mitocondrial de los dos pelos recuperados de la pared al salir del baño. La secuencia de ADN Mitocondrial difiere en varias posiciones de la secuencia del señor Correa López y la occisa, señora Delgado Candelaria. Por lo que, ambos están excluidos de ser la fuente de esos pelos.

Examinadas las conclusiones antes expresadas, podemos recapitular —**en primer término**— que la señora Delgado Candelaria o alguien de su línea materna, podría ser la fuente de todos pelos obtenidos de su cuerpo. Sin embargo, en lo que respecta

al señor Correa López solo podemos concluir que la secuencia de ADN Mitocondrial obtenida de esos pelos <u>difiere en una sola posición</u> de la secuencia de éste. Por lo que los resultados son <u>inconclusos</u> para indicar si él (o alguien perteneciente a su línea materna) podría ser la fuente de esos pelos. Sobre este punto, el serólogo forense III, Philip Hopper del Laboratorio SERI, le expresó mediante correo electrónico del 24 de julio de 2018 a la señora Mireya Hernández, directora del Laboratorio de ADN del NCF,[122] la razón por la cual el señor Correa López **no podría ser excluido** como fuente de los pelos hallados en el cuerpo de la occisa, señora Delgado Candelaria. En lo pertinente, indicó:

> The SWGDAM guidelines (and our guidelines too) say that in order for an exclusion to be Reported there must be more than one difference in the mito sequence. If one of the Evidence hairs matches Yadira, I will say it matches her, but the result for Eduardo would be inconclusive. **I would not be able to say that he is excluded as the source of the hair**. In a similar way if a hair matches Eduardo I will say it matches him, but for Yadira it will be inconclusive and not an exclusion. However if one of the hairs from Yadira has a 237G mutation (and not the heteroplasmy) then it would have two differences from Eduardo and would be an exclusion for him. Of course if there are hairs that have more than two differences from Yadira and Eduardo, they will both be excluded which is probably still important to know.
> [...].

En **segundo término** —podemos concluir— que las muestras de los dos pelos recuperados de la pared al salir del baño, <u>difiere en varias posiciones</u> de la secuencia de ADN Mitocondrial del señor Correa López y la occisa, señora Delgado Candelaria, por lo que <u>ambos están excluidos de ser la fuente de esos pelos</u>.

Ahora bien, es importante destacar que en el *Analytical Report* se hace una **recomendación** dirigida a tomar una nueva muestra al coacusado Tomás Delgado Nieves para determinar si él podría ser la fuente de <u>cualesquiera</u> de los pelos examinados en este caso:

---

[122] Véase, correo electrónico del 24 de julio de 2018, enviado a la señora Mireya Hernández, directora del Laboratorio de ADN del NCF, por el serólogo forense III, Philip Hopper del Laboratorio SERI, a las págs. 209-210 del Apéndice.

> A new reference sample from Tomas M. Delgado-Nieves
> should be submitted to determine if he could be the source
> of any of the hairs in this case.[123]

Lo antes recomendado se explica en el mismo correo electrónico que el señor Philip Hopper —serólogo forense III del Laboratorio SERI— le envió el 24 de julio de 2018 a la señora Mireya Hernández, directora del Laboratorio de ADN del NCF, relativo a la muestra bucal del coacusado Tomás Delgado Nieves. En lo pertinente, indicó:

> [...]
> Even though the sample from Tomas appears to be
> contaminated, the results I got for him were very different
> from the other two. Once we know the results from the
> evidence hairs, it might tell us more about whether we need
> another sample for him. I don't use all the buccal sample
> from Tomas, only about 1/3 of it. If you would like me to
> extract the rest of it and hope that there's more of his DNA
> on that part, please let me know.[124]

**-B-**

**En segundo orden**, queda establecido que la nueva prueba en este caso consiste en los resultados de ADN Mitocondrial y la recomendación que obra en el *Analytical Report,* del 3 de octubre de 2018.

El señor Correa López nos solicita un nuevo juicio basado en los resultados de la nueva prueba de ADN Mitocondrial, las múltiples incongruencias y retracción de la testigo principal en el juicio; unido, al testimonio de Fernando Fernández Mercado, especialista de ADN del ICF, sobre el análisis y resultado macroscópico de los pelos hallados en el cuerpo de la occisa y en la pared a la salida del baño, entre otros resultados. Veamos en detalle.

En primer lugar, el señor Correa López arguye que, la nueva prueba de ADN Mitocondrial cobra importancia al analizarse en conjunto con el testimonio del perito Fernando Fernández Mercado, especialista de ADN del ICF, que declaró ante el jurado que *"[los]*

---

[123] Véase, *Analytical Report*, a la pág. 178 del Apéndice del recurso.

[124] Véase, correo electrónico del 24 de julio de 2018, enviado a la señora Mireya Hernández, directora del Laboratorio de ADN del NCF, por el serólogo forense III, Philip Hopper del Laboratorio SERI, a la pág. 210 del Apéndice.

*pelos recuperados a través de todo el cuerpo de la occisa eran muestra de evidencia que **no se sabía su origen**. **Posiblemente pudieran ser de Yadira u otra persona."***

Además, señala que esa declaración abrió ***"la puerta a que el jurado infiriera que la fuente de dichos pelos era el peticionario"***.[125]

En segundo lugar, y tomando como base los resultados excluyentes de ADN Mitocondrial de los dos (2) pelos hallados en la pared izquierda que sale del baño, el señor Correa López arguye que, entre muchas inconsistencias de la testigo principal Shakira Delgado Delgado, no lo mencionó —en los primeros dos meses de haber ocurrido el crimen— como el coautor del asesinato. Aduce que ello resulta sospechoso, pues la niña lo ubica en la escena del crimen, junto al coacusado Delgado Nieves, cuando estaba bajo la custodia de los familiares maternos y agentes policiacos. Por lo que al examinar ese hecho, las múltiples inconsistencias de la niña, las pruebas científicas que lo favorecen, en conjunto con el resultado de las dos muestras de pelos que lo excluyen:

> *"se acentúa cuando la representación hecha por el Estado al jurado **es que todos los pelos encontrados** **eran o podían** **ser compatibles con la víctima**. Es decir, **el jurado nunca** **tuvo la oportunidad de escuchar que dichos pelos no** **pertenecían a Eduardo Correa López"**.*

Añade que ese resultado:

> ***"[p]uede producir duda sobre la presencia del peticionario en la casa y, particularmente, en el baño"***.[126]

**-C-**

**En tercer orden**, para conceder la moción de nuevo juicio, nuestro razonamiento debe ir dirigido a que al analizar la nueva evidencia, **junto a la presentada en el juicio original** de la forma **más favorable al veredicto de culpabilidad que se impugna**, la

---

[125] Véase, a la pág. 16 del recurso del Peticionario.
[126] Véase, a las págs. 17-18 del recurso del Peticionario.

misma **pudo haber creado duda razonable en el ánimo del jurado**, en cuanto a la **culpabilidad del peticionario**.[127] Veamos si esto ocurre en este caso.

**1.**

**Primero**, en cuanto a los siete (7) pelos obtenidos en el cuerpo de la occisa, los resultados de ADN Mitocondrial indican que ésta o alguien de su línea materna, podría ser la fuente de esos pelos obtenidos de su cuerpo.  Al compararlo con lo declarado por el perito Fernández Mercado en el juicio; cuando indicó que, los pelos fueron evaluados macroscópicamente (balo una luz y lupa) y concluyó que todos los pelos tenían características similares macroscópicamente con la muestra de referencia de la occisa.[128] Es decir, no le pertenecían a los coacusados.

Entonces, razonablemente podemos inferir que los resultados de la evaluación macroscópica realizada por el perito Fernández Mercado coinciden con los resultados de la prueba de ADN Mitocondrial, a los efectos de que, los siete pelos obtenidos en el cuerpo de la occisa, le pertenecen a la señora Yanira Delgado Candelaria. En otras palabras, la similitud estriba en que por un lado, la primera prueba dijo que "todos los pelos tenían características similares macroscópicamente con la muestra de referencia de la occisa". Y por otro lado, la nueva prueba dice que "la occisa o alguien de su línea materna, podría ser la fuente de esos pelos obtenidos de su cuerpo".

Ahora bien, lo que sí ha cambiado es que bajo la prueba de ADN Mitocondrial, el señor Correa López **no podría ser excluido** como fuente de los pelos hallados en el cuerpo de la occisa, debido a que la secuencia de ADN Mitocondrial obtenida de esos pelos difiere en una sola posición de la secuencia de éste. Por lo tanto, los

---

[127] *Pueblo v. Marcano Parrilla II, supra.*
[128] Véase, la Resolución recurrida a las págs. 79-80 del Apéndice del recurso.

resultados son **inconclusos** para indicar si él (o alguien perteneciente a su línea materna) podría ser la fuente de esos siete pelos.

Como bien lo indicó el serólogo Philip Hopper del Laboratorio SERI el 24 de julio de 2018 en el correo electrónico enviado a la directora del Laboratorio de ADN del NCF, Mireya Hernández, que, a tono con las guías del SWGDAM, se exige que para reportar una exclusión debe haber más de una diferencia en la mito secuencia. Es por esa razón, que el peticionario no podía ser excluido, ya que la secuencia de ADN Mitocondrial obtenida de las muestras pelos diferían en una sola posición de la secuencia de este; por lo que se obtiene un resultado inconcluso.

No obstante, el señor Correa López arguye que la nueva prueba de ADN Mitocondrial cobra importancia a su favor, pues el perito Fernández Mercado, especialista de ADN del ICF, declaró en el juicio por jurado que:

> "[los] pelos recuperados a través de todo el cuerpo de la occisa eran muestra de evidencia que **no se sabía su origen**. **Posiblemente pudieran ser de Yadira u otra persona."**

El señor Correa López añade que esa declaración tuvo el efecto de abrir ***"la puerta a que el jurado infiriera que la fuente de dichos pelos era el peticionario"***.

Un examen de esa declaración nos lleva a contextualizarla, pues la misma surge de la Resolución recurrida cuando el perito Fernández Mercado del ICF concluye su interrogatorio directo y comienza el contrainterrogatorio de la Defensa.

En lo pertinente, citamos:

> **La conclusión del testigo [Fernández Mercado] en cuanto a los pelos fue que estos eran similares a los de Yadira Delgado Candelaria. En cuanto a los análisis de ADN, las muestras que dieron positivo fueron a la sangre de la occisa.**
> En el contrainterrogatorio, Mercedes Fernández explicó que a ninguno de los pelos se les hizo análisis tricológico, ya que nunca se solicitó ese tipo de análisis. El testigo no refirió los pelos para el análisis tricológico, por órdenes de su supervisor, porque el análisis solicitado fue de ADN de las

piezas de evidencia, no de los pelos. A pesar de eso, él no mandó a hacer un análisis tricológico de los pelos porque no había muestra de referencia del sospechoso en cuanto a cabellos, y porque no se le solicitó ese análisis. Estos llegaron como parte del proceso. Sin embargo, si se lo hubiesen pedido, teniendo la información del colector bucal de Tomás Delgado, pudo haberlo comparado con los pelos, de éstos tener folículos para comparar ADN.

Cónsono con lo anterior, el testigo expresó que a la occisa le arrancaron (5) pelos de la cabeza y durante la autopsia se recolectaron (7) pelos en el cuerpo. Los pelos recuperados eran macroscópicamente similares a los de la occisa. **Los pelos recuperados a través de todo el cuerpo de la occisa eran muestras de evidencia que no se sabía su origen. Posiblemente pudieran ser de Yadira u otra persona**.[129]

De entrada, al ser un contrainterrogatorio no creemos que el mismo iba dirigido a incriminar a ninguno de los coacusados en ese juicio. Máxime, cuando estamos hablando de que los abogados de defensa eran, la licenciada Mayra Mulero y los licenciados Jorge Gordon y Carmelo Dávila, letrados de probada capacidad y experiencia profesional.

Todavía más, el Ministerio Público nunca alegó ni insinuó que los pelos recuperados en el cuerpo de la occisa o en el área del baño le pertenecieran a los coacusados. Por el contrario, ciñéndose a la prueba macroscópica realizada por el perito Fernández Mercado, señaló que todos los pelos examinados tenían <u>características similares macroscópicamente con la muestra de referencia de la occisa</u>. Bajo ese contexto de evaluación macroscópica, solo se puede hablar de <u>características similares con la muestra de referencia</u>, que en este caso era de la occisa.

Por lo tanto, un análisis ponderado de los resultados de la nueva prueba de ADN Mitocondrial —<u>siete (7) pelos obtenidos en el cuerpo de la occisa</u>— evaluada en conjunto con <u>toda la prueba presenta en el juicio **original** de la forma **más favorable al veredicto de culpabilidad que se impugna**</u>, nos lleva a concluir que **no pudo haber creado duda razonable en el ánimo del jurado, en cuanto a la culpabilidad del peticionario**.

---

[129] Véase, la Resolución recurrida a las págs. 80-81 del Apéndice del recurso.

**2.**

**Segundo**, los resultados de las muestras de los dos (2) pelos recuperados de la pared izquierda al salir del baño, <u>difiere en varias posiciones</u> de la secuencia de ADN Mitocondrial del señor Correa López y la occisa, señora Yanira Delgado Candelaria, por lo que **ambos están excluidos de ser la fuente de esos pelos**.

De entrada, resulta pertinente reseñar que en el juicio el perito Fernández Mercado declaró sobre la pieza de evidencia DNAS06-1296-009 (Identificación Q), la cual se describe como: <u>pelo levantado en la pared que se encontraba saliendo del baño, lado izquierdo, con fibra</u>. Esa pieza de evidencia llegó a través del área de Recibo de Evidencia del ICF, una vez el agente investigador Alex Cintrón la sometió para análisis. La misma fue recibida en el Instituto el 6 de diciembre de 2006. Allí, el perito Fernández Mercado del ICF le realizó una evaluación macroscópica. Observó la muestra de referencia, la cual se conocía el origen —un cabello extraído de la cabeza de la occisa— por lo que surgió que ambas piezas eran <u>similares en cuanto a características anatómicas macroscópicamente</u>. Manifestó que no realizó otro análisis.

Así, al comparar ambas pruebas, tenemos que el resultado de la prueba macroscópica indica que <u>los pelos recuperados en la pared izquierda saliendo del baño, **tenían características similares macroscópicamente con la muestra de referencia de la occisa**</u>. Por su parte, la nueva prueba de ADN Mitocondrial revela que tanto la occisa como el señor Correa López **están excluidos de ser la fuente de los dos pelos** levantados en la referida pared del baño.

No obstante, tanto la prueba macroscópica como el nuevo resultado de ADN Mitocondrial, todavía <u>sostienen</u> la argumentación que en todo momento hizo el Ministerio Público en el juicio por jurado, a los efectos, de que los pelos recuperados en el cuerpo de la occisa y en la pared izquierda de la salida del baño <u>no inculpaban</u>

al señor Correa López ni al coacusado Delgado Nieves. En ese sentido, ahora la nueva prueba indica que no le pertenece a la occisa ni al peticionario.[130]

Sin embargo, el señor Correa López alega que la nueva prueba:

> "… se acentúa cuando la representación hecha por el Estado al jurado **es que todos los pelos encontrados eran o podían ser compatibles con la víctima.** Es decir, **el jurado nunca tuvo la oportunidad de escuchar que dichos pelos no pertenecían a Eduardo Correa López**". Énfasis original.

Y añade que:

> "… puede producir duda sobre la presencia del peticionario en la casa y, particularmente, en el baño".

Para sostener esa alegación, el señor Correa López arguye que la nueva prueba, tomada en conjunto con los siguientes eventos ocurridos en el juicio, pudo haber creado duda razonable en el ánimo del jurado, en cuanto a su culpabilidad; a saber:

a. Las inconsistencias, retractaciones y omisiones de la testigo principal Shakira Delgado Delgado, constituyen una impugnación por omisión e inconsistencias anteriores.
b. Las manifestaciones anteriores que hizo testigo principal Shakira Delgado Delgado a la testigo señora Otero.
c. La posibilidad de que esas muestras de pelos le pertenezcan al verdadero asesino, bajo la teoría de la Defensa de que otra persona o personas pueden ser los autores.
d. La misteriosa aparición repentina en el juicio de la nueva prueba y la oposición del Fiscal para que en este caso se hiciera la prueba de ADN.
e. La ausencia de motivación del señor Correa López para asesinar a la señora Delgado.
f. La negativa del Ministerio Público en tomar muestra a Tomás Delgado Nieves.
g. Informe negativo de huellas y ADN de sangre que se presentó en el juicio no implicaban al peticionario.

Un análisis ponderado de la nueva prueba, en conjunto con toda la prueba presenta en el juicio, nos lleva a concluir que el señor Correa López no tiene razón. Veamos.

La prueba antes indicada por el señor Correa López fue objeto de examen y escrutinio por parte del jurado que la escuchó durante

---

[130] Como indicamos anteriormente, en el *Analytical Report* se recomienda tomar una nueva muestra al coacusado Tomás Delgado Nieves para determinar si él podría ser la fuente de cualesquiera de los pelos examinados en este caso.

el juicio. En específico, el jurado tuvo ante sí el testimonio de la niña Shakira Delgado Degaldo, con todas sus consistencias e inconsistencias;[131] de tal magnitud fue el escrutinio de dicho jurado, que la Fiscalía no tuvo reparos en estipular con los abogados de la Defensa treinta y cinco (35) inconsistencias vertidas por la menor, tanto en la vista preliminar como en el juicio. Ese listado de inconsistencias les fue leído a los miembros del jurado antes de irse a deliberar.[132] También, el jurado escuchó a la señora Ana Otero García, quien escribió unas notas sobre un comentario que hizo la niña espontáneamente. Sobre las referidas notas, la señora Otero García declaró lo siguiente a preguntas de la Defensa:

> En el contrainterrogatorio, la testigo [señora Otero] explicó que, desde el 29 de noviembre de 2006, hasta el día de la vista (11 de febrero de 2008), Shakira estuvo con Mary y los familiares de Yadira. Shakira expresó que había visto al amigo de papá, Eduardo, con él. La testigo [señora Otero] le dijo a su esposo que la niña habló de lo que había pasado en la casa. Después de eso ella no dialogó más del tema con ésta.
>
> La testigo [señora Otero] manifestó que Shakira habló con el Agte. Montalvo después que llegó del viaje. Otero García no fue a ese viaje. Shakira viajó con su abuela y su hermana Ninoshka. Sin embargo, la testigo [señora Otero] no recordó si la hermana gemela de la occisa fue con ellas, o era que iban para la casa de ella. Según Otero García, Shakira regresó el 7 de enero. Dos o tres semanas después de eso fue que Shakira habló con el Agte. Montalvo.
>
> La testigo [señora Otero] hizo una carta de su puño y letra,[133] después de la muerte de Yadira. Ella [señora Otero] escribió ese documento porque había escuchado que tomara nota cuando la niña hablara cualquier cosa que se oyera importante para la investigación. Esas notas las tomó antes que la niña se fuera de viaje, en la casa de Annie, la

---

[131] Véase, el testimonio de la niña Shakira Delgado Delgado, a las págs. 32-38 del Apéndice del recurso.

[132] Véase, el listado estipulado de las inconsistencias del testimonio de la niña Shakira Delgado Delgado, a las págs. 95-97 del Apéndice del recurso.

[133] Exhibit B de la Defensa- La carta de Ana Otero se transcribe íntegramente a continuación:

> "Dice que un primo visitaba la casa, que se parqueaba lejos para que nadie lo viera. Dice que un tal chino que es verdaderamente su primo no es porque el [sic] no va ya a la casa. El tipo es trigueño no tan alto, flaco como eñemao, no es narizón, pelo negro pegao (dice que se parece a ese primo, que nadie conoce ni su tío ni su papa) que si su papa se entera.. [sic] ella la nena se puso las manos en la cabeza y luego se las paso por el cuello como para cortárselo. (eso es lo que hubiera echo [sic] su papa)
> la mama [sic] decia [sic] que no saliera de hay [sic] o sea del cuarto porque ella fumaba tabaco con esa persona."

Véase, la notal al calce núm. 71 que obra en la pág. 60 del Apéndice del recurso.

bisabuela de la nena. Shakira salió hablando espontáneamente y la testigo [señora Otero] lo escribió. Ella [señora Otero] mencionó que un primo visitaba la casa y se estacionaba lejos para que nadie lo viera. La testigo [señora Otero] le preguntó que cuál primo y Shakira no supo decirle porque no sabía quién era, pero que no era Chino, el cual sí era primo. Chino era primo de Mayra. La niña dijo que Chino ya no iba a la casa de Yadira. La menor describió al primo que visitaba la casa como trigueño, no tan alto, flaco, como "eñemao", que no era narizón y tenía pelo negro, "pegao".

Otero García también mencionó en el escrito que la menor le dijo que si su papá se enteraba de que ese primo que nadie conocía llegaba a la casa, pasaría algo con la mamá. Eso lo dijo la menor. Lo que la testigo [señora Otero] escribió entre paréntesis ella lo interpretó, porque la niña hizo un gesto que se pasó la mano por el cuello. La niña hizo el gesto en ese momento, pero no verbalizó. Del documento también surgía que Shakira le expresó que la mamá le decía a ella que no salieran de su cuarto cuando estaba esa persona en la casa. La niña le manifestó a la testigo [señora Otero] que esa persona y su mamá fumaban tabaco en la casa. La testigo [señora Otero] escribió todo eso y cree que le entregó la carta al Agte. Montalvo.[134]

Tanto el testimonio de la señora Otero García como la nota escrita (Exhibit B de la Defensa) fue evaluado por el jurado.

También, el señor Correa López arguye la posibilidad de que esas muestras de pelos le pertenezcan al verdadero asesino. Alega que en el juicio la Defensa presentó la teoría de que otra persona o personas pudieran ser los autores del crimen.

No obstante, ninguno de los siete testigos que la Defensa presentó ante el jurado declaró sobre otro potencial asesino.[135] Incluso, arguye como posible sospechoso al señor Jeffrey Alberto Martínez Jiménez, quien mantenía una relación sentimental con la occisa y la visitó la noche antes del crimen; sin embargo, el señor

---

[134] Véase, el testimonio de la señora Ana Otero García, a las págs. 49-51 del Apéndice del recurso. Subrayado nuestro.
[135] A continuación los testigos presentados por la Defensa:
1. Jeffrey Alberto Martínez Jiménez.
2. Francisco Delgado Delgado.
3. Ana Rosa Delgado Delgado.
4. Rosa De Laust Ganges.
5. Carlos R. Rodríguez Borrás.
6. Rodolfo Ricardo Rojas Dávila.
7. Luis Antonio Avilés Valentín.

Martínez Jiménez fue el primer testigo de Defensa y no aportó nada a esa teoría.[136]

Todavía más, son los coacusados Tomás Delgado Nieves y Eduardo Correa López los que, en una entrevista por separados, le indican al agente investigador Alejandro Montalvo Arguelles, sobre la presencia de otras personas o de un vehículo raro. En lo pertinente, el agente Montalvo Arguelles declaró sobre la entrevista realizada al coacusado Tomás Delgado Nieves:

> El agente continúo testificando que el mismo día 29 de noviembre de 2006, luego de terminar de trabajar la escena, entre las 12:20 p.m. y las 12:30p.m., entrevistó a Tomás Delgado Nieves, a eso de las 2:30 p.m. en las Oficinas del Cuerpo de Investigaciones Criminales (CIC), en la Comandancia de Arecibo. Señaló que éste fue el esposo de la víctima por diez años, y era el padre de Shakira y Ninoshka. De su investigación surgió que el 29 de noviembre de 2006 Delgado Nieves se encontraba viviendo con sus abuelos Martín y Ana en la residencia arriba señalada. Testificó que Tomás se había ido a residir allí desde el día antes del día de Acción de Gracias ("Thanksgiving"), de ese mismo mes. Manifestó que fue Tomás quien llamó al 9-1-1, y dio conocimiento a la Policía sobre la escena.
>
> El testigo declaró que Tomás trabajaba en la fábrica Eaton, en el barrio Santana de Arecibo. El 28 de noviembre de 2006, trabajó en el turno de 3:00 p.m. a 11:30 p.m. y un primo lo llevó. Para regresar, lo hizo con Eduardo Correa, quien era su compañero de trabajo. Con éste, viajaba todas las noches, durante casi un año y medio. <u>Testificó que Tomás le dijo que llegó a su residencia entre las 11:50 y las 12:00 p.m. Éste le manifestó que, a esa hora, frente a la casa de la occisa, se encontraba estacionado el carro de ella y un carro color vino, parecido a la marca Toyota, adelantado, con focos alteza. Explicó que luego que se bajó del carro de Eduardo, se fue hasta su residencia, es decir, la de sus abuelos. Posterior a eso, el agente investigador declaró que Tomás le indicó que, alrededor de 20 minutos después, al sentir un ruido, miró por la ventana hacia la residencia de la víctima, de donde vio salir a un individuo que describió como alto, medio grueso, vestido con una "t shirt" clara, y quien quitó la alarma a un carro y se marchó. Señaló que, aproximadamente 15 minutos después, llegó por la misma calle un vehículo que describió como pequeño, compacto, del que no supo el color, ni tomó el número de tablilla, se estacionó en la casa siguiente y del cual se bajaron tres personas: dos hombres y una mujer de pelo largo, delgados. De estos, señaló que un hombre caminó por detrás de la casa de la occisa y que los otros entraron por el frente. El testigo declaró que Tomás le manifestó que dicho</u>

---

[136] Véase, el testimonio del señor Jeffrey Alberto Martínez Jiménez como testigo de la Defensa, a las págs. 86-87 del Apéndice del recurso.

vehículo se retiró cerca de la 1:00 a.m. Montalvo pudo corroborar la existencia del carro color vino, como perteneciente a Jeffrey Martínez, mientras que lo del carro compacto, jamás se supo.[137]

En cuanto a la entrevista realizada al coacusado Eduardo Correa López, el agente Montalvo Arguelles testificó:

El Agte. Montalvo Arguelles continuó declarando que entrevistó a Correa López el 30 de noviembre de 2006, a la 1:30 p.m. en la acera, frente a la residencia de éste. Para el 28 de noviembre de 2006 el convicto trabajaba en la fábrica Eaton, al igual que Tomás. Éstos tenían el mismo turno y llevaban viajando juntos un año y medio. Ese día habían salido a las 11:30 del trabajo. Tomás Delgado habló con Correa López y se fue con él, y un individuo que se llamaba Luis Torres. Tomaron la carretera número 2 de Arecibo, hasta el garaje Shell, que estaba en la entrada de Islote, donde se quedó Luis Torres. Correa López y Tomás Delgado siguieron para el "CMN *Car Wash"* que ubicaba en el centro del Pueblo de Arecibo. Allí echó gasolina y continuó a llevar a Tomás a la casa. Al llegar, a la izquierda, en el estacionamiento de la casa de Tomás, al lado del carro de la esposa, había un carro raro. El Agte. Montalvo Arguelles le preguntó a Correa López por el modelo, marca y color. Correa López le contestó que "era un carro raro", "allí había un carro raro". El testigo le preguntó de nuevo por el color, o marca y le respondió que porque... "No, un carro raro". El agente Montalvo le preguntó si no le había tomado la tablilla y Correa López le dijo que no, que Tomás se había bajado y él viró y se fue.[138]

Además de lo antes dicho, el señor Correa López argumenta que la exclusión de él y de la occisa como las fuentes de los dos pelos levantados en la pared izquierda del mencionado baño, cobra mayor relevancia ante la aparición misteriosa de esta prueba (y de los pelos recuperados en la víctima) en medio del juicio y la oposición enérgica del Ministerio Público a que se analizaran. También, señala que no tenía ningún motivo para asesinar a la señora Delgado Candelaria;

---

[137] Véase, el testimonio del agente Alejandro Montalvo Arguelles, a las págs. 42-43 del Apéndice del recurso. Subrayado nuestro.
     Cabe indicar que en el contrainterrogatorio, el agente Montalvo declaró lo siguiente:
     *El Agte. Montalvo entrevistó a Tomás Delgado Nieves en el CIC, el 29 de noviembre de 2006, después de las 2:30 p.m. Éste le habló de un carro color vino, adelantado, con focos transparentes, parecido a un Toyota. También le mencionó un segundo carro. Posteriormente, el agente Montalvo fue a la fábrica Eaton y corroboró que Eduardo y Tomás trabajaron el 28 de noviembre de 2006, hasta las 11:30 p.m.* Véase, además la pág. 49 del Apéndice del recurso.

[138] Véase, el testimonio del agente Alejandro Montalvo Arguelles, a la pág. 45 del Apéndice. Subrayado nuestro.

contrario al coacusado Tomás Delgado Nieves y el señor Jeffrey Alberto Martínez Jiménez que mantenían una relación sexual íntima con esta. A ello le añade la negativa del Ministerio Público en completar la prueba de ADN Mitocondrial al coacusado Tomás Delgado Nieves. Máxime cuando el informe negativo de huellas y ADN de sangre que se presentó en el juicio no lo implicaban.

Dicha argumentación carece de méritos. Primero, la evidencia del Ministerio Público sobre los resultados de la prueba macroscópica de los pelos recuperados en la víctima indicaba que tenían características similares con los cabellos de referencias tomados del cuero cabelludo de la occisa; por lo tanto, no incriminaban a los coacusados. Incluso, los resultados macroscópicos de **todos** los pelos recuperados (en la occisa y la pared) —al igual que el informe negativo de huellas y ADN de sangre— que se presentaron ante el jurado no incriminaban a los coacusados.

Tampoco vemos cómo la alegada ausencia de motivos del peticionario para asesinar a la señora Yadira Delgado —junto a la nueva prueba— puede crear duda razonable en el ánimo del jurado de su culpabilidad, pues en el juicio la Defensa del señor Correa López no argumentó que el coacusado Delgado Nieves o el señor señor Martínez Jiménez fueran los posibles autores por sostener relaciones íntimas con la señora Delgado.

De igual modo, resulta inmeritorio la supuesta negativa del Ministerio Público en completar la prueba de ADN Mitocondrial al coacusado Tomás Delgado Nieves, pues —como ya indicamos— los resultados macroscópicos de todos los pelos recuperados no inculpaban a ninguno de los coacusados.

En fin, al analizar los argumentos del señor Correa López y los resultados de ADN Mitocondrial en conjunto con la prueba presentada en el **juicio original** —y vista de la forma más favorable

al veredicto de culpabilidad— **no podemos concluir que pudo haber creado duda razonable** en el ánimo del jurado en cuanto a la **culpabilidad del peticionario**.

**3.**

**Tercer** y último punto. El señor Correa López nos señala que el TPI erró al no considerar como parte de la evaluación para la concesión de nuevo juicio, el efecto del testimonio retractado de la principal testigo Shakira Delgado Delgado conjuntamente con la nueva prueba. Tampoco tiene razón.

En nuestro ordenamiento procesal penal (Regla 188(a) o 192), así como en el ámbito criminal federal (Regla 33), se exige que la moción de nuevo juicio se fundamente en el **descubrimiento de nueva prueba**. Por lo tanto, la **nueva prueba** debe cumplir con los cinco (5) criterios conocidos como *Berry Rule,* para que se pueda conceder la moción de nuevo juicio. Estos criterios son: (1) no se pudo descubrir con razonable diligencia antes del juicio; (2) no es meramente acumulativa; (3) no impugna la prueba aducida durante el juicio; (4) es creíble, y (5) probablemente produciría un resultado diferente.

No cabe duda que la retracción a la que hace alusión el señor Correa López no constituye nueva prueba. Veamos.

El **29 de octubre de 2012**, el señor Correa López y el coacusado Delgado Nieves presentaron una *Moción Sobre Representación Legal Adicional; Solicitando se Ordene la Celebración de un Nuevo Juicio y en Solicitud de Remedios Urgentes*, en la que alegaron el descubrimiento de nueva prueba, consistente en que la testigo Shakira Delgado Delgado (menor de edad) prestó una declaración jurada el 13 de septiembre de 2012 ante el Notario Rafael Cardona Campos, retractándose del testimonio original que

brindó en el juicio.[139] Así, el **24 de octubre de 2013** TPI denegó dicha solicitud de nuevo juicio y, el **28 de octubre de 2014**, el Tribunal de Apelaciones confirmó la denegatoria de nuevo juicio en el caso núm. *KLCE201301427, El Pueblo de Puerto Rico v. Tomás Delgado Nieves y Eduardo Correa López.* Además de referir al notario Rafael Cardona Campos al Tribunal Supremo de Puerto Rico y a la Oficina de Inspección de Notarías (ODIN), dicha declaración jurada no gozó de confiabilidad ni credibilidad alguna, tanto en el TPI como en este foro intermedio. Finalmente, los coacusados no recurrieron al Tribunal Supremo.

En conclusión, no estamos ante una prueba nueva que podamos considerar de conformidad con los criterios de Barry Rules antes esbozados.

### -IV-

Por los fundamentos antes expuestos, expedimos el auto de *certiorari* solicitado y procedemos a confirmar la Resolución recurrida.

Lo acordó el Tribunal y lo certifica la secretaria del Tribunal de Apelaciones. El Juez Rivera Colón emite un voto de conformidad por escrito.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[139] Véase, la Retractación del 13 de septiembre de 2012, a la pág. 179 del Apéndice del recurso. Además, véase, la Declaración jurada del 15 de noviembre de 2012, tomada por el Ministerio Público a Shakira Delgado (menor de edad) junto a una Defensora Legal, a las págs. 180-207 del Apéndice del recurso.

<table>
<tr>
<td colspan="3">Estado Libre Asociado de Puerto Rico<br>**TRIBUNAL DE APELACIONES**<br>**PANEL ESPECIAL**</td>
</tr>
<tr>
<td>El Pueblo de Puerto Rico<br><br>Recurrido<br><br>vs.<br><br>Eduardo Correa López<br><br>Peticionario</td>
<td>KLCE202100891</td>
<td>**Certiorari**<br>procedente del Tribunal de Primera Instancia, Sala Superior de Arecibo<br><br>Civil Núm.: CVI2007G0011 y otros<br><br>Sobre: Art. 106 (Asesinato en 1er grado) y otros</td>
</tr>
</table>

Panel integrado por su presidente, el Juez Rodríguez Casillas, el Juez Rivera Colón y la Jueza Romero García.

**VOTO DE CONFORMIDAD DEL JUEZ FELIPE RIVERA COLÓN**

En San Juan, Puerto Rico, a 31 de marzo de 2023.

Me uno a la determinación del panel de expedir y confirmar la determinación recurrida, emitida por el Tribunal de Primera Instancia, Sala Superior de Arecibo. El señor Eduardo Correa López (Sr. Correa López o peticionario) no cumplió con el estándar de nueva evidencia exigido por la Regla 192 de Procedimiento Criminal, 34 LPRA Ap. II, R. 192, toda vez que no aportó evidencia de nuevos hechos o elementos de prueba que evidencien su inocencia. Un análisis de los resultados inconclusos de ADN mitocondrial *vis a vis* la evidencia presentada en el juicio original, no demuestran que el peticionario es más inocente que culpable. Máxime, cuando los resultados de ADN mitocondrial no descartan al Sr. Correa López como donante de los "pelos", y éste último fue identificado en la escena del crimen por la menor Shakira Delgado Delgado, hija del coacusado Tomás Delgado Nieves y la occisa Yadira Delgado Candelaria.

Número Identificador
SEN2023_____

Sin embargo, expreso por separado con el fin particular de abundar al respecto, específicamente, sobre la prueba de identificación y el ADN.

## I.

Para probar que una persona cometió un delito, el Estado debe presentar dos cosas: (1) prueba dirigida a demostrar que se cumplieron todos los elementos del delito, y (2) prueba de identificación. La importancia de la prueba de identificación no es otra de asegurarnos de que la persona que cometió el acto delictivo es la misma persona que se encuentra acusada. Para esto, el Estado puede utilizar prueba testimonial o física. Entre la prueba física se encuentra la prueba de ácido desoxirribonucleico (ADN).

En pleno siglo XXI, las pruebas de ADN se han convertido en una "abstracción apocalíptica que de sólo invocarla infunda temor de Dios al tribunal y paralice al adversario". *Domínguez Talavera v. Tribunal Superior*, 102 DPR 423, 428 (1974) (haciendo referencia al debido proceso de ley). **Aunque el ADN puede ser prueba muy confiable y de alto valor probatorio**, **no necesariamente excluye otro tipo de evidencia**, **como puede ser la testifical**.

De entrada, debo recalcar que las pruebas de ADN, incluso cuando se utiliza tecnología moderna, no siempre garantizan un resultado 100% confiable. Sobre este particular, se ha expresado que:

> *[F]orensic DNA testing rarely occurs [under] idyllic conditions. **Crime scene DNA samples do not come from a single source obtained in immaculate conditions; they are messy assortments of multiple unknown persons, often collected in the most difficult conditions**. The samples can be of poor quality due to exposure to heat, light, moisture, or other degrading elements. They can be of minimal or insufficient quantity, especially as investigators push DNA testing to its limits and seek profiles from a few cells retrieved from cigarette butts, envelopes, or soda cans. **And most importantly, forensic samples often constitute a mixture of multiple persons, such that it is not clear whose profile is whose, or even how many profiles are in the sample at all. All of these***

*factors make DNA testing in the forensic context far more subjective than simply reporting test results . . . ."* Murphy, <u>The Art in the Science of DNA: A Layperson's Guide to the Subjectivity Inherent in Forensic DNA Typing</u>, 58 Emory L. J. 489, 497 (2008).

Es por esto que, "DNA testing alone does not always resolve a case. **Where there is enough other incriminating evidence and an explanation for the DNA result**, **science alone cannot prove a prisoner innocent**". *DA's Office v. Osborne*, 557 US 52, 62 (2009). (Énfasis nuestro). Por tanto, resulta indispensable evaluar la totalidad de la prueba que surgió de la investigación, y que culminó con la determinación de culpabilidad.

Además, el hecho de que un veredicto de culpabilidad no esté sustentado en prueba científica, como lo es el ADN, no implica que dicha determinación sea incierta, cuestionable o controvertible. Tal como sucede en el caso de autos, un acusado puede ser identificado por un testigo, siempre y cuando dicha identificación tenga suficientes garantías de confiabilidad. *Pueblo v. Mejías*, 160 DPR 86, 93 (2003). Por otro lado, conviene señalar que "[l]a evidencia directa de una persona testigo que merezca entero crédito es prueba suficiente de cualquier hecho, salvo que otra cosa se disponga por ley". Regla 110(D) de Evidencia, 32 LPRA Ap. IV.

Igual razonamiento se ha adoptado en la esfera federal, pues la Corte Suprema de los Estados Unidos ha expresado que, "[t]**he availability of technologies not available at trial cannot mean that every criminal conviction**, **or even every criminal conviction involving biological evidence**, **is suddenly in doubt**". *DA's Office v. Osborne*, *supra*, a la pág. 62. (Énfasis suplido).

**II.**

En el caso de marras, durante la celebración del juicio en su fondo, el Ministerio Público presentó el testimonio de varios testigos, incluyendo el de la menor Shakira Delgado Delgado, **quien identificó al Sr. Correa López en la escena del crimen**. **Dicho**

**testimonio fue escuchado y creído por un jurado**, el cual emitió veredicto de culpabilidad. No obstante, el peticionario pretende impugnar esta determinación mediante un Informe de ADN Mitocondrial, el cual contiene unos resultados **inconclusos** en cuanto a si el Sr. Correa López podría ser el donante de varios "pelos". Argumenta que, como hay dos "pelos" que lo excluyen como donante,[140] éste sería más inocente que culpable. Sin embargo, **el hecho de que se haya excluido como donante de estos dos "pelos" no implica que este nunca estuvo presente en la escena del crimen**. Primero, bajo su premisa, podríamos decir que la occisa Yadira Delgado Candelaria, como también fue excluida de ser la donante de estos dos "pelos", tampoco se encontraba en la escena del crimen. Esto sería un ridículo, considerando que la escena del crimen fue **su casa**, **lugar donde fue encontrada sin vida** por su propia hija. Segundo, el Informe de ADN Mitocondrial no excluye al Sr. Correa López, ya que, aunque es cierto que lo excluye como donante de los dos "pelos", **también indica que este pudiera ser el donante de otros "pelos" encontrados en la escena del crimen**.

Como ya indicamos, la prueba de identificación puede ser **testimonial**. El testimonio es un tipo de prueba y, a menudo, es la única evidencia que posee el juzgador al momento de tomar su determinación. Cuando el testigo declara bajo juramento y ante un juez, lo que expresa se considera verdadero, salvo que la otra parte lo refute a través de testimonios, pruebas o contrainterrogatorios. En ese sentido, el testimonio mediante el cual se identifica a una persona como el autor del delito es prueba que debe ser aquilatada por el juzgador de los hechos, ya sea un juez o un jurado.

En este caso, el juzgador de los hechos fue un jurado. Sus miembros, quienes desempeñan un papel vital en nuestro sistema

---

[140] Específicamente, se tratan de dos "pelos" levantados en la pared que se encuentra saliendo del baño.

judicial, defienden la justicia entre sus conciudadanos y trabajan junto al juez convirtiéndose en parte del tribunal mismo. Por lo tanto, se le da un gran sentido de confianza a su ejecución, y se le otorga entera deferencia a su determinación. Precisamente, por esta razón es que los veredictos de un jurado gozan de la presunción "de corrección y legalidad en el dictamen". E. Rivera García, Los Criterios de Revisión Judicial y su Aplicación en el Sistema Acusatorio en Compendio sobre el Sistema Acusatorio: Experiencias Compartidas, San Juan, Publicaciones Gaviotas, 2019, pág. 321.

Máxime, cuando "es norma establecida firmemente que los foros revisores no deben intervenir en la apreciación de la prueba hecha por el tribunal revisado en ausencia de pasión, prejuicio, parcialidad o un error manifiesto por parte del juzgador de los hechos". *Íd.*, a la pág. 325; *Pueblo v. Pérez Núñez*, 208 DPR 511, 512 (2022). Por ende, ante la ausencia de pasión, prejuicio o parcialidad, los foros apelativos debemos abstenernos de intervenir con la apreciación de la prueba hecha por el juzgador de primera instancia. Después de todo, "[n]o se debe ceder a la tentación dañina de descartar arbitrariamente ni revocar el criterio del foro sentenciador a menos que surja de la prueba admitida que no existe base suficiente que apoye la determinación". E. Rivera García, op. cit., pág. 329.

Ante la realidad de que la menor Shakira Delgado Delgado identificó al Sr. Correa López en la escena del crimen, y que el jurado le otorgó credibilidad a su testimonio, éste no debe ser menospreciado ante un Informe de ADN Mitocondrial que no excluye al Sr. Correa López, sino que contiene resultados inconclusos y no exculpatorios.

Felipe Rivera Colón
Juez de Apelaciones